**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| In Re: | Case No.:  19-32928-MER |
| Rancher's Legacy Meat Co., | Chapter 11 |
| Debtor. | |

## NOTICE OF **EXPEDITED** HEARING AND MOTION
## FOR INTERIM AND FINAL ORDERS AUTHORIZING
## USE OF CASH COLLATERAL AND GRANTING ADEQUATE PROTECTION

TO: Entities Specified in Local Rule 9013-3.

1.      Rancher's Legacy Meat Co. ("Debtor"), by and through its undersigned counsel,

moves the Court for the relief requested below and give notice of hearing.

### PRELIMINARY HEARING

2.      The Court will hold a hearing on the Motion at **9:00 a.m., on September 26,**

**2019,** in Courtroom No. 7W, at United States Courthouse, 300 South Fourth Street, Minneapolis,

Minnesota 55415.

3.      Any response to this motion must be filed and served prior to the hearing.

### FINAL HEARING

4.      The Court will hold a Final Hearing on the Motion at **9:00 a.m., on October 23,**

**2019,** in Courtroom No. 7W, at United States Courthouse, 300 South Fourth Street, Minneapolis,

Minnesota 55415.

5.      Any response to this motion must be filed and served not later than **October 18,**

**2019**, which is five (5) days before the time set for the Final Hearing (including Saturdays,

Sundays, and holidays). **UNLESS A RESPONSE OPPOSING THE MOTION IS TIMELY FILED, THE COURT MAY GRANT THE RELIEF REQUESTED IN THE MOTION WITHOUT A HEARING.**

6.      This Court has jurisdiction over this motion under 28. U.S.C. §§ 157 and 1334, Bankruptcy Rule 5005 and Local Rule 1070-1. This proceeding is a core proceeding. The petition commencing this case was filed on September 20, 2019 (the "Petition Date"). This case is now pending before this Court.

7.      This motion arises under 11 U.S.C. § 363 and Bankruptcy Rule 4001(b). This motion is filed under Bankruptcy Rules 9014 and Local Rules 4001-2 and 9013. By this motion Debtor seeks (i) expedited relief and (ii) interim and final orders authorizing use of "Cash Collateral" as defined in Section 363(a) of the Bankruptcy Code, that the Debtor is holding or may obtain, pursuant to Bankruptcy Code Sections 361 and 363 and Bankruptcy Rule 4001(b) as requested herein. The Debtor further seeks to grant replacement liens as adequate protection to the lenders with liens in the cash collateral. The grounds for this Motion are set forth below.

8.      The Debtor requests interim authorization to use cash collateral through and including the date of the Final Hearing ("Interim Period"). At least fourteen days prior to the Final Hearing, the Debtor will file a supplement to this Motion along with a proposed final order that will include an amended budget to reflect actual activity in the case and cash projections through the time period the Debtors will ultimately seek to use cash collateral on a final basis. The Debtor intends to address multiple issues during the first month of this case and will have a more accurate picture of future cash flows at the time of filing the aforementioned supplement.

9.      The Debtor's use of cash collateral is essential to its continued business operations and irreparable harm would result if it is deprived of the ability to use such cash collateral on an interim basis. Without immediate access to cash collateral, the Debtor would be at serious risk of shutdown due to strained liquidity. The Debtor needs the use of cash collateral to, among other things, pay its more than 30 employees, purchase inventory, and fulfill outstanding production obligations.

10.     Pursuant to Local Rule 9013-2(a), this Motion is accompanied by a memorandum of law, proposed order, and proof of service. Additionally, this Motion is supported by the Verified Statement of Arlyn Lomen pursuant to Local Rule 4001-2.

## BUSINESS OF DEBTOR

11.     Debtor is a meat processing business, providing meat products to customers in the upper Midwest area of the United States.

12.     As of September 20, 2019, the Debtor employed approximately 30 full-time employees.  The Debtor's corporate headquarters are located in Vadnais Heights, Minnesota.

13.     The Debtor's operations have suffered in recent years due to several factors.  The Debtor has experienced a recent downturn in the rendering business and stagnant sales. However, over the last several months the Debtor has operated on a positive cash flow basis.

14.     In response to the Debtor's financial difficulties, the Debtor's management spent a substantial period of time evaluating alternatives for maximizing value for all of the Debtor's constituencies.  After careful consideration and the exercise of sound business judgment, the Debtor concluded that a Chapter 11 filing was the only viable option.

15.     In order to preserve the value of its business enterprise pending the confirmation of a Plan of Reorganization or consummation of a sale of the Debtor's business operations, it is imperative that the Debtor continue to operate its business in as normal a fashion as possible.

3

**CREDITORS HOLDING SECURITY INTERESTS IN CASH COLLATERAL**

16.     The company was formed originally in 2010 by Joe Unger under the name Unger
Meat Company with the financial assistance of James L. Ratcliff  ("Ratcliff" or "Lender") and
the bank he controls, First National Bank of Vinita ("Vinita").  Mr. Unger ran the company in
building owned by James Ratcliff individually.  Mr. Ratcliff and Vinita provided financing for
the operations.  Unger Meat Company singed a promissory note in the principal amount of
$2,250,000.00 on December 3, 2010 ("First Note") and a second promissory note in the principal
amount of $11,885,000.00 on December 3, 2010 ("Second Note"). Copies of the First Note and
Second Note are attached as Exhibit A to the affidavit of Arlyn J. Lomen.

17.     Unger Meat Company granted a security interest in the assets of the business to
Ratcliff on December 3, 2010.  Mr. Ratcliff filed a UCC financing statement with the Minnesota
Secretary of State on December 29, 2010. A copy of the Security Agreement is attached as
Exhibit B to the affidavit of Arlyn J. Lomen.

18.     The First Note required monthly payments of $10,310.83.  The Second Note
required monthly payments of $94,006.83.

19.     The Debtor is indebted to. Ratcliff in the approximate principal amount of
$17,040,393.37 of the Petition Date. Ratcliff claims a lien in substantially all of the Debtor's
assets, including, a lien in inventory, accounts, equipment, general intangibles and all other
personal property of the Debtor.[1]

20.     Ratcliff perfected his security interest in the Debtor's assets by filing a UCC-1
Financing Statement filed on December 29, 2010, with the Minnesota Secretary of State as
Document No. 201022606390 and an UCC Financing Statement Amendment filed on January

---

[1] Nothing contained herein shall be construed as an admission by Debtor as to the validity
or perfection of any interests held by Ratcliff or any other lender.

24, 2011 as Document No. 20112290995. Copies of the two Financing Statements are attached as Exhibit C to the affidavit of Arlyn J. Lomen.

21.     Unger Meat Company changed its name to Rancher's Legacy Meat Co. by amendment to its Articles of Incorporation on May 6, 2014.

22.     Ratcliff filed a UCC-3 continuation statement on November 12, 2015, with the debtor listed as "Unger Meat Company" as Document No. 854026600022. A copy of the UCC-3 Continuation Statement is attached as Exhibit D to the affidavit of Arlyn J. Lomen.

23.     Ratcliff filed a second UCC-3 continuation statement on January 10, 2019, with the debtor listed as "Ranchers Legacy Meat Co." as Document No. 854026600022. A copy of the UCC-3 Continuation Statement is attached as Exhibit E to the affidavit of Arlyn J. Lomen.

24.     Debtor also singed a promissory note, with Upper Lakes Foods, Inc. ("ULF") as creditor, in the principal amount of $3,040,000.00 on September 3, 2016 ("ULF Note") Copies of the ULF Note are attached as Exhibit F to the affidavit of Arlyn J. Lomen.

25.     Debtor granted a security interest in the assets of the business to ULF on September 3, 2016.  ULF filed a UCC financing statement with the Minnesota Secretary of State on April 18, 2017. A copy of the ULF Security Agreement is attached as Exhibit G to the affidavit of Arlyn J. Lomen.

26.     The Debtor is indebted to ULF in the approximate principal amount of $2,964,000.00 as of the Petition Date. ULF claims a lien in substantially all of the Debtor's assets, including, a lien in inventory, accounts, equipment, general intangibles and all other personal property of the Debtor.

27.     ULF perfected its security interest in the Debtor's assets by filing a UCC-1 Financing Statement filed on April 18, 2017, with the Minnesota Secretary of State as Document

5

No. 9465175000058. ULF filed a UCC-3 Termination on February 26, 2019, but, upon

information and belief, has recently re-filed a UCC-1. Copies of the ULF Financing Statements

are attached as Exhibit H to the affidavit of Arlyn J. Lomen.

28.     As of the date of this Motion, neither Ratcliff nor ULF has consented to the use of

cash collateral. Ratcliff is under secured. Depending on a determination of relative priority, ULF

may or may not be under secured.

29.     The Debtor seeks authority to use cash collateral for the purposes and in the

approximate amounts set forth in the budget attached as Exhibit I to the Affidavit of Arlyn J.

Lomen.

## ESTIMATED COLLATERAL VALUE

30.     On the Petition Date and as of the date of the hearing on this Motion, the Debtor's

collateral has the following estimated value:

| | |
|---|---|
| Cash | $ 0 |
| Accounts | $ 1,489,000 |
| Inventory | $ 2,400,000 |
| Estimated Furniture Fixtures and Equipment | $ 9,114,240 |
| Total | **$ 13,003,240** |

31.     As of October 19, 2019, Debtor estimates that the Collateral's value, will be:

| | |
|---|---|
| Cash | $ 0 |
| Accounts | $ 1,500,000 |
| Inventory | $ 2,500,000 |
| Estimated Furniture Fixtures and Equipment | $ 9,120,200 |
| Total | **$ 13,120,000** |

32.     Pursuant to the requirements of 11 U.S.C. § 363(e) , the Debtor proposes as

adequate protection for Ratcliff and ULF as follows: (i) to grant replacement liens in the lenders'

respective collateral; and to (ii) report and account for the use of any cash proceeds by the

Debtor.

6

33.    The Debtor projects that it can operate profitably in the ordinary course with use of cash collateral.

34.    The Debtor proposes to grant Ratcliff and ULF replacement liens in any new post-petition assets generated by Debtor having the same dignity, priority and extent as existed on the Petition Date.

35.    Pending the final hearing, the Debtor has a need to use cash collateral through the Interim Period to pay operating expenses in the amounts identified in the Budget attached as Exhibit I. If the Debtor is not permitted to use cash collateral on an interim basis for the purposes set forth in the Budget from the Petition Date through the Interim Period, the Debtor will suffer immediate and irreparable harm.

36.    Prior to the final hearing on this Motion for an order authorizing use of cash collateral, and in settlement of any and all of the matters raised in this Motion, Debtor may enter into a stipulation with its lenders concerning use of cash collateral, adequate protection and other related matters. In the event Debtor enters into any such stipulation, Debtor will seek approval of the stipulation without further notice of hearing pursuant to Bankruptcy Rule 4001(d)(4), and **DEBTOR HEREBY GIVES NOTICE OF INTENT TO SEEK APPROVAL OF ANY SUCH STIPULATION.**

**EXPEDITED RELIEF**

37.    In order to operate in the ordinary course, preserve the going concern value of its operations and avoid immediate and irreparable harm the Debtor must have immediate authority to use cash collateral pending a final hearing scheduled for October 23, 2019. There is good cause to consider the preliminary relief on an expedited basis.

7

38.     The Debtor's next payroll is due to be funded on September 26, 2019. Without the use of cash collateral, at least through the Interim Period, Debtor will be unable to pay its employees' wages.

39.     The Debtor may offer additional evidence in support of this Motion, including the testimony of Arlyn J. Lomen, Debtor's President, and Rod Peterson, financial advisor to the Debtor, if such is necessary in connection with this Motion.

**WHEREFORE**, the Debtor moves the Court for an order:

A.  Authorizing use of cash collateral from the Petition Date through the Interim Period, in accordance with the proposed budget;

B.  Authorizing the Debtor to grant adequate protection as set forth in the Motion; and

C.  Such other relief as is just and equitable.

Dated: September 23, 2019                         **FOLEY & MANSFIELD, PLLP**


BY: /s/ Cameron A. Lallier
_____
   Thomas J. Lallier (#163041)
   tlallier@foleymansfield.com
   Cameron A. Lallier (#393213)
   clallier@foleymansfield.com
   250 Marquette Avenue, Suite 1200
   Minneapolis, MN  55401
   Telephone:  (612) 338-8788

   **ATTORNEYS FOR DEBTOR**

8

## VERIFICATION

I, Arlyn J. Lomen, President of Rancher's Legacy Meat Co., declare under penalty of perjury that the facts set forth in the preceding Motion are true and correct to the best of my knowledge, information, and belief.

Dated: September 19, 2019

_____
Arlyn J. Lomen

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

| In Re: | Case No.:  19-32928-MER |
|---|---|
| Rancher's Legacy Meat Co., | Chapter 11 |
| Debtor. | |

## MEMORANDUM OF LAW

This memorandum of law is submitted in support of the Motion for Interim and Final Orders Authorizing Use of Cash Collateral and Granting Adequate Protection filed by Rancher's Legacy Meat Co. ("Debtor"). A preliminary hearing has been scheduled for **9:00 a.m. on September 26, 2019**. A final hearing is scheduled on **October 23, 2019 at 9:00 a.m.**

## FACTS

The factual basis for this memorandum are set forth in the verified Motion and incorporated herein. All capitalized terms not defined herein have the meaning ascribed in the Motion.

## LEGAL ARGUMENT

Under the terms of Section 363(c) of Title 11 of the United States Code (the "Bankruptcy Code"), cash collateral use is authorized if certain conditions are met:

> (2)  The trustee may not use, sell or lease cash collateral under paragraph (1) of this subsection unless –
>
>> (A)  each entity that has an interest in such cash collateral consents; or
>>
>> (B)  the court, after notice and a hearing, authorized such use, sale or lease in accordance with the provisions of this section.

11 U.S.C. § 363(c)(2).

10

Subsection (e) of Section 363 provides that, at any time, on request of an entity that has

an interest in property proposed to be used by the debtor, "the court, with or without a hearing,

*shall* prohibit or condition such use . . . as is necessary to provide adequate protection of such

interest." 11 U.S.C. § 363(e)(emphasis added).

Under the terms of Section 361 of the Bankruptcy Code, when adequate protection is

required under section 363 of the Bankruptcy Code, such adequate protection may be provided

by, *inter alia*, "providing to such entity an additional or replacement lien to the extent that . . .

use, sale [or] lease [under Section 363] . . . results in a decrease in the value of such entity's

interest in such property." 11 U.S.C. § 361.

Rule 4001(a)(1) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules")

requires that a motion conditioning the use, sale or lease of property shall be made in accordance

with Bankruptcy Rule 9014 and shall be served on any committee appointed pursuant to

Section 1102 of the Bankruptcy Code or its authorized agent, or, if no committee of unsecured

creditors has been appointed, upon the holders of the 20 largest unsecured claims.  In accordance

with Bankruptcy Rule 4001(b)(1), a motion for use of cash collateral shall be made in

accordance with Bankruptcy Rule 9014 and shall be served on any entity which has an interest in

the cash collateral and on any committee appointed pursuant to Section 1102 of the Bankruptcy

Code or its authorized agent.  If no committee of unsecured creditors has been appointed, a

motion for use of cash collateral shall be served on the holders of the 20 largest unsecured

claims.

Finally, Local Rule 4001-2 requires that, in connection with a motion for use of cash

collateral, the debtor shall attach: 1) the debtor's calculation of the amount of debt secured by the

collateral; 2) the debtor's description of the collateral and estimate of the collateral's value on the

11

date of the filing of the petition and at the beginning of the period of time for which the debtors

seek authorization to use cash collateral; 3) the debtor's description of the collateral and estimate

of the collateral's value at the end of the period of time for which the debtor seeks authorization

to use cash collateral; and 4) the debtor's cash flow projections.

11 U.S.C. §363(c)(2) provides that a debtor may use cash collateral only with the consent

of each entity that has an interest in such cash collateral, or if the court, after notice and a

hearing, authorizes such use. Use of cash collateral must be restricted or conditioned as is

necessary to provide adequate protection to any entity that has an interest in the property which

the Debtor proposes to use. 11 U.S.C. §363(e). In this case, the Debtor proposes to use cash

collateral through the Interim Period, to the extent necessary to operate its business in the

ordinary course according to the Budget attached to the Motion as Exhibit I to the affidavit of

Arlyn J. Lomen. As adequate protection, the Debtor proposes to provide replacement liens and a

reporting of information to the Lender.  The Eighth Circuit Court of Appeals has stated:

> "In any given case, the bankruptcy court must necessarily (i) establish the value of the
> secured creditor's interest, (ii) identify the risk to the secured creditor's value resulting
> from the debtor's request for use of cash collateral, and (iii) determine whether the
> debtor's adequate protection proposal protects value as nearly as possible against risks to
> that value consistent with the concept of indubitable equivalence."

*In re Martin*, 761 F.2d 472, 476-77 (8th Cir. 1985).

The adequate protection offered by the Debtor satisfies the Bankruptcy Code

requirements for adequate protection.   In the present case, the Debtor has satisfied all of the

requirements under the Bankruptcy Code and the applicable rules.  The secured lenders, Ratcliff

and ULF,  have been afforded adequate protection from the use of cash collateral pursuant to the

terms of the Proposed Order.   In accordance with the terms of the Proposed Order, the secured

lenders will receive replacement liens in an amount equal to the Debtor's actual use of cash

12

collateral and any diminution in the value of the Lender's interest in the prepetition collateral

occurring on or subsequent to the Petition Date.  Consequently, the terms of Sections 361 and

363(c)(2) and (e) of the Bankruptcy Code have been satisfied.

## THE ASSERTED SECURITY INTERESTS OF RATCLIFF AND ULF ARE AVOIDABLE

The following facts are undisputed as it relates to Ratcliff's asserted security interest in

Rancher's assets: (i) Unger Meat Company executed and delivered to Ratcliff a Security

Agreement dated December 3, 2010, by which Unger Meat Company pledged and granted

Ratcliff a security interest in its ownership interest in all of Unger's equipment, inventory, lease

agreements, accounts receivable, furniture and fixtures, whether then owned or thereafter

acquired, together with all proceeds and products thereof and replacements therefor; (ii) Unger

Meat Company changed its name to Rancher's Legacy Meat Co. by amendment to its Articles of

Incorporation on May 6, 2014; (iii) Ratcliff filed a UCC continuation statement on November 12,

2015 with the debtor listed as "Unger Meat Company"; and (iv) Ratcliff did not file a debtor

name change to reflect the change in his debtor's name to Rancher's Legacy Meat Co. until

January 10, 2019.

The provisions of the Uniform Commercial Code governing this particular issue were

changed significantly in 2010. Previously the Uniform Commercial Code, in section 9-402

required the financing statement to contain the name, address, and signature of the debtor.  It did

not define what constituted the name.  Since the 2010 revisions, the definition of what constitutes

a sufficient name on the financing statement is specified and 9-506 specifies that an erroneous

name is seriously misleading unless the financing statement is saved by the safe harbor

provision.  The revised provisions of the Uniform Commercial Code, as adopted in Minnesota,

provide as follows:

13

336.9-503 NAME OF DEBTOR AND SECURED PARTY.

(a) Sufficiency of debtor's name. A financing statement sufficiently provides the name of the debtor:

>(1) except as otherwise provided in paragraph (3), if the debtor is a registered organization or the collateral is held in a trust that is a registered organization, only if the financing statement provides **_the name that is stated to be the registered organization's name_** on the public organic record most recently filed with or issued or enacted by the registered organization's jurisdiction of organization which purports to state, amend, or restate the registered organization's name;

(b) Additional debtor-related information. A financing statement that provides the name of the debtor in accordance with subsection (a) is not rendered ineffective by the absence of:

>(1) a trade name or other name of the debtor; or

>(2) unless required under subsection (a)(6)(B), names of partners, members, associates, or other persons comprising the debtor.

(c) Debtor's trade name insufficient. A financing statement that provides only the debtor's trade name does not sufficiently provide the name of the debtor.

336.9-506 EFFECT OF ERRORS OR OMISSIONS.

(a) Minor errors and omissions. A financing statement substantially satisfying the requirements of this part is effective, even if it has minor errors or omissions, unless the errors or omissions make the financing statement seriously misleading.

(b) Financing statement seriously misleading. Except as otherwise provided in subsection (c), a financing statement that fails sufficiently to provide the name of the debtor in accordance with section 336.9-503(a) is seriously misleading.

(c) Financing statement not seriously misleading. **_If a search of the records of the filing office under the debtor's correct name, using the filing office's standard search logic, if any, would disclose a financing statement_** that fails sufficiently to provide the name of the debtor in accordance with section 336.9-503(a), the name provided does not make the financing statement seriously misleading.

(d) Debtor's correct name. For purposes of section 336.9-508(b), the "debtor's correct name" in subsection (c) means the correct name of the new debtor.

336.9-507 EFFECT OF CERTAIN EVENTS ON EFFECTIVENESS OF FINANCING STATEMENT.

1182808 v1

(a) Disposition. A filed financing statement remains effective with respect to collateral that is sold, exchanged, leased, licensed, or otherwise disposed of and in which a security interest or agricultural lien continues, even if the secured party knows of or consents to the disposition.

(b) Information becoming seriously misleading. Except as otherwise provided in subsection (c) and section 336.9-508, a financing statement is not rendered ineffective if, after the financing statement is filed, the information provided in the financing statement becomes seriously misleading under section 336.9-506.

(c) *Change in debtor's name*. If the name that a filed financing statement provides for a debtor becomes insufficient as the name of the debtor under section 336.9-503 (a) so that the financing statement becomes seriously misleading under section 336.9-506:

> (1) the financing statement is effective to perfect a security interest in collateral acquired by the debtor before, or *within four months after*, the filed financing statement becomes seriously misleading; and

> (2) the financing statement is *not effective* to perfect a security interest in collateral acquired by the debtor more than four months after the filed financing statement becomes seriously misleading, unless an amendment to the financing statement which renders the financing statement not seriously misleading is filed within four months after the financing statement became seriously misleading.

Minn. Stat. §§ 336.9-503, 506 and 507 (*emphasis added*).

Case law analyzing the 2010 revisions to the Uniform Commercial Code remains in its infancy. However, at least one appellate court within the 8th Circuit has addressed the issue. *See*, *In re EDM Corp.*, 431 B.R. 459 (B.A.P. 8th Cir. 2010). After conducting a thorough analysis of the applicable provisions of the Uniform Commercial Code and prior 8th Circuit decisions, the *EDM Corp.* court concluded,

> In sum, we interpret § 9–503 to mean exactly what it says: if the debtor is a registered organization, then a financing statement "provides the name of the debtor" only if it "provides the name of the debtor indicated on the public record of the debtor's jurisdiction of organization"—*nothing more and nothing less.*

*Id*. at 466. (*emphasis added*)

It is worth noting that the *EDM Corp.* court found the secured lender was not validly perfected even though its UCC financing statement included the debtor's organizational name. The mere inclusion of a d/b/a name in addition to the debtor's organizational name was enough to negate perfection of the secured lender's asserted security interest. By comparison, here, Ratcliff filed his continuation statement in November 2015 under the completely wrong debtor's name. No UCC search for Rancher's Legacy Meat Co. would have revealed the financing statement that Ratcliff now seeks to have declared a valid, perfected, first priority lien on Rancher's assets.

On May 6, 2014 2014 Unger Meat Company became Rancher's Legacy Meat Co. Ratcliff was aware of the change of name.  When the name of the debtor on his security interest changed, Ratcliff was required to file an amendment within four months reflecting the name change to maintain perfection.  Ratcliff did not file a change of name amendment until January 10, 2019.

After September 6, 2014, the Ratcliff security interest remained perfected in the assets which existed on that date: all the equipment which was owned by Rancher's and fixed assets then possessed by Rancher's.  However, after September 6, 2014 Plaintiff's security interest was unperfected in all assets acquired after that date; inventory, accounts receivable, and equipment acquired by Rancher's after that date.

As to ULF, it filed a termination in February 2019. Upon information and belief ULF has recently re-filed its UCC-1. To the extent that is true, ULF's UCC-1 is avoidable as a preferential transfer. Accordingly, it is the Debtor's position that all asserted security interests against its accounts receivable and inventory will be avoided for the benefit of the estate.

16

## EXPEDITED RELIEF

Cause exists here to grant the Motion on an expedited basis. The liquidity to be provided through use of the cash collateral on an interim basis is essential to the Debtor's continued operations and the success of the Debtor's reorganization efforts, and is needed on the most urgent basis possible. Without use of the cash collateral, the Debtor would be at serious risk of a shutdown, which would likely lead to its liquidation, the loss of dozens of jobs, and severe prejudice to its creditors. The expenditures the Debtor proposes to make between the preliminary hearing and the final hearing are described in the budget submitted with the Motion. Without the ability to pay operational expenses outlined in the budget, the Debtor will not be able to conduct its business. Accordingly, the expedited relief requested is necessary to avoid immediate and irreparable harm.

## CONCLUSION

The Debtor respectfully requests that an order be entered granting this Motion granting expedited relief and authorizing the use of cash collateral in accordance with the terms of the budget attached to the affidavit of Arlyn J. Lomen and authorizing the Debtor to grant replacement liens as adequate protection as set forth in the Motion.

Dated: September 23, 2019    **FOLEY & MANSFIELD, PLLP**

BY: /s/ Cameron A. Lallier
Thomas J. Lallier (#163041)
Cameron A. Lallier (#393213)
250 Marquette Avenue, Suite 1200
Minneapolis, MN 55401
Telephone: (612) 338-8788

**ATTORNEYS FOR DEBTOR**

1182808 v1

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

| In Re: | Case No.:  19-32928-MER |
|---|---|
| Rancher's Legacy Meat Co., | Chapter 11 |
| Debtor. | |

## UNSWORN DECLARATION OF ARLYN J. LOMEN IN SUPPORT OF MOTION FOR ENTRY OF AN ORDER GRANTING EXPEDITED RELIEF FOR INTERIM AND FINAL ORDERS AUTHORIZING USE OF CASH COLLATERAL AND GRANTING ADEQUATE PROTECTION

Arlyn J. Lomen, under penalty of perjury, states as follows:

I am the President of Ranchers Legacy Meat. Co. ("Rancher's"). I make this unsworn declaration in support of the Debtor's Motion for Interim and Final Orders Authorizing Use of Cash Collateral and Granting Adequate Protection.

1.      I am familiar with Rancher's assets, debts and operations.

2.      Rancher's was founded in 2010 and was formally known as Unger Meat Company.

3.      The Debtor is indebted to James L. Ratcliff ("Ratcliff") in the approximate principal amount of $17,040,393.37 as of the Petition Date. Ratcliff claims a lien in substantially all of Rancher's assets, including, a lien in inventory, accounts, equipment, general intangibles and all other personal property of Rancher's.[1]

---

[1] Nothing contained herein shall be construed as an admission by Debtor as to the validity or perfection of any interests held by the Lender.

1182808 v1

4.      Rancher's executed two promissory notes, each dated December 3, 2010, in favor of Ratcliff in the amounts of $11,885,000.00 and $2,250,000.00, respectively. Copies of the two promissory notes are attached hereto as Exhibit A.

5.      Rancher's executed a Security Agreement in favor of Ratcliff to secure the two Promissory Notes on December 3, 2010.  The Security Agreement granted Ratcliff a lien in substantially all of the Rancher's assets. A copy of the Security Agreement is attached hereto as Exhibit B.

6.      Ratcliff perfected its security interest in Rancher's assets by filing a UCC-1 Financing Statement filed on December 29, 2010, with the Minnesota Secretary of State as Document No. 201022606390 and an UCC Financing Statement Amendment filed on January 24, 2011 as Document No. 20112290995. Copies of the two Financing Statements are attached hereto as Exhibit C.

7.      Unger Meat Company changed its name to Rancher's Legacy Meat Co. by amendment to its Articles of Incorporation on May 6, 2014.

8.      Ratcliff filed a UCC-3 continuation statement on November 12, 2015, with the debtor listed as "Unger Meat Company" as Document No. 854026600022. A copy of the UCC-3 Continuation Statement is attached as Exhibit D.

9.      Ratcliff filed a second UCC-3 continuation statement on January 10, 2019, with the debtor listed as "Rancher's Legacy Meat Co." as Document No. 854026600022. A copy of the UCC-3 Continuation Statement is attached as Exhibit E.

10.      Debtor also singed a promissory note, with Upper Lakes Foods, Inc. ("ULF") as creditor, in the principal amount of $3,040,000.00 on September 3, 2016 ("ULF Note") Copies of the ULF Note are attached as hereto as Exhibit F.

19

11.     Debtor granted a security interest in the assets of the business to ULF on September 3, 2016.

12.     ULF filed an UCC financing statement with the Minnesota Secretary of State on April 18, 2017. A copy of the ULF Security Agreement is attached hereto as Exhibit G.

13.     The Debtor is indebted to ULF in the approximate principal amount of $2,964,000.00 as of the Petition Date.

14.     ULF claims a lien in substantially all of the Debtor's assets, including, a lien in inventory, accounts, equipment, general intangibles and all other personal property of the Debtor.

15.     ULF perfected its security interest in the Debtor's assets by filing a UCC-1 Financing Statement filed on April 18, 2017, with the Minnesota Secretary of State as Document No. 9465175000058. Copies of the ULF Financing Statements are attached hereto as Exhibit H.

16.     The Debtor seeks authority to use cash collateral for the purposes and in the approximate amounts set forth in the budget attached hereto as Exhibit I.

17.     Rancher's estimates at the time of the Petition Date (which is also the date of the proposed beginning use of cash collateral), the value of the Rancher's accounts receivable and inventory (collectively, the "Cash Collateral") is $3,889,000.00, consisting of accounts receivable of $1,489,000.00 and inventory of $2,400,000.00.  Rancher's anticipates generating Cash Collateral on and after the Petition Date to the close of business on October 19, 2019 in amounts equal than or greater to the amount of Cash Collateral used by Rancher's in the same period.  Rancher's estimates at the close of business on October 19, 2019 the value of the Rancher's accounts receivable and inventory will be $4,000,000.00, consisting of accounts receivable of $1,500,000.00 and inventory of $2,500,000.00.

18.     Rancher's needs the use of Cash Collateral to meet its operating expenses.

19.    From and after the Petition Date through the Interim Period, Rancher's requires cash for the items and in the amounts specified on budget attached hereto as Exhibit I.  Exhibit I contains only those amounts as are necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

20.    Rancher's will suffer immediate and irreparable harm if Rancher's is unable to use cash collateral.

21.    I declare under penalty of perjury that the foregoing is true and correct according to the best of my knowledge, information and belief.

Dated:  September 19, 2019

_____
Arlyn J. Lomen, President

# PROMISSORY NOTE

$11,885,000                                                    4301 White Bear Parkway
5% (Indexed)                                                 Vadnais Heights, MN 55110
                                                                December 3, 2010

FOR VALUE RECEIVED, Unger Meat Company, a Minnesota corporation ("Maker"),
promises to pay to the order of James L. Ratcliff ("Holder"), at the address of 24631 South Hwy. 2,
Vinita, Oklahoma, 74301, or at such other place as the Holder may designate and notify the
undersigned, in lawful money of the United States, and in immediately available funds, the principal
sum of $11,885,000, together with interest at the initial rate of five percent (5%) per annum.

1.       Principal payments on this Promissory Note shall be deferred for eighteen (18)
months from the date hereof.  During said eighteen-month period, interest shall be payable in
eighteen (18) monthly installments. The first monthly installment shall be $49,512.85 commencing
on January 3, 2011.  The final installment of interest only will be due on June 3, 2012.  Interest rates
and payment amounts shall be subject to adjustment as provided below.

2.       Monthly principal and interest payments on this Promissory Note shall commence
becoming due and payable commencing nineteen (19) months after the date hereof, the first such
payment of principal and interest in the sum of $94,006.83 (subject to index adjustment as set forth
below) will be due and owing on July 3, 2012, with successive installments in said amount being due
on the first day of each month thereafter until July 3, 2017, at which time the entire unpaid balance
of principal and interest shall be due and payable in full.

3.       The interest rate on all sums owing under the terms of this Promissory Note shall be
adjusted in the same manner and upon the same effective dates as provided by the Loan Application

Page 1

**Exhibit A**

and Debt Modification Agreement by and between James L. Ratcliff and James N. Ratcliff as

borrowers and Arvest Bank as lender attached hereto as Exhibit "A" and made a part hereof by

reference. Interest after default and late penalties under the terms of this Promissory Note shall occur

at the same rate and manner as specified by the said Exhibit "A" Loan Application and Debt

Modification Agreement.

    4.    Maker acknowledges that this Promissory Note is secured pursuant to the terms of

the Security Agreement executed by Maker, in which Maker grants a security interest in and to all

of its assets including, but not limited to, its equipment, tools, inventory, accounts receivable and

other intangibles. Maker further acknowledges that this Promissory Note is secured by the Personal

Guaranty of Joe Unger.

    5.    In the event:

        a.    Maker fails to pay and installment payment that is due and payable on or
before the date such payment is due;

        b.    Maker neglects to comply with any of the terms or provisions of this
Promissory Note;

        c.    Maker defaults or neglects to comply with any of the terms of any other
promissory note or other agreement between Maker and Holder;

        d.    Maker fails to comply with any of the terms or provisions of the Security
Agreement or Guaranty referenced above.

        e.    Maker executes or makes an assignment for the benefit of his creditors and/or
a receiver or trustee is appointed for his creditors or the Maker is unable
generally to pay his debts as they become due;

        f.    Any proceedings are commenced relating to the Maker under any bankruptcy,
insolvency, readjustment of debt, dissolution or liquidation statutes or any
jurisdiction now or hereafter in effect; or

**Exhibit A**

g.   There is a seizure and sale, or post-judgment attachment or post-judgment judicial process upon all or a substantial part of the property of the Maker,

then Holder, upon the occurrence of any such event may, at his sole option, declare any or all of the indebtedness evidenced by this Promissory Note to be immediately due and payable, and Holder be entitled to exercise any and all rights and remedies that the he has against Maker.

6.   Maker hereby waives presentment for payment, demand, notice of nonpayment, protest, and notice of protest, and agrees that the time of payment hereby may be extended from time to time, one or more times without notice of such extension or extensions and without previous consent. No delay on the part of Holder in exercising any rights hereunder shall operate as a waiver of such rights, nor shall any single or partial exercise of any power or right hereunder preclude other or further exercise of any power or right hereunder.

7.   If this Promissory Note is placed in the hands of any attorney for collection, the Maker agrees to pay to Holder, in addition to the unpaid principal and interest due hereon, all costs of collection, including, but not limited to, reasonable attorney's fees and all court costs incurred.

8.   This Promissory Note has been executed and delivered in, and its terms and conditions are to be governed and construed by, the laws of the State of Minnesota.

9.   This Promissory Note shall be binding upon the successors and assigns of Maker.

10.   This Promissory Note may be assigned without the consent of the Maker.

Dated and signed this 3rd day of December, 2010.

"MAKER"
Unger Meat Company

By: _____
Joe Unger, President

Page 3

**Exhibit A**

## PROMISSORY NOTE

$2,250,000                                          4301 White Bear Parkway
5.5% (Indexed)                                      Vadnais Heights, MN 55110
                                                    December 3, 2010

FOR VALUE RECEIVED, Unger Meat Company, a Minnesota corporation ("Maker"), promises to pay to the order of James L. Ratcliff ("Holder"), at the address of 24631 South Hwy. 2, Vinita, Oklahoma, 74301, or at such other place as the Holder may designate and notify the undersigned, in lawful money of the United States, and in immediately available funds, the principal sum of $2,250,000, together with interest at the initial rate of five percent (5.5%) per annum.

1.      Principal payments on this Promissory Note shall be deferred for eighteen (18) months from the date hereof. During said eighteen-month period, interest shall be payable in eighteen (18) monthly installments. The first monthly installments shall be $10,310.83 commencing on January 3, 2011. The final installment of interest only will be due on June 3, 2012.

2.      Principal and interest payments on this Promissory Note shall become due and payable commencing nineteen (19) months after the date hereof, the first such payment of principal and interest in the sum of $18,388.83 (subject to adjustment or set forth below) will be due and owing on July 3, 2012, with successive installments in said amount being due on the first day of each month thereafter until June 3, 2017, at which time the entire unpaid balance of principal and interest shall be due and payable in full.

3.      Interest on all sums owing under the terms of this Promissory Note shall be subject to adjustment in the amounts and on the effective dates that the interest rate on the sums owing under the terms of that certain Promissory Note given by James L. Ratcliff as maker to American Bank of

**Exhibit A**

Oklahoma dated November 24, 2010, and attached hereto and made a part hereof by reference shall occur. Interest after default and late payments under the terms of this Note shall be charged in the same manner as specified by the aforesaid Exhibit "A" Promissory Note from James L. Ratcliff to American Bank of Oklahoma.

4.    In the event:

a.    Maker fails to pay and installment payment that is due and payable on or before the date such payment is due;

b.    Maker neglects to comply with any of the terms or provisions of this Promissory Note;

c.    Maker defaults or neglects to comply with any of the terms of any other promissory note or other agreement between Maker and Holder;

d.    Maker fails to comply with any of the terms or provisions of the Security Agreement or Guaranty referenced above.

e.    Maker executes or makes an assignment for the benefit of his creditors and/or a receiver or trustee is appointed for his creditors or the Maker is unable generally to pay his debts as they become due;

f.    Any proceedings are commenced relating to the Maker under any bankruptcy, insolvency, readjustment of debt, dissolution or liquidation statutes or any jurisdiction now or hereafter in effect; or

g.    There is a seizure and sale, or post-judgment attachment or post-judgment judicial process upon all or a substantial part of the property of the Maker,

then Holder, upon the occurrence of any such event may, at his sole option, declare any or all of the indebtedness evidenced by this Promissory Note to be immediately due and payable, and Holder be entitled to exercise any and all rights and remedies that the he has against Maker.

5.    Maker hereby waives presentment for payment, demand, notice of nonpayment, protest, and notice of protest, and agrees that the time of payment hereby may be extended from time

**Exhibit A**

to time, one or more times without notice of such extension or extensions and without previous consent. No delay on the part of Holder in exercising any rights hereunder shall operate as a waiver of such rights, nor shall any single or partial exercise of any power or right hereunder preclude other or further exercise of any power or right hereunder.

6.    If this Promissory Note is placed in the hands of any attorney for collection, the Maker agrees to pay to Holder, in addition to the unpaid principal and interest due hereon, all costs of collection, including, but not limited to, reasonable attorney's fees and all court costs incurred.

7.    This Promissory Note has been executed and delivered in, and its terms and conditions are to be governed and construed by, the laws of the State of Minnesota.

8.    This Promissory Note shall be binding upon the successors and assigns of Maker.

9.    This Promissory Note may be assigned without the consent of the Maker.

Dated and signed this 3rd day of December, 2010.

 

 

"MAKER"
Unger Meat Company

By: _____
Joe Unger, President

 

**Exhibit A**

Loan 24-125300

# PROMISSORY NOTE – Fixed or Variable Rate – Real Estate – General

DATE OF NOTE
11/24/2010

| DEBTOR'S NAME(S) | LENDER'S NAME AND ADDRESS |
|---|---|
| James L. Ratcliff | AMERICAN BANK OF OKLAHOMA<br>Collinsville<br>P.O. Box 66<br>Collinsville, OK 74021-0066 |

DEBTOR'S ADDRESS
P.O. Box 402
Vinita, OK 74301

| NOTE NUMBER | MATURITY DATE | PRINCIPAL AMOUNT | CUSTOMER NUMBER | OFFICER | SOCIAL SECURITY/TIN NUMBER | ☒ACTUAL/SS ☐TIN/SS |
|---|---|---|---|---|---|---|
| 24-265300 | 11/24/2011 | $2,000,000.00 | | JAL | 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 | ☒ACTUAL/SS |

| ☐FIXED INTEREST RATE PER ANNUM | ☒VARIABLE INTEREST RATE INDEX | | VARIABLE RATE INDEX | MAXIMUM PER ANNUM INTEREST RATE CHANGE |
|---|---|---|---|---|
| | PRESENT INDEX RATE ........... 3.250 % | | Wall Street Journal Prime | once a day |
| | MARGIN OVER/UNDER INDEX ... 2.000 % | | | MINIMUM INTEREST RATE  5.500 % |
| | INITIAL PER ANNUM RATE ........ 5.500 % | | | MAXIMUM INTEREST RATE  21.000 % |

| ☐NEW LOAN | 24-2471000 | PURPOSE OF LOAN |
|---|---|---|
| ☒RENEWAL OF LOAN NUMBER(S) | | Cattle operation expense until Spring & operating |
| ☐FULLY ADVANCED  ☐MULTIPLE ADVANCES  ☒REVOLVING CREDIT | | expense for Minnesota meat packing plants Originally |
| COLLATERAL DESCRIPTION | | Cattle Operating Expense |
| 1st RE Mtg on at 35996 Oak Tree Drive Ketchum OK, Delaware County | | |

PAYMENT TERMS
Demand or in absence of demand; This note is payable in payments of all accrued interest due quarterly beginning February 24, 2011, a final payment of
outstanding principal plus all accrued interest shall be due and payable on November 24, 2011.

**PROMISE TO PAY.** For value received, the undersigned Debtor, whether one or more, and jointly and severally if more than one, agrees to the terms of this Note and promises to pay at the office of the Lender named above at its place of business as indicated in this Note or such other place as may be designated in writing by Lender, the Principal Amount of this Note and any accrued and unpaid Finance Charges, together with interest on the unpaid Principal Amount until Maturity at the per annum interest rate(s) stated above and according to the payment terms stated above. Depending on the box checked above, interest on this Note is calculated either on the assumption that every year has 360 days and every month has 30 days (30/360) or on the actual number of days elapsed on a basis of a 360 day year (Actual/360) or a 365 day year (Actual/365). For purposes of computing interest and determining the date principal and interest payments are received, all payments will be deemed made only when received in collected funds. Payments are applied first to accrued and unpaid interest and other charges, and then to payment of the unpaid principal balance. In this Note, "Debtor" includes any party liable under this Note, including endorsers, co-makers, guarantors and otherwise, and "Lender" includes all subsequent holders.

**VARIABLE RATE.** If this is a Variable Rate transaction as indicated above, the interest rate shall vary from time to time with changes (whether increases or decreases) in the Index Rate shown above. The interest rate on this Note will be the Index Rate plus a Margin, if any, as indicated above. Each change will become effective on the same date the Index Rate changes unless a different effective date is indicated above. If the Index Rate is Lender's base or prime rate, it is determined by Lender in its sole discretion, primarily on a basis of its cost of funds, is not necessarily the lowest rate Lender is charging its customers, and is not necessarily a published rate.

**LATE PAYMENTS.** When permitted by law, any principal and/or interest amount not paid within 10 calendar days after the due date will be assessed the greater ____ of $.00 ____ or 5.000 ____% of the amount past due, as a late charge fee, with a minimum fee of $31.00 ____. At any time after the maturity date, Lender may at its sole discretion raise the interest rate on any unpaid principal and/or interest to the applicable rate stated in this Note plus NA ____ per annum ("Default Rate"). In no event shall the interest rate and related charges either before or after maturity be greater than permitted by law.

**ALL PARTIES PRINCIPALS.** All Debtors shall each be regarded as a principal and each Debtor agrees that any party to this Note, with Lender's approval and without notice to any other party, may from time to time renew this Note or consent to one or more extensions or deferrals of the Maturity Date for any term(s) or to any other modification(s), and all Debtors shall be liable in same manner as on the original note.

**ADVANCES AND PAYMENTS.** If the Fully Advanced box is checked, then the Debtor acknowledges that the entire Principal Amount has been advanced to the Debtor or for Debtor's account or benefit. For Multiple Advances or Revolving Credit, unless otherwise agreed in writing, Lender has not made a commitment to make any advances and has sole discretion to make, or not

make, each advance under this Note. If the Multiple Advances box is checked, then the Debtor understands that the Lender will disburse the proceeds of this Note in installments, up to the Principal Amount, but that once if the Debtor prepays, the Debtor has no right to reborrow any amounts disbursed. The balance that the Debtor owes under this Note is the aggregate of all such disbursements, less any payments of principal made on this Note. Interest will accrue only on the actual amount of principal disbursed and outstanding from time to time. If the Revolving Credit box is checked, then the Debtor understands that the Lender will disburse the proceeds of this Note in increments up to the Principal Amount and that the remaining terms of this paragraph shall apply to this Note. The balance that the Debtor owes under this Note is the aggregate of all such disbursements, less any payments of principal made on this Note. The Debtor understands that the maximum amount of all advances outstanding at any one time cannot exceed the Principal Amount, but that the Debtor may repay and reborrow up to the Principal Amount during the term of this Note. If the aggregate outstanding amount advanced under this Note ever exceeds the Principal Amount, then the Debtor will repay the excess upon demand, plus interest on the excess. There may be times when no principal is outstanding on this Note, but this Note and any collateral securing this Note remain valid and effective as to future advances under this Note. Any loans or advances the Lender makes to the Debtor or for the Debtor's account or benefit are presumed to be made under the terms of this Note. The Lender may make advances under this Note at the oral or written request of any person designated or authorized by the Debtor revokes such designation or authorization in writing received by the Lender, provided that the Lender has this right, but is not obligated, to require written authorization from the Debtor prior to honoring any oral request. Interest will accrue only on the actual amount of principal disbursed and outstanding from time to time.

**PREPAYMENT.** Debtor shall have the right to prepay all or any part of the principal due under this Note at any time, subject to the following conditions: (a) all interest must be paid through the date of any prepayment; (b) if this Note provides for monthly or other periodic payments, there will be no change in the due dates or amounts following any partial prepayments unless Lender agrees to such changes in writing; and (c) upon prepayments, in whole or in part, Lender may charge and Debtor agrees to pay a fee or premium calculated as follows (this fee/premium provision will not apply if prohibited by applicable law):

**COLLATERAL.** This Note is secured by real property and the debt evidenced by this Note and all other obligations of Debtor to Lender, including renewals and extensions, are secured by all collateral securing this Note and by all other security interests and mortgages previously or later granted to Lender as more specifically described in security agreements, mortgages and other securing documentation, and by all money, deposits and other property owned by any Debtor and in Lender's possession or control.

DEBTOR(S) SIGNATURE(S)

X *[signature]* James L. Ratcliff

Form 95 0436 2

© Copyright 07/06 American Ba...

EXHIBIT
A

Exhibit A

ADDITIONAL PROVISIONS ON REVERSE SIDE

DEBTOR EXPRESSLY AGREES:

## ADDITIONAL PROVISIONS

ACCELERATION. At option of Lender, the unpaid balance of this Note and all other obligations of Debtor to Lender, whether direct or indirect, absolute or contingent, now existing or later arising, shall become immediately due and payable without notice or demand, upon or after the occurrence or existence of any of the following events or conditions; (a) any payment required by this Note or by any other note or obligation of Debtor to Lender or to others is not made when due, or any event or condition occurs or exists which results in acceleration of the maturity of any Debtor's obligation to Lender or to others under any promissory note, agreement or undertaking; (b) Debtor defaults in performing any covenant, obligation, warranty or provision contained in any loan agreement or in any instrument or document securing or relating to this Note or any other note or obligation of Debtor to Lender or to others; (c) any warranty, representation, financial information or statement made or furnished to Lender by or on behalf of Debtor proves to have been false in any material respect when made or furnished; (d) any levy, seizure, garnishment or attachment is made against any asset of any Debtor; (e) Lender determines, at any time and in Lender's sole discretion, that the prospect of payment of this Note is impaired; (f) whenever, in Lender's sole judgment, the collateral for the debt evidenced by this Note becomes unsatisfactory or insufficient either in character or value and, upon request, Debtor fails to provide additional collateral as required by Lender; (g) all or any part of the collateral for the debt evidenced by this Note is lost, stolen, substantially damaged or destroyed; (h) any Debtor dies or becomes incompetent, insolvent, dissolves, changes ownership or senior management, or terminates their existence; or (i) a receiver is appointed over all or part of any Debtor's property, or any Debtor makes an assignment for the benefit of creditors, files for relief under any bankruptcy or insolvency laws, or becomes subject to an involuntary proceeding under such laws. Upon the occurrence of any event described above, Lender may, at its option and with or without accelerating the Note, increase the Interest Rate on this Note to the Default Rate provided herein.

RIGHT OF OFFSET. Except as otherwise restricted by law, any indebtedness due from Lender to Debtor, including, without limitation, any deposits or credit balances due from Lender, is pledged to secure payment of this Note and any other obligation to Lender of Debtor, and may at any time while the whole or any part of such obligation(s) remain(s) unpaid, either before or after maturity of this Note, be set off, appropriated, held or applied toward the payment of this Note or any other obligation to Lender by any Debtor.

ADDITIONAL PROVISIONS. (1) Debtor agrees, if requested, to furnish to Lender copies of income tax returns as well as balance sheets and income statements for each fiscal year following Date of Note and at more frequent intervals as Lender may require. (2) No waiver by Lender of any payment or other right under this Note or any related agreement or documentation shall operate as a waiver of any other payment or right. All Debtors waive presentment, notice of acceleration, notice of dishonor and protest and consent to substitutions, releases and failure to perfect as to collateral and to additions or releases of any Debtor. (3) This Note and the obligations evidenced by it are to be construed and governed by the laws of the state indicated in Lender's address shown in this Note. (4) All Debtors agree to pay costs of collection, including, as allowed by law, an attorney's fee equal to a minimum of 15% of all sums due upon default or such other maximum fee as allowed by law. (5) All parties signing below acknowledge receiving a completed copy of this Note and related documents, which contain the complete and entire agreement between Lender and any party liable for payment under this Note. No variation, condition, modification, change or amendment to this Note or related documents shall be binding unless in writing and signed by all parties. No legal relationship is created by the execution of this Note and related documents except that of debtor and creditor or as stated in writing.

Form 01-0466 3

© Copyright 076 American Bank Systems, Inc.

**Exhibit A**

## SECURITY AGREEMENT

THIS SECURITY AGREEMENT is executed and delivered as of this 3rd day of December, 2010, by UNGER MEAT COMPANY, a Minnesota corporation (the "Debtor"), to JAMES L. RATCLIFF (the "Secured Party"), with reference to the following facts:

A.    Debtor and Secured Party have entered into a transaction whereby Secured Party financed the purchase price and acquisition of all of Debtor's business assets;

B.    Debtor and Secured Party have entered into a second transaction whereby Secured Party has provided additional working capital for Debtor's benefit;

C.    Debtor has executed two promissory notes dated December 3, 2010 in favor of Secured Party which evidence the financing arrangement described in paragraph A. above; and

D.    Debtor and Secured Party desire to enter into this Security Agreement to secure payment of the debt evidenced by the two promissory notes as owed to Secured Party arising from the purchase of such business assets, together with any and all other debts owing from Debtor to Secured Party.

NOW, THEREFORE, in consideration of the foregoing, the mutual covenants herein contained, and other fair and valuable considerations, the receipt and adequacy of which are hereby acknowledged, Debtor and Secured Party agree as follows:

1.    <u>Secured Interest</u>.  Debtor does hereby grant, bargain, sell, and convey unto Secured Party a purchase money security interest in and to all of Debtor's equipment, including but not limited to the equipment described on Exhibit "1" hereto, inventory, lease agreement, accounts receivable, furniture and fixtures, whether now owned or hereafter acquired, together with all proceeds and products thereof and replacements therefor (hereafter the "Collateral").

2.    <u>Obligations Secured</u>.  The security interest created hereby is given to secure the due, punctual and complete performance by Debtor of all Debtor's obligations now or hereafter owed to Secured Party.

3.    <u>Representations and Warranties</u>.  Debtor does hereby represent and warrant to Secured Party as follows:

a.    <u>Ownership of Collateral</u>.  Debtor is the owner of the Collateral and is not prohibited by contract or otherwise from subjecting the same to the security interest created hereby.  Immediately prior to the execution of this Security

Page 1

**Exhibit B**

Agreement the Collateral is free and clear of all security interests and encumbrances of every nature.

b.  Financing Statements. Debtor will execute and deliver to Secured Party such certificates and other documents or instruments as may be necessary to enable Secured Party to perfect the security interest created hereby including, without limitation, such financing statements, certificates and other documents as may be necessary to perfect the security interest created hereby in any collateral hereafter acquired by Debtor or in any replacement or proceeds of the Collateral.

4.  Affirmative Covenants. Until this Agreement is terminated, Debtor covenants that it shall:

a.  Notify Secured Party in writing, promptly upon Debtor's learning thereof, of any litigation or the institution of any suit or administrative proceeding which may materially and adversely affect Debtor's financial condition or Secured Party's security interest in the Collateral, whether or not the claim is considered by Debtor to be covered by insurance;

b.  Maintain the Collateral, as the same is constituted from time to time, free and clear of all liens, claims, security interests and encumbrances;

c.  Notify Secured Party, in writing, promptly upon Debtor's learning of any violation of any law, statute, regulation or ordinance of any governmental entity, or of any agency thereof, applicable to Debtor which violation in any respect may materially and adversely affect the Collateral or Debtor' property, assets, operations or condition, financial or otherwise; and

d.  Notify Secured Party in writing, within thirty (30) days after the occurrence thereof, of Debtor's default under any note, indenture, loan agreement, mortgage, lease, deed or other similar agreement to which Debtor are a party or by which Debtor are bound.

5.  Negative Covenants. Without Secured Party's prior written consent, until this Agreement is terminated, Debtor covenants that it shall not:

a.  Enter into any transaction which materially and adversely affects the Collateral or Debtor's ability to repay all obligations owed to Secured Party;

b.  Encumber, pledge, mortgage, grant a security interest in, assign, sell, lease or otherwise dispose of or transfer, whether by sale, merger, consolidation,

Page 2

**Exhibit B**

liquidation, dissolution, or otherwise, outside the ordinary course of business, any of the Collateral without Secured Party's consent in writing.

c.      Declare or pay any dividend or bonus with respect to the stock of the Debtor.

d.      Pay any salary, bonus, consulting fee or other payment of any description to the officers and directors of Debtor apart from the salaries and benefits detailed at Exhibit "2" hereto.

6.      <u>Term</u>. This Agreement shall terminate upon Debtor's full performance, payment and satisfaction of the obligations owed to Secured Party.

7.      <u>Insurance</u>. Debtor shall insure the Collateral in Secured Party's name against loss or damage by accident, fire, theft, burglary, pilferage, loss in transit and such other hazards as Secured Party shall specify in amounts and under policies by insurers acceptable to Secured Party, and all premiums thereon shall be paid by Debtor and the policies or a certificate thereof signed by the insurer shall be delivered to Secured Party. Each such policy shall name Secured Party as an additional named insured, and shall provide that such policy may not be amended or canceled without thirty (30) days prior written notice to Secured Party. If Debtor fails to do so, Secured Party may (but shall not be required to) procure such insurance and charge the cost to Debtor's account as part of the obligations secured by the Collateral. Copy of page 1 showing terms of insurance and showing Secured Party as additional insureds shall be provided to Secured Party upon each renewal.

8.      <u>Default</u>. Debtor shall be in default hereunder in the event Debtor fails to punctually and completely satisfy all of Debtor's obligations to Secured Party embodied in any promissory note or otherwise or in the event of a failure by Debtor to comply with any term, covenant or condition of this agreement. Debtor will be provided a ten-day (10) grace period for all installment payments on the promissory note, and payment within such grace period will not be considered an Event of Default. Otherwise, the occurrence of any such events shall herein be referred to as an "Event of Default".

9.      <u>Remedies</u>. If an Event of Default occurs, Secured Party shall have all remedies available under law. Without limitation of the foregoing, at the request of Secured Party, Debtor will assemble the Collateral and make it available to Secured Party at a place designated by Secured Party. Debtor agrees that a period of five days from the time the notice is sent shall be a reasonable period for notification of any sale or other disposition of Collateral by the Secured Party. Debtor agrees to pay, on demand, the amount of all expenses for storing and selling the Collateral, and Debtor further agrees that if this Security Agreement, or any obligation secured by it, is referred to an attorney for protecting or defending the priority of Secured Party's interest or for enforcing any of the provisions thereof, Debtor shall pay a reasonable attorneys' fee, all court costs, and all costs incurred by Secured Party in the taking possession of, preservation, maintenance, and sale of the Collateral, which amounts shall be deemed a portion of the indebtedness secured hereby, and any

**Exhibit B**

and all such items shall bear interest from the date incurred by Secured Party until repaid by Debtor at the rate of eighteen percent (18%) per annum.

10.    <u>Governing Law</u>.  This Security Agreement shall be governed by and construed in accordance with the laws of the State of Minnesota applicable to contracts made and performed entirely therein.

11.    <u>Notices</u>.  All notices, requests, demands, instructions, and other communications called for hereunder or contemplated hereby shall be given in the manner set forth herein and to the Debtor and Secured Party at their respective addresses as set forth below:

<u>Secured Party</u>:

>    Ratcliff Ranch and Investment Co.
>    Attention:  James L. Ratcliff
>    24631 South Hwy. 2
>    Vinita, OK  74301

<u>With Copy To</u>:

>    Thomas J. McGeady, Esquire
>    Logan & Lowry, LLP
>    101 South Wilson
>    P. O. Box 558
>    Vinita, OK  74301

<u>Debtor</u>:

>    Unger Meat Company
>    Attention:  Joe Unger
>    4301 White Bear Parkway
>    Vadnais Heights, MN  55110

<u>With Copy To</u>:

12.    <u>Whole Agreement – No Oral Modification</u>.  This Agreement embodies all representations, warranties, and agreements of the parties hereto and may not be altered or modified except by an agreement in writing signed by the parties.

**Exhibit B**

13.   <u>Remedies Cumulative</u>.  The various rights, powers, elections, and remedies of the parties hereto shall be considered as cumulative and no one of them is exclusive of the others or exclusive of any right or remedy allowed by law and no right shall be exhausted by being exercised on one or more occasions.

14.   <u>Benefit of Agreement</u>.  This Agreement shall be binding upon and the benefits shall inure to the parties and their respective successors and assigns.

15.   <u>Section Headings</u>.  The section headings contained in this Agreement are for convenient reference only and shall not in any way affect the meaning or interpretation of this Agreement.

EXECUTED AND DELIVERED the day and year first above written.

"DEBTOR":

UNGER MEAT COMPANY

By: _____

Joe Unger

"SECURED PARTY"

_____

James L. Ratcliff

**Exhibit B**

Filing NO: 201022606390
Filing Date: 2010/12/29
Filing Time: 12:23 PM
State of Minnesota
Processing Office: Secretary of State
Filed by: boono01

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

Henningson & Snoxell, Ltd.  (SMG)
6900 Wedgwood Road, Suite 200
Maple Grove, MN 55311

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME – insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | | | |
|---|---|---|---|---|---|---|
| Unger Meat Company | | | | | | |
| 1b. INDIVIDUAL'S LAST NAME | | FIRST NAME | | MIDDLE NAME | | SUFFIX |
| 1c. MAILING ADDRESS | | CITY | STATE | POSTAL CODE | | COUNTRY |
| 4301 White Bear Parkway | | Vadnais Heights | MN | 55110 | | USA |

| 1d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| | | Corporation | Minnesota | 3826691-2 | ☐ NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| 2b. INDIVIDUAL'S LAST NAME | | FIRST NAME | | MIDDLE NAME | SUFFIX |
| 2c. MAILING ADDRESS | | CITY | STATE | POSTAL CODE | COUNTRY |

| 2d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| | | | | | ☐ NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| 3b. INDIVIDUAL'S LAST NAME | | FIRST NAME | | MIDDLE NAME | SUFFIX |
| Ratcliff | | James | | L. | |
| 3c. MAILING ADDRESS | | CITY | STATE | POSTAL CODE | COUNTRY |
| 24631 South Highway 2 | | Vinita | OK | 74301 | USA |

4. This FINANCING STATEMENT covers the following collateral:


See attached Exhibit A

This is a purchase-money security interest.


| 5. ALTERNATIVE DESIGNATION (if applicable): | ☐ LESSEE/LESSOR | ☐ CONSIGNEE/CONSIGNOR | ☐ BAILEE/BAILOR | ☐ SELLER/BUYER | ☐ AG. LIEN | ☐ NON-UCC FILING |
|---|---|---|---|---|---|---|
| 6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. Attach Addendum [if applicable] | | | | 7. See Instruction Debtor(s) | | |
| 8. OPTIONAL FILER REFERENCE DATA | | | | | | |

401 FILING OFFICE COPY — NATIONAL UCC FINANCING STATEMENT (FORM UCC1) (REV. 9/05)

Exhibit C

# Exhibit A

**Unger Meat Company**
**Equipment Schedule**
**11/30/2010**

_Production Equipment Schedule_

| Equipment Location | Product Description | Vendor | Cost |
|---|---|---|---|
| **GRINDING LINE** | | | |
| | OMNI Y / WITH SPARE PARTS | Provisor | 157,842.50 |
| | DOMINATOR 14 | Provisor | 191,700.35 |
| | DOMINATOR 14/spare parts | Provisor | 6,938.90 |
| | DOMINATOR 14/Co2 | Provisor | 59,425.00 |
| | 5" BOX PAPER ASSEMBLY (VAC+HOP) | Provisor | 7,154.80 |
| | DOMINATOR 14/CO2 - fitted for future | Provisor | 1,157.50 |
| | AUGER WITH PIVOT | Provisor | 41,880.25 |
| | PLATFORM | Provisor | 14,711.00 |
| | PIRANHA | Provisor | 59,232 |
| | LOAD CELL (LATE ADD ON) | Provisor | 10,000.00 |
| | COMBO DUMPERS | A-One | 26,156.00 |
| | TABLES 53 | A-One | 4,372.00 |
| | ANTI BAY | M&M | 18,500 |
| | GONDOLAS | M&M | 13,269.00 |
| | ALL SCALES | Kennedy | 11,680 |
| | 2 MEAT BELTS ACETLE | Unisource | 70,005 |
| | CO2 GAS INSTALL EQUIPMENT | TC Oxygen | 30,000.00 |
| | **Total Grinding Line** | | **867,146.29** |
| **FRESH PATTIE LINE** | | | |
| | FORMAX | Provisor | 498,262 |
| | FORMAX/Spare parts | Provisor | 8,384 |
| | Paper Hopper | Provisor | 6,730 |
| | Mold Plates (we got 11 plates) | Provisor | 58,006 |
| | MOLD PLATES 10 | Tomahawk | 34,000 |
| | MULTIVAC | Unisource | 232,316 |
| | METAL DETECTOR | Unisource | 45,090 |
| | HITACHI DATER | Unisource | 13,900 |
| | BOX LABELER | Unisource | 52,060 |
| | GRAVITY CONVEYOR | Unisource | 3,450 |
| | LABEL CONVEYOR | Unisource | 28,150 |
| | COLUMN DUMPER | A-One | 22,343 |
| | **Total Fresh Pattie Line** | | **985,341** |
| **FRESH BULK/ RETAIL LINE** | | | |
| | VEMAG(WEILER) | Unisource | 128,010 |
| | INLINE GRINDER & CUT OFF | Unisource | 23,010 |
| | SMART CONVEYOR | Unisource | 23,220 |
| | TAPE MACHINE | Unisource | 10,347 |
| | VACUUM | Unisource | 232,516 |
| | PACK OFF TABLE/BELT | Unisource | 10,000 |
| | METAL DETECTOR | Unisource | 26,492 |
| | SPIRAL FREEZER | JST | 600,000 |
| | COLUMN DUMPER | A-One | 12,234 |
| | Other Performed | Provisor | 64,262 |
| | **Total Fresh Bulk/Retail Line** | | **1,239,119** |
| **RETAIL FROZEN** | | | |
| | ADCO BOX MACHINE | Unisource | 78,500 |
| | TIPPER TIE | Unisource | 147,885 |
| | CHUB METAL DETECTOR | Unisource | 19,450 |
| | BAND SEALER | Unisource | 14,855 |
| | EMBOSSING CODER | | 3,497 |
| | **Total Retail Frozen Line** | | **264,187** |
| **DOCK** | | | |
| | FORKLIFT | Quality Forklift | 19,209 |
| | Forklift Parts | Quality Forklift | 536 |
| | Forklift Parts | Quality Forklift | 852 |
| | RIDERS | Quality Forklift | 15,228 |
| | STRETCHWRAPPER | Unisource | 13,782 |
| | AIR SYSTEM | Air Power Equipment | 22,687 |
| | **Total Dock** | | **68,274** |
| **REFRIGERATION EQUIPMENT** | | | |
| | Mechanical Equipment | Solid Refrigeration | 547,624. |
| | **Total Mechanical Equipment** | | **547,624** |
| **KITCHEN** | | | |
| | Racking (Cooler, Freezer etc.) | Quality | 64,185 |
| | Hot-tec Production software | Hot-Tec | 100,000 |
| | Stainless Steel | SS | 10,000 |
| | Kitchen Equipment | Own formax | 15,446 |
| | **Total Kitchen Equipment** | | **189,631** |
| **GRAND EQUIPMENT TOTAL** | | | 4,161,321 |

Exhibit C

**Filing NO: 20112290995**
**Filing Date: 2011/01/24**
**Filing Time: 5:00 PM**
**State of Minnesota**
**Processing Office: Secretary of State**
**Filed by: schdo01**

## UCC FINANCING STATEMENT AMENDMENT
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

Henningson & Snoxell, Ltd. (SMG)
6900 Wedgwood Road, Suite 200
Maple Grove, MN 55311

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1a. INITIAL FINANCING STATEMENT FILE#
**201022606390**

1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.

2. ☐ TERMINATION: Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

3. ☐ CONTINUATION: Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

4. ☐ ASSIGNMENT (full or partial): Give name of assignee in item 7a or 7b and address of assignee in item 7c; and also give name of assignor in item 9.

5. AMENDMENT (PARTY INFORMATION): This Amendment affects ☐ Debtor or ☐ Secured Party of record. Check only one of these two boxes.
Also check one of the following three boxes and provide appropriate information in items 6 and/or 7.

☐ CHANGE name and/or address: Please refer to the detailed instructions in regards to changing the name/address of a party.   ☐ DELETE name: Give record name to be deleted in item 6a or 6b.   ☐ ADD name: Complete item 7a or 7b, and also item 7c; also complete items 7e-7g (if applicable).

6. CURRENT RECORD INFORMATION:

OR | 6a. ORGANIZATION'S NAME
**Unger Meat Company**

| 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
|  |  |  |  |

7. CHANGED (NEW) or ADDED INFORMATION:

OR | 7a. ORGANIZATION'S NAME

| 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
|  |  |  |  |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
|  |  |  |  |  |

| 7d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 7e. TYPE OF ORGANIZATION | 7f. JURISDICTION OF ORGANIZATION | 7g. ORGANIZATION ID#, if any |
|---|---|---|---|---|
|  |  |  |  | ☐ NONE |

8. AMENDMENT (COLLAERAL CHANGE): check only one box.

Describe collateral ☐ deleted or ☐ added, or give entire ☒ restated collateral description, or describe collateral ☐ assigned.

See attached Exhibits "A," "B," and "C."

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT (name of assignor, if this is an Assignment). If this is an Amendment authorized by a Debtor which adds collateral or adds the authorizing Debtor, or if this is a Termination authorized by a Debtor, check here ☐ and enter name of DEBTOR authorizing this Amendment.

OR | 9a. ORGANIZATION'S NAME

| 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| **Ratcliff** | **James** | **L.** |  |

10. OPTIONAL FILER REFERENCE DATA
**26225-002**

Exhibit C

## EXHIBIT "A"

This financing statement covers the following types (or items) of property:

(a) INVENTORY:

    All inventory of Debtor, whether now owned or hereafter acquired and wherever located; together with

(b) EQUIPMENT:

    The following equipment of Debtor:

    All furniture, fixtures, and equipment of Debtor, whether now owned or hereafter acquired and wherever located, including without limitation, the furniture, fixtures, and equipment listed in the attached Exhibit "B;" together with:

(c) ACCOUNTS AND OTHER RIGHTS TO PAYMENT:

    Each and every right of Debtor to the payment of money, whether such right to payment now exists or hereafter arises, whether such right to payment arises out of a sale, lease or other disposition of goods or other property by Debtor, out of a rendering of services by Debtor, out of a loan by Debtor, out of the overpayment of taxes or other liabilities of Debtor, or otherwise arises under any contract or agreement, whether such right to payment is or is not already earned by performance, and howsoever such right to payment may be evidenced, together with all other rights and interests (including all liens and security interests) which Debtor may at any time have by law or agreement against any account debtor or other obligor obligated to make any such payment or against any of the property of such account debtor or other obligor; all including, but not limited to, all present and future debt instruments, chattel papers, accounts, investment property, letters-of-credit rights, letters of credit, documents, deposit accounts, payment intangibles, loans and obligations receivable, tax refunds and all supporting obligations relating to the foregoing; and together with

(d) LEASES

    All rents, issues, income, revenue, receipts, fees, and profits now due or which may hereafter become due under or by virtue of and together with all right, title and interest of the Debtor in and to any lease, license, sublease, contract or other kind of occupancy agreement, whether written or verbal, for the use or occupancy of the real property legally described in the attached Exhibit "C" or any part thereof, together with all security therefor and all monies payable thereunder, including, without limitation, tenant security deposits, and all books and records which contain information pertaining to payments made thereunder and security therefor.

(e) GENERAL INTANGIBLES:

    All general intangibles of Debtor, whether now owned or hereafter acquired, including, but not limited to, applications for patents, patents, applications for copyrights, copyrights, application for trademarks, trademarks, trade secrets, good will, trade names, other names, customer lists, permits and franchises, software, payment intangibles and the right to use Debtor's name; together with

all substitutions and replacements for and products of any of the foregoing property and together with proceeds of any and all of the foregoing property, including without limitation all investment property, letter-of-credit rights, letters of credit, other rights to payment, deposit accounts, money insurance proceeds and general intangibles related to the foregoing property, and all refunds of insurance premiums due or to become due under all insurance policies covering the foregoing property, and, in the case of all tangible collateral, together with all accessions, together with (a) all accessories, attachments, fittings, increases, parts, equipment, returns and repairs now or hereafter attached or affixed to or used in connection with any such goods, and (b) all warehouse receipts, bills of lading and other documents of title now or hereafter covering such goods. All books and records relating to any of the foregoing Collateral and all computers and other equipment (and computer software used in connection therewith) used in connection with the record keeping for the collateral.

Exhibit C

**Unger Meat Company**
**Equipment Schedule**
**11/30/2010**

**Exhibit "B"**

_Production Equipment Schedule_

| Equipment Location | Product Description | Vendor | Cost |
|---|---|---|---|
| **GRINDING LINE** | | | |
| | OMNI V / WITH SPARE PARTS | Provisor | 137,842.30 |
| | DOMINATOR 14 | Provisor | 398,700.33 |
| | DOMINATOR 14/spare parts | Provisor | 6,836.80 |
| | DOMINATOR 14/Co2 | Provisor | 88,425.00 |
| | 5' SGR PAPER ASSEMBLY (VAC-HOP) | Provisor | 7,354.80 |
| | DOMINATOR 14/CO2 - fitted for future | Provisor | 2,137.50 |
| | AUGER WITH PIVOT | Provisor | 41,380.25 |
| | PLATFORM | Provisor | 14,725.00 |
| | PIRANHA | Provisor | 58,185 |
| | LOAD CELL (LATE ADD ON) | Provisor | 10,000.00 |
| | COMBO DUMPERS | A-One | 26,158.00 |
| | TABLES SS | A-One | 4,372.00 |
| | ANTL RAY | M&M | 18,500 |
| | GONDOLAS | M&M | 13,369.00 |
| | ALL SCALES | Kennedy | 11,680 |
| | 2 MEAT BELTS ACETLE | Unisource | 70,005 |
| | CO2 GAS INSTALL EQUIPMENT | TC Oxygen | 10,000.00 |
| | **Total Grinding Line** | | **867,146.28** |
| **FRESH PATTIE LINE** | | | |
| | FORMAX | Provisor | 430,262 |
| | FORMAX/Spare parts | Provisor | 9,894 |
| | Paper Hopper | Provisor | 6,730 |
| | Mold Plates (we get 11 plates) | Provisor | 38,006 |
| | MOLD PLATES 10 | Tomahawk | 14,000 |
| | MULTIVAC | Unisource | 232,316 |
| | METAL DETECTOR | Unisource | 45,000 |
| | HITACHI DATER | Unisource | 35,500 |
| | BOX LABELER | Unisource | 52,060 |
| | GRAVITY CONVEYOR | Unisource | 5,450 |
| | LABEL CONVEYOR | Unisource | 28,150 |
| | COLUMN DUMPER | A-One | 22,963 |
| | **Total Fresh Patty Line** | | **985,341** |
| **FRESH BULK/ RETAIL LINE** | | | |
| | VEMAG(REISER) | Unisource | 128,010 |
| | INLINE GRINDER & CUT OFF | Unisource | 25,010 |
| | SMART CONVEYOR | Unisource | 63,230 |
| | TAPE MACHINE | Unisource | 10,387 |
| | VACUUM | Unisource | 232,516 |
| | PACK OFF TABLE/BELT | Unisource | 30,000 |
| | METAL DETECTOR | Unisource | 25,491 |
| | SPIRAL FREEZER | JBT | 630,000 |
| | COLUMN DUMPER | A-One | 12,224 |
| | Cuber Perforated | Provisor | 84,262 |
| | **Total Fresh Bulk/Retail Line** | | **1,239,119** |
| **RETAIL FROZEN** | | | |
| | ADCO BOX MACHINE | Unisource | 78,500 |
| | TIPPER TIE | Unisource | 147,585 |
| | CHUB METAL DETECTOR | Unisource | 18,650 |
| | BAND SEALER | Unisource | 14,855 |
| | EMBOSSING CODER | | 5,497 |
| | **Total Retail Frozen Line** | | **264,187** |
| **DOCK** | | | |
| | FORKLIFT | Quality Forklift | 19,209 |
| | Forklift Parts | Quality Forklift | 536 |
| | Forklift Parts | Quality Forklift | 652 |
| | RIDERS | Quality Forklift | 15,016 |
| | STRETCHWRAPPER | Unisource | 13,292 |
| | AIR SYSTEM | Air Power Equipment | 19,887 |
| | **Total Dock** | | **68,274** |
| **REFRIGERATION EQUIPMENT** | | | |
| | Mechanical Equipment | Sold Refrigeration | 547,624 |
| | **Total Mechanical Equipment** | | **547,624** |
| **KITCHEN** | | | |
| | Racking (Cooler, Freezer etc.) | Quality | 64,185 |
| | Hol-tee Production software | Hol-Tek | 100,000 |
| | Stainless Steel | SS | 10,000 |
| | Kitchen Equipment | Don Steeves | 15,446 |
| | **Total Kitchen Equipment** | | **189,631** |
| **GRAND EQUIPMENT TOTAL** | | | 4,161,321 |

Exhibit C

Filing Number: 854026600022
Date: 11/12/2015
Time: 4:00 PM
STATE OF MINNESOTA
Office: Office of the Minnesota
Secretary of State

# UCC3 – Continuation – UCC Financing Statement

**ORIGINAL FILING NUMBER:**  201022606390

**ORIGINAL FILING DATE:** 12/29/2010

**RETURN ACKNOWLEDGEMENT TO:**
Steve Graffunder
6900 WEDGWOOD ROAD
MAPLE GROVE, MINNESOTA (MN)  55311

## AUTHORIZING PARTY

| INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL(S)INITIAL(S) |
|---|---|---|
| Ratcliff | James | L. |

Exhibit D

Filing Number: 1061988100028
Date: 01/10/2019
Time: 4:28 PM
**STATE OF MINNESOTA**
Office: Office of the Minnesota
Secretary of State

# UCC3 - Debtor Change - UCC Financing Statement

**ORIGINAL FILING NUMBER:** 201022606390

**ORIGINAL FILING DATE:** 12/29/2010

**RETURN ACKNOWLEDGEMENT TO:**
Kathy Brandt
6900 Wedgwood Road
Maple Grove, MN 55311

## DEBTOR INFORMATION

**ORGANIZATION'S NAME**
Rancher's Legacy Meat Co.

| MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 4301 White Bear Parkway | Vadnais Heights | MN | 55110 | USA |

## AUTHORIZING PARTY

| INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL(S)INITIAL(S) |
|---|---|---|
| Ratcliff | James | L. |

Exhibit E

## PROMISSORY NOTE

$3,040,000.00

Minneapolis, Minnesota
September 30, 2016

FOR VALUE RECEIVED, the undersigned, Rancher's Legacy Meat Co., a Minnesota corporation ("Debtor"), promises to pay to the order of Upper Lakes Foods, Inc., a Minnesota corporation ("Creditor"), at its office 801 Industry Avenue, Cloquet, MN 55720, or at any other place designated at any time by the holder hereof, the principal sum of Three Million Forty Thousand and 00/100 Dollars ($3,040,000.00), together with interest on the principal balance outstanding hereon from the date hereof as hereinafter provided.   This Note is executed on March 3 1, 2017, but effective for all purposes as of September 30, 2016 (the "Effective Date") when the aggregate advances evidenced by this Note was made by Creditor to Debtor.

1.      Interest shall accrue on the unpaid principal balance of this Note at the rate of 3.25 percent (3.25%) per annum.  All interest hereon shall be calculated on the basis of actual days elapsed in a year of 360 days.

2.      Interest under this note shall begin accruing as of the Effective Date with respect to the aggregate advances made hereunder.  Subsequent advances, if any, shall begin accruing interest as of the date of such advance.  Accrued interest under this Note shall be payable on April 1, 2017 and on the first day of each calendar month thereafter.

3.      The aggregate principal and accrued interest relating to the Debtor's obligations evidenced by this Note shall be due and payable as follows:

(a)     $8,233.33 per month, commencing April 1, 2017 and payable on the first day of each calendar month thereafter through and including March 31, 2018;

(b)     $13,230.00 per month, commencing April 1, 2018 and payable on the first day of each calendar month thereafter through and including March 31, 2028;

(c)     the remaining unpaid principal balance of this Note and all accrued interest thereon shall be due and payable on the earlier of (i) April 1, 2028 (the "Maturity Date"),  or (ii) acceleration of the Maturity Date in accordance with the terms hereof.

Amounts repaid (including prepayments) in respect of this Note may not be reborrowed.

4.      All payments of principal, interest, fees and expenses under this Note shall be made without set-off or counterclaim in immediately available funds in lawful money of the United States of America not later than 2:00 p.m., Minnesota time, on the dates called for under this Note at the office of the Creditor designated above.  Funds received on any day after such time shall be deemed to have been received on the next business day.  Whenever any payment would be due on a day which is not a business day, such payment shall be made on the next succeeding business day and such extension of time shall be included in the computation of any interest or fees.  All payments (or prepayments) received by the Creditor hereunder shall be applied to the principal sum, interest thereon and the other obligations of Debtor to the Creditor arising under or in connection with this Note in such order and manner as the Creditor may elect, and in the absence of any such election: first, to the payment of costs, expenses and fees due from Debtor to the Creditor arising under or in connection with this Note or the indebtedness

8211421v2

**Exhibit F**

evidenced hereby; next, to the payment of interest computed at the applicable rate provided for above; next, toward installments of the principal sum of this Note (in the case of a prepayment, in the inverse order of their maturities); and finally, to the payment of any other obligations due from Debtor and owing to Creditor.

5.      Any payment not made by Debtor within five (5) days of the due date thereof, including without limitation any payment due on the Maturity Date, shall be subject to a late payment charge equal to five percent (5%) of such delinquent payment, and shall be immediately due by Debtor to the holder hereof. Notwithstanding any other provision of this Note apparently to the contrary, after the occurrence and during the continuance of an Event of Default hereunder the entire principal sum evidenced by this Note, together with all accrued and unpaid interest thereon, shall, at the option of the holder hereof, bear interest at a rate per annum (the "Default Rate") equal to five percent (5.00%) in excess of the rate of interest per annum which would otherwise be payable hereunder, which interest shall be due and payable in full on demand.

6.      Debtor will pay Creditor, on demand, all out-of-pocket expenses incurred by Creditor in connection with this Note and the indebtedness evidenced hereby, including without limitation, attorneys' fees. If Debtor fails to pay such expenses upon demand, Creditor may, at its option, advance the same under this Note and the payment thereof shall be secured by all real or personal property of Debtor in which Creditor has a security interest.

7.      The extension of credit evidenced by this Note, and the rate of interest applicable hereto, shall be governed by Section 334.01, Subdivision 2 of the Minnesota Statutes. If for any reason whatsoever the interest and other consideration payable to Creditor hereunder exceeds the limit prescribed by any applicable usury statute or any other applicable law, then such interest and other consideration shall be reduced to the limit provided in such statute or law, so that in no event shall such interest and other consideration be in excess of such limit. If any payments of interest or other consideration have been made to Creditor in excess of such limits, such excess amount shall be applied to the principal balance or, if the Note has been fully paid, refunded to Debtor. This provision shall control every other provision of all agreements between Debtor and Creditor and shall also be binding upon and available to any subsequent holder of this Note.

8.      This Note is secured by, among other things, a Security Agreement dated on or about the date herewith by and between Debtor and Creditor (the "Security Agreement"). For purposes of this Note, "Transaction Documents" means collectively, this Note, the Security Agreement, and all other documents, instruments, certificates, statements and agreements now or hereafter delivered that evidence or secure, in whole or in part, any obligations of Debtor to Creditor, or otherwise relate to such indebtedness or relate to any of the agreements enumerated above, in each case, as amended, restated, supplemented, renewed, replaced or otherwise modified from time to time.

9.      The occurrence of any one or more of the following events shall constitute an "Event of Default" under this Note:

(a)      Debtor shall fail to make when due, whether by acceleration or otherwise, any payment of principal of or interest on this Note or any fee or other amount required to be paid to the Creditor hereunder, or under any other Transactional Documents;

(b)      The occurrence of an event of default (however denominated) beyond applicable notice and cure periods under any Transaction Documents;

2

**Exhibit F**

(c)     Any non-compliance by Debtor with any of the terms, provisions, covenants or agreements set forth herein, or in any other Transaction Documents to which it is a party;

(d)     Any representation or warranty of Debtor herein or in any other Transaction Document, when made or deemed made, is false, misleading or incorrect in any respect;

(e)     The sale, lease or other disposition of Debtor's interests or rights in any of its assets, other than in the ordinary course of business;

(f)     (i) the appointment of a receiver for any part of the property of Debtor, (ii) the making by Debtor of an assignment for the benefit of creditors or (iii) the initiation by or against Debtor of any case or proceeding under the Federal Bankruptcy Code or any other state or federal insolvency law;

(g)     an event of default occurs under the terms of any indebtedness of Debtor to any creditor other than Creditor (excluding the indebtedness under two (2) promissory notes to James L. Ratcliff dated December 3, 2010, copies of which have been delivered to Creditor, until such time as Debtor is required to commence making interest or principal payments thereunder);

10.     If (a) any Event of Default described in item 9(g) above shall occur, the outstanding unpaid principal balance of this Note, the accrued interest thereon and all other obligations of Debtor to the Creditor shall automatically become immediately due and payable; or (b) any other Event of Default shall occur and be continuing, then the Creditor may take any or all of the following actions: (i) declare the outstanding unpaid principal balance of this Note, the accrued and unpaid interest thereon and all other obligations of Debtor to the Creditor to be forthwith due and payable, whereupon the outstanding unpaid principal balance of this Note, all accrued and unpaid interest thereon and all such obligations shall immediately become due and payable, in each case without demand or notice of any kind, all of which are hereby expressly waived, anything in this Note or any other agreements to the contrary notwithstanding, (ii) exercise all rights and remedies hereunder and under any other Transaction Document, and (iii) enforce all rights and remedies under any applicable law.  Failure to exercise any right or remedy provided for or referenced herein shall not constitute a waiver of the right to exercise the same in connection with the applicable Event of Default or any subsequent Event of Default.

11.     This Note may be prepaid in whole or in part at any time without penalty or premium.

12.     Debtor and each endorser hereby waives demand, presentment for payment, notice of nonpayment, protest and notice of protest hereon, and agrees that when or at any time after this Note becomes due, the holder hereof may, without notice, offset or charge this Note against any amounts owed by the holder hereof to Debtor.  Debtor and each endorser further agrees (a) that, without any notice Creditor, may from time to time extend, renew or otherwise modify the dates or amounts of payment or release any collateral security for this Note, with or without consideration, and that in any such case Debtor and each endorser will continue to be liable to pay the unpaid balance of the indebtedness evidenced by this Note as so extended, renewed or modified and notwithstanding any such release, and (b) to pay all costs of collection, including reasonable attorneys' fees, if any payment is not made when due, and all costs and expenses, including reasonable attorneys' fees, incurred in connection with the enforcement of this Note and in connection with protecting or preserving the collateral security for this Note.  Such attorneys' fees shall be owed (i) whether suit is brought or not, and (ii) for any kind or an action, including, but not limited to, any bankruptcy, insolvency or similar proceedings and any probate or other proceedings involving a decedent.

13.     Debtor represents and warrants to Creditor that the indebtedness evidenced by this Note was used solely for business purposes.

8211421v2

**Exhibit F**

14.    The execution, delivery, and performance of this Note by Debtor and each other Transaction Document to which it is a party, and the consummation of the transactions contemplated hereby and thereby, (i) are within the company powers of Debtor, (ii) have been duly authorized by Debtor's board of directors, managers or members and no other proceedings on the part of Debtor are necessary, (iii) will not violate any provisions of Debtor's organizational documents or other documents of company governance, and (iv) will constitute the legal, valid, and binding obligations of Debtor. The recitals set forth herein and all information provided by Debtor to Creditor, previously or in connection with this Agreement, whether communicated orally or in writing, is true and correct in all material respects. The obligation of Debtor to repay the indebtedness evidenced by this Note is absolute and unconditional, and nothing has occurred that would give Debtor grounds to assert a defense, offset or counterclaim to the obligations of Debtor to repay such indebtedness.

15.    Time is of the essence of this Note and each of the provisions hereof.

16.    CREDITOR BY ITS ACCEPTANCE HEREOF AND DEBTOR HEREBY VOLUNTARILY, KNOWINGLY AND INTENTIONALLY WAIVE ANY AND ALL RIGHTS TO TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING ARISING UNDER THIS NOTE OR CONCERNING THE INDEBTEDNESS EVIDENCED HEREBY AND/OR ANY COLLATERAL SECURING SUCH INDEBTEDNESS, REGARDLESS OF WHETHER SUCH ACTION OR PROCEEDING CONCERNS ANY CONTRACTUAL OR TORTIOUS OR OTHER CLAIM. DEBTOR ACKNOWLEDGES THAT THIS WAIVER OF JURY TRIAL IS A MATERIAL INDUCEMENT TO CREDITOR ACCEPTING THIS NOTE, THAT CREDITOR WOULD NOT HAVE ACCEPTED THIS NOTE WITHOUT THIS JURY TRIAL WAIVER AND THAT DEBTOR HAS BEEN REPRESENTED BY AN ATTORNEY OR HAS HAD AN OPPORTUNITY TO CONSULT WITH AN ATTORNEY IN CONNECTION WITH THIS JURY TRIAL WAIVER AND UNDERSTANDS THE LEGAL EFFECT OF THIS WAIVER.

17.    THIS NOTE SHALL BE GOVERNED AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF MINNESOTA. DEBTOR HEREBY CONSENTS TO THE PERSONAL JURISDICTION OF THE STATE AND FEDERAL COURTS LOCATED IN THE STATE OF MINNESOTA IN CONNECTION WITH ANY CONTROVERSY RELATED TO THIS NOTE, WAIVES ANY ARGUMENT THAT VENUE IN SUCH FORUMS IS NOT CONVENIENT AND AGREES THAT ANY LITIGATION INSTIGATED BY DEBTOR HEREOF AGAINST THE CREDITOR IN CONNECTION WITH THIS NOTE MAY BE VENUED IN EITHER THE DISTRICT COURTS OF HENNEPIN COUNTY, MINNESOTA, OR THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MINNESOTA, FOURTH DIVISION.

18.    Debtor also acknowledges and agrees that the actions taken by Creditor to date in furtherance of the foregoing agreements and all other related documents are reasonable and appropriate under the circumstances and are within its rights under such agreements and applicable law. Notwithstanding the foregoing, in consideration of the agreements and understandings herein, Debtor and its respective employees, agents, officers, directors, affiliates, subsidiaries, shareholders, attorneys, associates, executors, heirs, administrators, successors and assigns (collectively, "Associates"), hereby release, discharge, and forever acquit Creditor and each of Creditor's Associates from all claims based on facts in existence as of the date hereof, or the relationship between Debtor and Creditor, whether or not any such claim now exists or hereafter arises.

[signature page follows]

4

8211421v2

**Exhibit F**

Debtor:

RANCHER'S LEGACY MEAT CO.
a Minnesota corporation

By: _____

Printed Name: Arlyn Lomen
Title: President

8211421v2

**Exhibit F**

## SECURITY AGREEMENT

THIS SECURITY AGREEMENT (this "Agreement"), dated as of March 31, 2017 but effective for all purposes as of September 30, 2016, is entered into between UPPER LAKES FOODS, INC., a Minnesota corporation (the "Creditor") and RANCHER'S LEGACY MEAT CO., a Minnesota corporation (the "Borrower").


RECITALS:

The Creditor has made or may make loans, advances or otherwise extend credit to the Borrower pursuant to a certain Promissory Note dated as of even date herewith made payable by the Borrower to the order of the Creditor in the original principal amount of $3,040,000.00 (the "Note");

NOW, THEREFORE, for and in consideration of loans, advances or other extensions of credit under the Note and any other loan, advance or extension of credit made or to be made to the Borrower by the Creditor, and for other good and valuable consideration, the parties hereto agree as follows:

## ARTICLE 1 - DEFINITIONS AND INTERPRETATION

Section 1.1    Definitions.  In addition to the terms defined elsewhere in this Agreement, the following terms shall have the meanings indicated for purposes of this Agreement (such meanings being applicable to both the singular and plural forms):

"Agreement" shall mean this Security Agreement, as it may be amended, modified, supplemented, assigned, restated or replaced from time to time.

"Collateral" shall mean all property or rights in which a security interest is granted hereunder.

"Copyrights" shall mean, collectively, all copyrights owned by or assigned to and all copyright registrations and applications made by the Borrower (whether statutory or common law and whether established or registered in the United States or any other country), together with any and all (a) rights and privileges arising under applicable law with respect to the Borrower's use of any copyrights, (b) reissues, renewals, continuations and extensions thereof, (c) income, fees, royalties, damages, claims and payments now and hereafter due and/or payable with respect thereto, including, without limitation, damages and payments for past, present or future infringements thereof, (d) rights corresponding thereto throughout the world and (e) rights to sue for past, present and future infringements thereof.

"Credit Document" shall mean the Note, and any other promissory note, agreement, evidence of indebtedness, guaranty, security agreement, application, instrument or document relating to any obligation of the Borrower to the Creditor, whether heretofore or hereafter issued, made or entered by the Borrower, and whether evidencing a present or future obligation or an obligation payable under any circumstance, whether now or hereafter due, direct or indirect, absolute or contingent.

"Default" shall mean: (a) the occurrence of any "Event of Default" or similar occurrence under any Credit Document; (b) nonpayment, when due or demanded (if under a demand instrument) of any amount of the Liabilities, or any amount payable to the Creditor by the Borrower; (c) failure to perform any agreement of the Borrower hereunder or under any Credit Document and such failure shall continue beyond any grace period expressly applicable thereto; or (d) any representation made, or deemed to be made, by the Borrower hereunder or under any Credit Document is untrue or incorrect in any material respect when made or deemed to be made.

8211422v2

**Exhibit G**

"Intellectual Property Collateral" shall mean, collectively, the Patents, Trademarks, Copyrights, and Licenses, and other tradenames and certifications (production and other).

"Liabilities" shall mean all debts, liabilities and obligations of the Borrower arising under or evidenced by any Credit Document and under this Agreement, and all other obligations of the Borrower to the Creditor, its successors and assigns, howsoever created, arising or evidenced, whether direct or indirect, absolute or contingent, or now or hereafter existing, or due or to become due, including without limitation any such obligations that arise after the filing of a petition by or against the Borrower under the Bankruptcy Code, even if the obligations do not accrue because of the automatic stay under Bankruptcy Code Section 362 or otherwise.

"Licenses" shall mean, collectively, all license and distribution agreements and covenants not to sue with any other party with respect to any Patent, Trademark or Copyright, whether the Borrower is a licensor or licensee, distributor or distributee under any such license or distribution agreement including, without limitation, the license and distribution agreements listed in Schedule 3.7 attached hereto, together with any and all (a) renewals, extensions, supplements and continuations thereof, (b) income, fees, royalties, damages, claims and payments now and hereafter due and/or payable thereunder and with respect thereto including, without limitation, damages and payments for past, present or future infringements or violations thereof, (c) rights to sue for past, present and future infringements or violations thereof, and (d) any other rights to use, exploit or practice any or all of the Patents, Trademarks or Copyrights.

"Non-Goods Collateral" shall mean all Collateral other than Inventory, Fixtures, and Equipment.

"Patents" shall mean, collectively, all patents issued or assigned to and all patent applications and registrations made by the Borrower (whether established or registered or recorded in the United States or any other country), together with any and all (a) rights and privileges arising under applicable law with respect to the Borrower's use of any patents, (b) inventions and improvements described and claimed therein, (c) reissues, divisions, continuations, renewals, extensions and continuations-in-part thereof, (d) income, fees, royalties, damages, claims and payments now and hereafter due and/or payable thereunder and with respect thereto including, without limitation, damages and payments for past, present or future infringements thereof, (e) rights corresponding thereto throughout the world, and (f) rights to sue for past, present and future infringements thereof.

"Person" shall mean any individual, sole proprietorship, partnership, limited liability company, joint venture, trust, unincorporated organization, association, corporation, institution, entity, party or government (whether national, federal, state, provincial, county, city, municipal or otherwise, including without limitation, any instrumentality, division, agency, body or department thereof).

"Trademarks" shall mean, collectively, all trademarks (including service marks), logos, federal and state trademark registrations and applications made by the Borrower, common law trademarks and trade names owned by or assigned to the Borrower and all registrations and applications for the foregoing, together with any and all (a) rights and privileges arising under applicable law with respect to the Borrower's use of any trademarks, (b) reissues, continuations, extensions and renewals thereof, (c) income, fees, royalties, damages and payments now and hereafter due and/or payable thereunder and with respect thereto, including, without limitation, damages, claims and payments for past, present or future infringements thereof, (d) rights corresponding thereto throughout the world, and (e) rights to sue for past, present and future infringements thereof.

"Work" shall mean any work which is subject to copyright protection pursuant to Title 17 of the United States Code.

2

**Exhibit G**

Section 1.2    <u>Terms defined in Uniform Commercial Code</u>. "Account", "Account Debtor", "Chattel Paper", "Commercial Tort Claims", "Deposit Account", "Document", "Equipment", "Fixtures", "General Intangibles", "Instrument", "Inventory", "Investment Property", "Letter-of-Credit Rights", "Proceeds" and "Supporting Obligations" shall have the meanings set forth in the Minnesota Uniform Commercial Code, as amended from time to time, and such meanings shall automatically change at the time that any amendment to the Minnesota Uniform Commercial Code, which changes such meanings, shall become effective.  For purposes of this Agreement, such terms may be capitalized, even if not capitalized in the Minnesota Uniform Commercial Code, provided, that if any additional goods, property or rights shall be included in such terms under Article 2 hereof, such terms shall be construed to include such additional goods, property or rights.

Section 1.3    <u>Interpretation</u>. A reference to an Article, Section, Exhibit or Schedule is, unless otherwise stated, a reference to a section hereof, or an exhibit or schedule hereto, as the case may be. Section captions used in this Agreement are for convenience only, and shall not affect the construction of this Agreement.  The word "including" shall, in each instance, be deemed to mean "including but not limited to".

## ARTICLE 2 - GRANT OF SECURITY INTEREST

Section 2.1    <u>Grant of Security Interest</u>. As security for the payment and performance of all Liabilities, the Borrower hereby assigns to the Creditor, and grants to the Creditor a continuing security interest in all of the personal property and Fixtures of the Borrower, including without limitation the following, whether now owned or hereafter arising or acquired:

(a)    Accounts, including all other rights and interests (including all liens and security interests) that the Borrower may at any time have by law or agreement against any Account Debtor or other obligor obligated to make any such payment or against any of the property of such Account Debtor or other obligor;

(b)    Equipment and Fixtures, including all accessories, parts and other property at any time affixed thereto or used in connection therewith and all substitutions and replacements thereof;

(c)    Inventory, including goods that are returned, repossessed, stopped in transit or which otherwise come into the possession of the Borrower;

(d)    General Intangibles, including payment intangibles, inventions, designs, patents, patent applications, design patents, design patent applications, trademarks, trademark applications, trade names, trade secrets, goodwill, copyrights, registrations, licenses, franchises, customer lists, tax refund claims, rights to indemnification, rights under warranties, all domain names, together with all contracts, agreements, licenses and registrations relating to such domain names, and Commercial Tort Claims, if any, identified on <u>Schedule 2.1</u> attached hereto;

(e)    Chattel Paper, Instruments and Documents;

(f)    Investment Property;

(g)    Deposit Accounts;

(h)    Letter-of-Credit rights;

3

8211422v2

**Exhibit G**

(i)     Money, cash and cash equivalents

(j)     Supporting Obligations;

(k)     Intellectual Property Collateral;

(l)     all accessions to, substitutions for and replacements, products and Proceeds of the foregoing, all policies, claims to payment under, and proceeds of any and all insurance policies payable to the Borrower, or on behalf of the Borrower's property, whether or not such policies are issued to or owned by the Borrower and whether or not the Creditor is named as loss payee or additional insured, including any credit insurance; and

(m)     all books and records, correspondence, customer lists, credit files, invoices, manuals, other papers and documents, software, computer files, programs, printouts and other computer materials and records related thereto and any General Intangibles at any time evidencing or relating to any of the foregoing, including any of the foregoing in the possession or control of any service, consultant, or outside vendor.

ARTICLE 3 - REPRESENTATIONS AND WARRANTIES

The Borrower represents and warrants to the Creditor that:

Section 3.1     <u>Organization, Names and Organization Number</u>.  The Borrower is an entity of the type identified on <u>Schedule A</u>, organized under the laws of the jurisdiction identified on <u>Schedule A</u>. The organization identification number, if any, and the federal taxpayer identification number of the Borrower are set forth on <u>Schedule A</u>.  The Borrower does business solely under its own name and the trade names and styles, if any, set forth on <u>Schedule A</u> (which includes any name used within the past 5 years).

Section 3.2     <u>Owner, No Other Financing Statements.</u>  The Borrower is and will be the lawful owner of all Collateral, free of all liens and claims whatsoever, other than the security interest hereunder, and those shown on <u>Schedule B</u>.  No financing statement (other than any which may have been filed on behalf of the Creditor) covering any of the Collateral is on file in any public office, except those listed on <u>Schedule B</u>.

Section 3.3     <u>Offices and Locations</u>.  The Borrower's chief place of business and chief executive office and the office where it keeps its books and records concerning the Non-Goods Collateral, and the originals of all Chattel Paper, Instruments and Documents are located at its address set forth on the signature page hereof.

Section 3.4     <u>Locations of Equipment and Inventory</u>.  All of the Equipment and Inventory existing on the date of the Agreement is located at the places specified in <u>Schedule C</u>.  The Borrower will immediately notify the Creditor of any additional state in which any item of Equipment or Inventory is hereafter located.

Section 3.5     <u>Locations of Fixtures</u>.  The legal descriptions, common addresses and record owners of all property on which Fixtures are located are listed on <u>Schedule D</u>.

Section 3.6     <u>Inventory</u>.  All Inventory has been produced in compliance with all requirements of the Fair Labor Standards Act.

8211422v2

**Exhibit G**

Section 3.7      Intellectual Property Collateral.

(a)      Representation and Warranties.  Set forth on Schedule 3.7 are all registered Copyrights, Patents and Trademarks, and all Licenses, owned by the Borrower in its own name as of the date hereof.  To the best of the Borrower's knowledge, each such Copyright, Patent and Trademark of the Borrower is valid, subsisting, unexpired, enforceable and has not been abandoned.  Except as set forth in Schedule 3.7, none of such Copyrights, Patents and Trademarks is the subject of any licensing or franchise agreement.  The Borrower has not made any assignment or agreement in conflict with the security interest in the Copyrights, Patents or Trademarks of the Borrower hereunder.  No holding, decision or judgment has been rendered by any governmental authority which would limit, cancel or question the validity of any Copyright, Patent or Trademark.  Except as set forth in Schedule 3.7, no action or proceeding is pending seeking to limit, cancel or question the validity of any such Copyright, Patent or Trademark, or which, if adversely determined, would have a material adverse effect on the value of any such Copyright, Patent or Trademark.  To the best of the Borrower's knowledge, all applications pertaining to the Copyrights, Patents and Trademarks of the Borrower have been duly and properly filed, and all registrations or letters pertaining to such Copyrights, Patents and Trademarks have been duly and property filed and issued, and all of such Copyrights, Patents and Trademarks are valid and enforceable.

(b)      Covenants Relating to Copyrights.

(i)      The Borrower shall employ the Copyright for each Work with such notice of copyright as may be required by law to secure copyright protection in the country in which the Work is published.

(ii)      The Borrower shall not do any act or knowingly omit to do any act whereby any Copyright may become invalidated and (A) the Borrower shall not do any act, or knowingly omit to do any act, whereby any Copyright may become injected in the public domain, (B) the Borrower shall notify the Creditor immediately if it knows, or has reason to know, that any Copyright may become injected into the public domain or of any adverse determination or development (including, without limitation, the institution of, or any such determination or development in, any court or tribunal in the United States or any other country) regarding the Borrower's ownership of any such Copyright or its validity, (C) the Borrower shall take all necessary steps as it shall deem appropriate under the circumstances, to maintain and pursue each application (and to obtain the relevant registration) and to maintain each registration of each Copyright owned by the Borrower including, without limitation, filing of applications for renewal where necessary, and (D) promptly notify the Creditor of any material infringement of any Copyright of which it becomes aware and take such actions as it shall reasonably deem appropriate under the circumstances to protect such Copyright, including, where appropriate, the bringing of suit for infringement, seeking injunctive relief and seeking to recover any and all damages for such infringement.

(iii)      The Borrower shall not make any assignment or agreement in conflict with the Creditor's security interest in the Copyrights.

(c)      Covenants Relating to Patents and Trademarks.

(i)      (A) The Borrower shall continue to use each Trademark on each and every trademark class of good applicable to its current line as reflected in its current

5

**Exhibit G**

catalogs, brochures and price lists in order to maintain such Trademark in full force free from any claim of abandonment for non-use unless the Borrower concludes in its reasonable business judgment that abandoning a particular trademark will not have a material adverse effect on the Borrower or its operations as presently conducted, (B) maintain as in the past the quality of products and services offered under such Trademark, (C) employ such Trademark with the appropriate notice of registration, (D) not adopt or use any mark which is confusingly similar or a colorable imitation of such Trademark unless the Creditor shall obtain a perfected security interest in such mark pursuant to this Agreement, and (E) not (and not permit any licensee or sublicensee thereof to) do any act or knowingly omit to do any act whereby any Trademark may become invalidated.

(ii)    The Borrower shall not do any act, or omit to do any act, whereby any Patent may become abandoned or dedicated unless the Borrower concludes in its reasonable business judgment that abandoning or dedicating a particular Patent will not have a material adverse effect on the Borrower or its operations as presently conducted.

(iii)    The Borrower shall notify the Creditor immediately if it knows, or has reason to know, that any application or registration relating to any Patent or Trademark may become abandoned or dedicated, or of any adverse determination or development (including, without limitation, the institution of, or any such determination or development in, any proceeding in the United States Patent and Trademark Office or any court or tribunal in any country) regarding the Borrower's ownership of any Patent or Trademark or its right to register the same or to keep and maintain the same.

(iv)    Whenever the Borrower, either by itself or through any agent, employee, licensee or designee, shall file an application for the registration of any Patent or Trademark with the United States Patent and Trademark Office or any similar office or agency in any other county or any political subdivision thereof, the Borrower shall report such filing to the Creditor within five (5) Business Days after the last day of the fiscal quarter in which such filing occurs.  Upon request of the Creditor, the Borrower shall execute and deliver any and all agreements, instruments, documents and papers as the Creditor may request to evidence the Creditor's security interest in any Patent or Trademark and the goodwill and General Intangibles of the Borrower relating thereto or represented thereby.

(v)    The Borrower shall take all reasonable and necessary steps, including, without limitation, in any proceeding before the United States Patent and Trademark Office, or any similar office or agency in any other country or any political subdivision thereof, to maintain and pursue each application (and to obtain the relevant registration) and to maintain each registration of all Patents and Trademarks, including without limitation, filing of applications for renewal, affidavits of use and affidavits of incontestability.

(vi)    The Borrower shall not make any assignment or agreement in conflict with the Creditor's security interest in the Patents or Trademarks.

(d)    <u>New Patents, Copyrights and Trademarks</u>.  The Borrower shall promptly provide the Creditor with a listing of all applications, if any, for new Copyrights, Patents or Trademarks (together with a listing of the issuance of registrations or letters on present applications), which

6

**Exhibit G**

new applications and issued registrations or letters shall be subject to the terms and conditions hereunder, and (a) a duly executed Notice of Security Interest in such new Copyrights, Patents or Trademarks, and (b) such other duly executed documents as the Creditor may request in a form acceptable to counsel for the Creditor and suitable for recording to evidence the security interest in the Copyright, Patent or Trademark which is the subject of such new application.

(e)     <u>Grant of License</u>.     For the purpose of enabling the Creditor, during the continuance of a Default, to exercise rights and remedies under hereunder at such time as the Creditor shall be lawfully entitled to exercise such rights and remedies, and for no other purpose, the Borrower hereby grants to the Creditor, to the extent assignable, an irrevocable, non-exclusive license (exercisable without payment of royalty or other compensation to the Borrower or any other person) to use, assign, license or sublicense any of the Intellectual Property Collateral now owned or hereafter acquired by the Borrower, wherever the same may be located, including in such license access to all media in which any of the licensed items may be recorded or stored and to all computer programs used for the compilation or printout hereof.

(f)     <u>Litigation</u>.

(i)     Unless there shall occur and be continuing a Default, the Borrower shall have the right to commence and prosecute in its own name, as the party in interest, for its own benefits and at its sole cost and expense, such applications for protection of the Intellectual Property Collateral and suits, proceedings or other actions to prevent the infringement, counterfeiting, unfair competition, dilution, diminution in value or other damage as are necessary to protect the Intellectual Property Collateral.  The Borrower shall promptly notify the Creditor in writing as to the commencement and prosecution of any such actions, or threat thereof relating to the Intellectual Property Collateral, and shall provide to the Creditor such information with respect thereto as may be requested by the Creditor.  The Borrower shall indemnify and hold harmless Creditor and its shareholders, officers, directors, managers and employees (each, an "Indemnified Person") from and against all liabilities which may be imposed on, incurred by or asserted against such indemnified person in connection with or in any way arising out of the suits, proceedings or other actions contemplated in this <u>Section 3.7</u>.

(ii)     Upon the occurrence and during the continuance of a Default, the Creditor shall have the right but shall in no way be obligated to file applications for protection of the Intellectual Property Collateral and/or bring suit in the name of the Borrower or the Creditor to enforce the Intellectual Property Collateral and any license thereunder.  In the event of such suit, the Borrower shall, at the request of the Creditor, do any and all lawful acts and execute any and all documents requested by the Creditor in aid of such enforcement and the Borrower shall promptly reimburse and indemnify the Creditor for all costs and expenses incurred by the Creditor in the exercise of its rights under this <u>Section 3.7</u>.  In the event that the Creditor shall elect not to bring suit to enforce the Intellectual Property Collateral, the Borrower agrees, at the request of the Creditor, to take all actions necessary, whether by suit, proceeding or other action, to prevent the infringement, counterfeiting, unfair competition, dilution, diminution in value of or other damage to any of the Intellectual Property Collateral by others and for that purpose agrees to diligently maintain any suit, proceeding or other action against any Person so infringing necessary to prevent such infringement.

8211422v2

**Exhibit G**

## ARTICLE 4 - SALE AND COLLECTION

Section 4.1      Sale in Ordinary Course.  Until the occurrence of a Default, the Borrower may, in the ordinary course of its business, sell, lease, or consume (if raw materials) Inventory and furnish Inventory under contracts of service.

Section 4.2      Collection of Non-Goods Collateral.  Until such time as the Creditor shall notify the Borrower of the revocation of such authority, the Borrower will endeavor to collect, as and when due, all amounts due with respect to any of the Non-Goods Collateral, and shall take any action in connection with such collection as the Creditor may reasonably request.

Section 4.3      Validity of Non-Goods Collateral.  Each right to payment and each Instrument Document, Chattel Paper and other agreement constituting or evidencing Non-Goods Collateral is (or will be when arising in the ordinary course of business) a valid obligation of the Account Debtor or other obligor named therein or in the Borrower's records pertaining thereto as being obligated to pay such obligation.  The Borrower will neither agree to any material modification or amendment nor agree to any cancellation of any such obligation without the Creditor's prior written consent and will not subordinate any such right to payment to claims of other creditors of such Account Debtor or other obligor.

Section 4.4      Refunds.  The Borrower may grant, in the ordinary course of its business, any refund or allowance to any Account Debtor to which it may be lawfully entitled, and may accept, in connection therewith, the return of goods, the sale or lease of which shall have given rise to Accounts.

Section 4.5      Collection Rights of Creditor.  With respect to the Creditor's rights to any and all Instruments, Chattel Paper, Accounts and other rights to payment constituting Non-Goods Collateral (including all Proceeds thereof), the Creditor may, at any time after the occurrence of a Default, notify any Account Debtor or any other person obligated to pay any amount due, that such Instrument, Chattel Paper, Account or other right to payment has been assigned or transferred to the Creditor for security and shall be paid directly to the Creditor.  If the Creditor so requests at any time after the occurrence of a Default, the Borrower will so notify such Account Debtors and other obligors in writing and will indicate on all invoices to such Account Debtors or other obligors, that the amount due is payable directly to the Creditor.  At any time after the Creditor or the Borrower gives such notice to an Account Debtor or other obligor, the Creditor may (but need not), in its own name or in the Borrower's name, demand, sue for, collect or receive any money or property at any time payable or receivable on account of, or securing, any such Instrument, Chattel Paper, Account or other right to payment constituting Non-Goods Collateral, or grant any extension to, make any compromise or settlement with or otherwise agree to waive, notify, amend, surrender, release or change the obligations (including collateral obligations) underlying such Collateral or any such Account Debtor or other obligor.

Section 4.6      Transmittal of Items to the Creditor.  The Borrower will, upon request of the Creditor following a Default, upon receipt, transmit and deliver to the Creditor, in the form received, all cash, checks, drafts, and any other form of payment (properly endorsed, where required, so that such items may be collected by the Creditor) received as proceeds of any of the Collateral.  The Creditor is authorized to endorse, in the name of the Borrower, any item received by the Creditor constituting a proceed of any of the Collateral.  After such request by the Creditor, any such items received by the Borrower will not be commingled with any other of its funds or property, but will be held separate and apart from its own funds or property and upon express trust for the Creditor until delivered to the Creditor.

Section 4.7      Collection Account.  All items or amounts which are received by the Creditor as proceeds of the Collateral shall be deposited to the credit of a deposit account of the Borrower with the

8

**Exhibit G**

Creditor, securing the Liabilities.  The Borrower shall have no right to make withdrawals from such account.  The Creditor may, from time to time, in its discretion (a) apply collected balances therein to the Liabilities, whether or not then due, in such order of application as it shall determine, and (b) release all or any of such balance to the Borrower.

## ARTICLE 5 - AGREEMENTS OF BORROWER

The Borrower agrees that, unless otherwise agreed in writing by the Creditor, it will:

Section 5.1     Schedules and Reports.  Furnish to the Creditor, in form and detail satisfactory to the Creditor: (a)  written notice of any event causing loss, material damage or depreciation in value of any of the Collateral, describing, and specifying the amount of, such loss, damage or depreciation; and (b) from time to time, as the Creditor may request, such additional schedules, certificates and reports concerning the Collateral, including the Account Debtors obligated thereon, as the Creditor may request and (c) any and all instruments, documents, assignments, security agreements and other agreements, and writings which the Creditor may at any time reasonably request in order to secure, protect, perfect or enforce the security interest and the Creditor's rights under this Agreement.

Section 5.2     Inspection.  Permit the Creditor and its agents or its designees, from time to time, to inspect and evaluate the Collateral, and to inspect, audit and make copies of all books and records constituting or otherwise concerning the Collateral, and will, upon request of the Creditor, deliver to the Creditor all of such records which pertain to the Collateral and all Account Debtors.  The Borrower will reimburse the Creditor upon demand for all reasonable costs and expenses incurred by the Creditor, its agents or its designees in the course of such inspection and evaluation.

Section 5.3     Financing Statements and Filing.   Upon request of the Creditor, execute such financing statements and other documents (and pay the cost of recording the same in all offices requested by the Creditor) and do such other acts as the Creditor may from time to time request to establish and maintain a valid perfected security interest in the Collateral, including depositing with the Creditor any certificate of title issued on any of the Equipment and noting thereon the Creditor's security interest.  The Borrower agrees that any carbon, photographic or other reproduction of this Agreement or of any such financing statement shall be sufficient for filing as a financing statement.   The Borrower hereby irrevocably authorizes the Creditor at any time and from time to time to file in any office in any Uniform Commercial Code jurisdiction any initial financing statements and amendments thereto that (a) indicate the Collateral (i) as all assets of the Borrower or words of similar effect, regardless of whether any particular assets comprised in the Collateral falls within the scope of Article 9 of the Minnesota Uniform Commercial Code or such other jurisdiction, or (ii) as being of an equal or lesser scope or with greater detail, and (b) provide any other information required by part 5 of Article 9 of the Minnesota Uniform Commercial Code or such other jurisdiction for the sufficiency or filing office acceptance of any such financing statement or amendment. The Borrower hereby ratifies its authorization for the Creditor to have filed in any Uniform Commercial Code jurisdiction any initial financing statements or amendments thereto filed prior to the date hereof.

Section 5.4     Locations and Notices.  Maintain and keep  (a) all Inventory and Equipment at the locations shown on Schedule C and immediately give written notice to the Creditor of any use of Equipment in any jurisdiction other than a State listed on such Schedule, and not use any Equipment outside the territorial limits of the United States; (b) all Fixtures at the addresses shown on Schedule D; (c) except as delivered to the Creditor from time to time, all Chattel Paper, Instruments and Documents, and all records included as Collateral or otherwise concerning the Collateral, at the address shown on the signature page and not duplicate any records regarding any Non-Goods Collateral at any other address; and (d) the location of its chief office at the address shown on the signature page.

9

**Exhibit G**

Section 5.5     Names.  Not do business under any name other than its own and the trade names and styles, if any, set forth on Schedule A.

Section 5.6     Notation on Records.  Upon request of the Creditor, stamp on its records concerning the Collateral a notation, in form satisfactory to the Creditor, of the security interest of the Creditor hereunder, and mark conspicuously each Document, Chattel Paper, Instrument or contract included in the Collateral with a legend, in form and substance satisfactory to the Creditor, indicating that such Document, Chattel Paper, Instrument or contract is subject to the security interest of the Creditor.

Section 5.7     Delivery of Collateral.  Upon request of the Creditor, deliver to the Creditor all Documents, Instruments and Chattel Paper, duly endorsed to be payable to the Creditor, or accompanied by duly executed instruments of transfer or assignment in form and substance satisfactory to the Creditor, with full recourse to the Borrower.

Section 5.8     Transfer, Sale or Security Interest.  Except as expressly authorized under Section 4.1 hereof (subject to the limits therein), not sell, lease, transfer, consume, assign or otherwise dispose of, or create or permit to exist any lien on or security interest (other than the Creditor's security interest) in, any Collateral.

Section 5.9     Maintenance.  Keep all Equipment and Fixtures in first class order and repair, excepting (a) ordinary wear and tear, and (b) any damage or destruction which is fully covered by insurance payable to the Creditor.

Section 5.10    Insurance.  Keep all Inventory, Equipment and Fixtures insured against loss, damage, theft and other risks, with amounts and insurance companies, and under policies, satisfactory to the Creditor, which policies shall provide that loss thereunder shall be payable to the Creditor as its interest may appear (and the Creditor may apply any proceeds of such insurance which may be received by it toward payment of Liabilities, whether or not due, in such order of application as the Creditor may determine), and such policies or certificates thereof shall, if the Creditor so requests, be deposited with the Creditor.

Section 5.11    Payment of Taxes and Liabilities.  Pay, when due, all taxes, assessments, governmental charges and other similar charges levied against any of the Collateral, except and so long as the Borrower is contesting such taxes, assessments or charges in good faith and, by appropriate proceedings and the Borrower has set aside on its books such reserves or other appropriate provisions therefor as may be required by generally accepted accounting principles, and so long as no enforcement action is being taken that would interfere with the Borrower's use of such Collateral or the enforcement of the Creditor's rights hereunder.  The Borrower further agrees to pay as and when due all Liabilities.

Section 5.12    Waivers.  Upon request of the Creditor, obtain and deliver to the Creditor waivers in form and substance satisfactory to the Creditor of any claim to any Collateral by any landlord or mortgagee of any property where Equipment or Inventory is located.

Section 5.13    Inventory.  Comply with all requirements of the Fair Labor Standards Act in producing Inventory.

Section 5.14    Deposit Accounts.  All Deposit Accounts presently maintained by the Borrower are listed on Schedule E.

10

**Exhibit G**

## ARTICLE 6 – THE CREDITOR'S DUTIES AND POWER OF ATTORNEY

Section 6.1      The Creditor's Performance of Agreements and Reimbursement.  The Creditor may, from time to time, at its option, perform any agreement of the Borrower hereunder which the Borrower shall fail to perform and take any other action which the Creditor deems necessary for the maintenance or preservation of the Collateral or its interest therein, and the Borrower shall reimburse the Creditor for all expenses of the Creditor in connection with the foregoing, together with interest thereon at the highest rate of interest borne by any of the Liabilities at such time from the date incurred until reimbursed by the Borrower.

Section 6.2      Grant of Power.  The Borrower does hereby make, constitute and appoint the Creditor (or any officer or agent of the Creditor) as the Borrower's true and lawful attorney-in-fact, with full power of substitution, in the name of the Borrower or in the name of the Creditor or otherwise, for the use and benefit of the Creditor, but at the cost and expense of the Borrower, (a) to indorse the name of the Borrower on any instruments, notes, checks, drafts, money orders, or other media of payment (including payments payable under any policy of insurance on the Collateral) or Collateral that may come into the possession of the Creditor or any affiliate of the Creditor in full or part payment of any of the liabilities; (b) upon the occurrence and during the continuance of any Default, to sign and indorse the name of the Borrower on any invoice, freight or express bill, bill of lading, storage or warehouse receipts, drafts against debtors, assignments, verifications and notices in connection with any Collateral, and any instrument or document relating thereto or to any of the Borrower's rights therein; (c) to file financing statements pursuant to the Uniform Commercial Code and other notices appropriate under applicable law as the Creditor deems necessary to perfect, preserve, and protect the Creditor's rights and interests under this Agreement; (d) after a Default has occurred, to obtain the insurance required under the Credit Documents and indorse any drafts, and cancel any insurance so obtained by the Creditor; (e) after a Default has occurred, to give written notice to the United States Post Office to effect change(s) of address so that all mail addressed to the Borrower may be delivered directly to the Creditor; and (f) to do any and all things necessary or desirable (i) to perfect the Creditor's security interest in, and Lien on, and other rights and interests in, the Collateral, (ii) to preserve and protect the Collateral, (iii) to enforce the Creditor's rights and remedies under the Credit Documents and applicable law, and (iv) to otherwise carry out this Agreement and the other Credit Documents.  This power of attorney, being coupled with an interest, is irrevocable for the term of this Agreement and all transactions under this Agreement and thereafter so long as any of the liabilities remain in existence.  The Borrower ratifies and approves all acts of such attorney, and neither the Creditor nor its attorney will be liable for any acts or omissions or for any error of judgment or mistake of fact or law.  The Borrower will execute and deliver promptly to the Creditor all instruments necessary or desirable, as determined in the Creditor's discretion, to further the Creditor's exercise of the rights and powers granted it in this Section 6.2.

Section 6.3      No Liability on Collateral; Indemnity.  The rights and powers of the Creditor hereunder are conferred solely to protect its interest in the Collateral and shall not impose any duty upon it to exercise any such rights or powers.  The Creditor does not in any way assume any of the Borrower's obligations under, or with respect to, the Collateral.  The Borrower shall remain liable with respect to the Collateral to the same extent as if this Agreement had not been executed.  The Borrower agrees to indemnify and hold harmless the Creditor against any and all liabilities, claims, damages, actions, proceedings, losses or other obligations arising in connection with or on account of any of the Collateral.

Section 6.4      Care of Collateral.  Except for the safe custody of any Collateral in its possession, the Creditor shall have no duty as to any Collateral or as to the taking of any steps to preserve rights against any other party.  The Creditor shall be deemed to have exercised reasonable care in the custody and preservation of any Collateral in its possession if such Collateral is accorded treatment

11

**Exhibit G**

substantially equal to that which the Creditor accords its own property, or is accorded treatment complying with any provision of any other document setting forth a standard of care for such Collateral.

## ARTICLE 7 – DEFAULT AND REMEDIES

Whenever a Default shall be existing:

Section 7.1    Liabilities Due and Payable.  All of the Liabilities may (notwithstanding any provisions of any of the Credit Documents), at the option of the Creditor, and without demand or notice of any kind, be declared, and thereupon immediately shall become, due and payable.

Section 7.2    Deposits, etc.  The Creditor may, from time to time, without demand or notice of any kind, appropriate and apply toward the payment of such of the Liabilities, and in such order of application, as the Creditor may from time to time elect, any and all balances, credits, deposits (general or special, time or demand, provisional or final), accounts or moneys of or in the name of the Borrower then or thereafter with the Creditor.

Section 7.3    Assembly of Collateral.  Upon demand of the Creditor, the Borrower shall assemble, at its expense, all Collateral at a convenient place acceptable to the Creditor.

Section 7.4    Use and Sale of Collateral.  The Creditor may, to the fullest extent permitted by applicable law, without notice, hearing or process of law of any kind, (a) enter upon any premises where any of the Collateral may be located and take possession of and remove such Collateral; (b) use or license, on an exclusive or non-exclusive basis, any General Intangibles throughout the world for such term or terms, on such conditions, and in such manner, as the Creditor shall in its sole discretion determine, without compensation to the Borrower; (c) sell any or all of the Collateral, free of all rights and claims of the Borrower therein and thereto; and (d) bid for and purchase any or all of such Collateral at any such sale.

Section 7.5    Additional Provisions on Sale.  Any sale of Collateral may be in one or more parcels at public or private sales, at any of the Creditor's offices or elsewhere, for cash, on credit, or for future delivery, and upon such other terms as the Creditor may reasonably believe are commercially reasonable.  The Creditor shall not be obligated to make any sale of Collateral regardless of notice of sales having been given, and the Creditor may adjourn any public or private sale from time to time by announcement made at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned.

Section 7.6    Waiver by the Borrower.  The Borrower hereby expressly waives, to the fullest extent permitted by applicable law, any and all notices, advertisements, hearings or process of law in connection with the exercise by the Creditor of any of its rights and remedies upon Default.  Any notification of intended disposition of any of the Collateral required by law shall be deemed reasonably and properly given if given at least five days before such disposition.

Section 7.7    Proceeds of Collateral.  Any proceeds of any disposition by the Creditor of any of the Collateral may be applied by the Creditor to the payment of expenses in connection with the Collateral, including reasonable attorneys' fees and legal expenses, and any balance of such proceeds may be applied by the Creditor toward the payment of such of the Liabilities, and in such order of application, as the Creditor may from time to time elect.

Section 7.8    Recourse to Collateral; Remedies not Exclusive.  The Creditor may resort to the Collateral for payment of any of the Liabilities, whether or not the Creditor shall have resorted to any

8211422v2

**Exhibit G**

other property securing the Liabilities or shall have proceeded against the Borrower or any other party obligated to pay or perform the Liabilities.  The Creditor's exercise of rights hereunder shall not prevent the Creditor's exercise of any other rights it may have upon the occurrence of a Default under any other Credit Documents or otherwise, and one exercise of rights hereunder shall not prevent any subsequent exercise of rights of the Creditor hereunder, under any Credit Documents or otherwise.

Section 7.9     Other Rights.  The Creditor may exercise from time to time any other rights and remedies available to it under any Credit Document and under all applicable law.

ARTICLE 8 – GENERAL PROVISIONS

Section 8.1     Reimbursement of Expenses.  The Borrower agrees to pay on demand: (a) all costs and expenses of the Creditor (including the reasonable fees and expenses of counsel and paralegals for the Creditor) incurred in connection with the preparation, execution and delivery of this Agreement and the preparation, negotiation and execution of any and all amendments to this Agreement, and (b) all costs and expenses of the Creditor incurred in connection with the enforcement of its rights hereunder, including expenses of any repairs to any realty or other property to which any of the Equipment or Fixtures may be affixed or be a part.  The obligations of the Borrower under this Section shall survive any termination of this Agreement.

Section 8.2     Notices.  Any notice, consent or approval that Creditor or Borrower may desire or be required to give to the other shall be in writing and shall be mailed or delivered to the intended recipient thereof at its address set forth below or at such other address as such intended recipient may from time to time by notice in writing designate to the sender pursuant hereto.  Any such notice, consent or approval shall be deemed effective if given (a) by nationally recognized overnight courier for next day delivery one (1) business day after delivery to such courier; (b) by United States mail (registered or certified), two (2) business days after such communication is deposited in the mails; or (c) in person, when written acknowledgment of receipt thereof is given.  Refusal to accept delivery or the inability to deliver because of a changed address for which no notice was given shall be deemed receipt.

(a)          If to Borrower:

             Rancher's Legacy Meat Co.
             4301 White Bear Parkway
             Vadnais Heights, MN 55110
             Attn:   President

(b)          If to Creditor:

             Upper Lakes Foods, Inc.
             801 Industry Avenue
             Cloquet, MN 55720
             Attn:   Chief Financial Officer

Section 8.3     Waivers and Amendments.  No failure or delay on the part of the Creditor in the exercise of any power, right or remedy, and no course of dealing between the Borrower and the Creditor, shall operate as a waiver of such power, right or remedy, nor shall any single or partial exercise of any power, right or remedy preclude other or further exercise thereof or the exercise of any other power, right or remedy.  No notice to or demand on the Borrower not required hereunder shall in any event entitle the Borrower to any other or further notice or demand in similar or other circumstances or constitute a waiver of the right of the Creditor to any other or further action in any circumstances without notice or demand. No amendment, modification or waiver of, or consent with respect to, any provision of this Agreement

13

8211422v2

**Exhibit G**

shall in any event be effective unless the same shall be in writing and signed and delivered by the Creditor. Any waiver of any provision of this Agreement, and any consent to any departure by the Borrower from the terms of any provision of this Agreement, shall be effective only in the specific instance and for the specific purpose for which given.

Section 8.4    Remedies Cumulative. The remedies provided for herein are cumulative and not exclusive of any remedies which may be available to the Creditor at law or in equity.

Section 8.5    Termination of Agreement. Unless sooner terminated by the Creditor, this Agreement shall terminate when all of the Credit Documents shall have expired or been terminated and all Liabilities shall have been paid in full. This Agreement shall continue notwithstanding that there may be, from time to time, no outstanding loans or extensions of credit from the Creditor to the Borrower. Any return of Collateral upon termination of this Agreement and any instruments of transfer or termination shall be at the expense of the Borrower and shall be without warranty by, or recourse against, the Creditor.

Section 8.6    Successors and Assigns. This Agreement shall be binding upon the Borrower, its successors and assigns (and, if an individual, the Borrower's heirs, estate and personal representatives), and shall inure to the benefit of, and be enforceable by, the Creditor and its successors, transferees, and assigns. Without limiting the generality of the foregoing, the Creditor may assign or otherwise transfer all or any portion of the Liabilities to any other person or entity and may similarly transfer all or any portion of its rights under this Agreement to such person or entity.

Section 8.7    Choice of Law. This Agreement has been delivered at Minneapolis, Minnesota, and shall be construed in accordance with and governed by the laws of the State of Minnesota.

Section 8.8    Severance. Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity without invalidating the remainder of such provision or the remaining provisions of this Agreement.

Section 8.9    Counterparts. This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument.

Section 8.10    Consent to Jurisdiction. AT THE OPTION OF THE CREDITOR, THIS AGREEMENT MAY BE ENFORCED IN ANY FEDERAL COURT OR MINNESOTA STATE COURT SITTING IN MINNEAPOLIS OR ST. PAUL, MINNESOTA; AND THE BORROWER CONSENTS TO THE JURISDICTION AND VENUE OF ANY SUCH COURT AND WAIVES ANY ARGUMENT THAT VENUE IN SUCH FORUMS IS NOT CONVENIENT. IN THE EVENT THE BORROWER COMMENCES ANY ACTION IN ANOTHER JURISDICTION OR VENUE ARISING DIRECTLY OR INDIRECTLY FROM THE RELATIONSHIP CREATED BY THIS AGREEMENT, THE CREDITOR AT ITS OPTION SHALL BE ENTITLED TO HAVE THE CASE TRANSFERRED TO ONE OF THE JURISDICTIONS AND VENUES ABOVE-DESCRIBED, OR IF SUCH TRANSFER CANNOT BE ACCOMPLISHED UNDER APPLICABLE LAW, TO HAVE SUCH CASE DISMISSED WITHOUT PREJUDICE.

Section 8.11    Waiver of Notice and Hearing. THE BORROWER HEREBY WAIVES ALL RIGHTS TO A JUDICIAL HEARING OF ANY KIND PRIOR TO THE EXERCISE BY THE CREDITOR OF ITS RIGHTS TO POSSESSION OF THE COLLATERAL WITHOUT JUDICIAL

14

**Exhibit G**

PROCESS OR OF ITS RIGHTS TO REPLEVY, ATTACH, OR LEVY UPON THE COLLATERAL WITHOUT PRIOR NOTICE OR HEARING.

Section 8.12    Waiver of Jury Trial.    THE BORROWER AND THE CREDITOR EACH WAIVE ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHTS UNDER THIS AGREEMENT OR UNDER ANY AMENDMENT, INSTRUMENT, DOCUMENT OR AGREEMENT DELIVERED OR WHICH MAY IN THE FUTURE BE DELIVERED IN CONNECTION HEREWITH AND AGREE THAT ANY SUCH ACTION OR PROCEEDING SHALL BE TRIED BEFORE A COURT AND NOT A JURY.

[Remainder of page intentionally blank;
signature page follows]

8211422v2

**Exhibit G**

IN WITNESS WHEREOF, this Agreement has been duly executed as of the day and year first above written.

**BORROWER:**                           RANCHER'S LEGACY MEAT CO.,
                                        a Minnesota corporation

                                        By: _____
                                        Printed Name:  Arlyn J. Lomen
                                        Title:  President

*Address*:
Rancher's Legacy Meat Co.
4301 White Bear Parkway
Vadnais Heights, MN 55110
Attn:   President

**CREDITOR:**                           UPPER LAKES FOODS, INC.,
                                        a Minnesota corporation

                                        By: _____
                                        Printed Name:  SUSAN RYAN
                                        Title:  PRESIDENT

*Address*:
801 Industry Ave.
Cloquet, MN 55720
Attention: Chief Financial Officer

16

8211422v2

**Exhibit G**

SCHEDULE A
TO
SECURITY AGREEMENT
BETWEEN
RANCHER'S LEGACY MEAT CO.
AND
UPPER LAKES FOODS, INC.

1. Type of entity:  Corporation

2. Jurisdiction of Organization:   Minnesota

3. Organizational Identification Number:  3826691-2

4. Federal Taxpayer Identification Number:  27-2478431

5. Trade Names and Trade Styles used by the Borrower during the past 5 years:

Unger Meat Company
Rancher's Best
Heritage Ranch
Rancher's Legacy

17

**Exhibit G**

SCHEDULE B
TO
SECURITY AGREEMENT
BETWEEN
RANCHER'S LEGACY MEAT CO.
AND
UPPER LAKES FOODS, INC.

Other Security Interests

| SECURED PARTY | FILING NUMBER / FILING OFFICE | FILING DATE | COLLATERAL DESCRIPTION |
|---|---|---|---|
| James L. Ratcliff | 201022606390 (MN) | December 29, 2015 (amended Jan 24, 2011 and continued November 12, 20150 | Inventory, equipment, leases, general intangibles, accounts (see financing statement for more detail) |
| UMC Equipment, LLC | 834683600053 (MN) | July 28, 2015 | Specified equipment (see financing statement for more detail) |
|  |  |  |  |

8211422v2

**Exhibit G**

SCHEDULE C
TO
SECURITY AGREEMENT
BETWEEN
RANCHER'S LEGACY MEAT CO.
AND
UPPER LAKES FOODS, INC.

Locations at which Equipment and Inventory are kept:

| | |
|---|---|
| 1. | 4301 White Bear Parkway<br>Vadnais Heights, MN 55110 |
| 2. | Trademark Transportation<br>5322 Main Street NE<br>Fridley, MN 55421 |
| 3. | _____<br>_____<br>_____ |
| 4. | _____<br>_____<br>_____ |

19

**Exhibit G**

SCHEDULE D
TO
SECURITY AGREEMENT
BETWEEN
RANCHER'S LEGACY MEAT CO.
AND
UPPER LAKES FOODS, INC.

Address:

4301 White Bear Parkway
Vadnais Heights, MN 55110

Legal Description:

That part of the South 342 feet of the North 642 feet of the Northwest Quarter of the Southeast Quarter (NW/4 SE/4) of Section Twenty-one (21), Township Thirty (30) North, Range Twenty-two (22) West lying East of the Easterly right-of-way line of Interstate Highway No. 35E, Ramsey County, Minnesota;

Fee Owners:
James L. Ratcliff, as Trustee of 2001 James L. Ratcliff Revocable Trust Agreement
James N. Ratcliff

8211422v2

**Exhibit G**

SCHEDULE E
TO
SECURITY AGREEMENT
BETWEEN
RANCHER'S LEGACY MEAT CO.
AND
UPPER LAKES FOODS, INC.


None

8211422v2

**Exhibit G**

SCHEDULE 2.1
TO
SECURITY AGREEMENT
BETWEEN
RANCHER'S LEGACY MEAT CO.
AND
UPPER LAKES FOODS, INC.

None

8211422v2

**Exhibit G**

SCHEDULE 3.7
TO
SECURITY AGREEMENT
BETWEEN
RANCHER'S LEGACY MEAT CO.
AND
UPPER LAKES FOODS, INC.


<u>COPYRIGHTS</u>

None

<u>PATENTS</u>

None.

<u>LICENSES</u>

None.

<u>TRADEMARKS</u>

See attached schedule

23

8211422v2

**Exhibit G**

**Rancher's Legacy Meat Co.**
**Summary of Registered Trademarks**
**06.01.2015**

| US Patent Registration Number | Vidas File Number | Registered Name | Owner of Trademark | |
|---|---|---|---|---|
| | | | Rancher's | Effective As Of |
| 4,071,657 | U15.4C-14995-US01 | Rancher's Legacy & Design | yes | 06.04.2014 |
| 4,007,213 | U15.4B-14997-US01 | Heritage Ranch | yes | 06.04.2014 |
| 4,007,215 | U15.4C-15227-US01 | Heritage Ranch Premium Source Verified Beef | yes | 06.04.2014 |
| 4,147,341 | U15.4C-14998-US01 | Unger Meat Company & Design | yes | 06.04.2014 |
| 3,969,889 | U15.4C-14997-US01 | Heritage Ranch & Design | yes | 06.04.2014 |
| 4,445,069 | U15.4Z-15848-US01 | Rancher's Best & Design | yes | 06.04.2014 |
| **Publication Number** | | | | **Filing Date** |
| 9,065,182 | U15.5A-15226-CN01 | Heritage Ranch & Design (China) | yes | 06.23.2014 |
| 85/035186 | U15.5A-15226-JP01 | Heritage Ranch & Design (Japan) | yes | 10.06.2014 |
| 1394594 | U15.5A-15848-MX01 | Rancher's Best & Design (Mexico) | yes | pending |
| Pending | U15.5A-15848-CN01 | Rancher's Best & Design (China) | yes | 02.04.2015 |

8211422v2

**Exhibit G**

**Filing Number: 1071081700028**
**Date: 02/26/2019**
**Time: 10:32 AM**
**STATE OF MINNESOTA**
**Office: Office of the Minnesota**
**Secretary of State**

# UCC3 - Termination - UCC Financing Statement

**ORIGINAL FILING NUMBER:**  974464700113

**ORIGINAL FILING DATE:** 10/18/2017

**RETURN ACKNOWLEDGEMENT TO:**
Robert Magie
501 Lake Ave. South
Duluth, MN  55802

## AUTHORIZING PARTY

**ORGANIZATION'S NAME**
Upper Lake Foods, Inc.

Exhibit H

|  | | | | | | Next 30 Days |
|---|---|---|---|---|---|---|
| **Gross Sales -** | | | | | | |
| Fresh & Frozen Ground Beef/Pork - | | | | | Total Customer Receipts | $2,870,000 |
| Regular Business | $1,845,720 | $2.700 | $2,181,600 | $2.700 | | |
| New Chain Business | 535,500 | $1.750 | 853,125 | $1.750 | Purchases: | |
| Portion-Cut Steaks | 271,250 | $7.750 | 325,500 | $7.750 | Product Purchases | 1,910,000 |
| Tolling - | | | | | Packaging Purchases | 130,000 |
| Ground Products - | | | | | Supplies (Production/QA) | 15,000 |
| Existing Business | 12,672 | $0.495 | 12,870 | $0.495 | | |
| New Business | 15,840 | $0.495 | 63,360 | $0.495 | Outgoing Freight Charges | 90,000 |
| Portion-Cut Steaks | 12,600 | $2.000 | 12,600 | $2.000 | | |
| Other Products Not Specified | 0 | $0.000 | 0 | $0.000 | Payroll Cost - | |
| Boxed Beef/Pork | 144,000 | $6.000 | 180,000 | $6.000 | Production-related  Labor - | |
| | | | | | Employees | 83,000 |
| **Gross Sales** | **2,837,582** | **$2.551** | **3,629,055** | **$2.375** | Temporary Services | 105,000 |
| **Marketing Allowances** | (109,000) | ($0.098) | (155,000) | ($0.101) | Health Insurance - Production Workers | 12,300 |
| **Net Sales** | **$2,728,582** | **$2.453** | **$3,474,055** | **$2.274** | Sales staff, including benefits | 50,000 |
| | | | | | Administrative, including benefits | 57,000 |
| **Gross Margin -** | | | | | T&E Expenses, primarily sales staff | 8,000 |
| Fresh & Frozen Ground Beef/Pork - | | | | | | |
| Regular Business | $581,060 | $0.850 | $686,800 | $0.850 | Building Rent | 12,700 |
| New Chain Business | 76,500 | $0.250 | 121,875 | $0.250 | Real Estate Taxes (due 10.15.19) | 48,100 |
| BEK Price Increase (5 cents per pound) | 7,500 | $0.050 | 18,000 | $0.050 | Utilities | 21,000 |
| Portion-Cut Steaks | 52,500 | $1.500 | 63,000 | $1.500 | Property & Other Insurance, including W/C | 11,700 |
| Tolling - | | | | | | |
| Ground Products - | | | | | Plant Cleaning Fees | 29,000 |
| Existing Business | 11,520 | $0.450 | 11,700 | $0.450 | Repairs & Maintenance Costs | 10,000 |
| New Business | 15,360 | $0.480 | 61,440 | $0.480 | IT Service Fees, plus supplies | 5,500 |
| Portion-Cut Steaks | 11,340 | $1.800 | 11,340 | $1.800 | Professional Services- Regular Operations | 10,000 |
| Other Products Not Specified | 0 | $0.000 | 0 | $0.000 | Other Miscellanous Expenses | 7,500 |
| Boxed Beef/Pork | 24,000 | $1.000 | 30,000 | $1.000 | | |
| Samples & Donated Products | (2,200) | | (2,800) | | | |
| Other Product Costs Not Allocated | (38,098) | ($0.035) | (52,423) | ($0.035) | Marketing Allowances-Paid to Distributors | 112,000 |
| Freight to Customers' Locations | (95,810) | ($0.100) | (120,480) | ($0.100) | Food Shows and Other Marketing Expenses | 10,000 |
| Marketing Allowances | (109,000) | ($0.098) | (155,000) | ($0.101) | Sales Commissions | 18,000 |
| | | | | | | |
| **Total Gross Margin** | **534,673** | **$0.481** | **673,452** | **$0.441** | Total Expenditures | 2,755,800 |
| | | | | | | |
| **Production Costs** | | | | | | |
| Production Labor | 72,500 | 0.067 | 92,000 | 0.060 | Nissan Lease | 700 |
| Incremental Labor - New Business | 27,040 | 0.025 | 49,240 | 0.033 | Debt Service - Ochsner Annual Payment | 112,940 |
| Labor - PTO | 4,400 | 0.004 | 5,500 | 0.004 | | |
| Labor - Holiday Pay | 4,000 | 0.004 | 0 | 0.000 | Total Debt Service | 113,640 |
| Health Insurance | 12,500 | 0.011 | 12,500 | 0.008 | | |
| Payroll Taxes - Company-portion | 7,000 | 0.006 | 8,750 | 0.006 | Excess of Receipts Over Expenditures | $560 |
| 401K Plan - Company-portion | 1,700 | 0.002 | 2,125 | 0.001 | | |
| Workman Compensation Insurance | 3,300 | 0.003 | 3,300 | 0.002 | Legal Retainer | |
| Payroll Processing Costs | 800 | 0.001 | 1,000 | 0.001 | Other Related Expenditures | |
| Temporary Workers | 89,000 | 0.082 | 106,000 | 0.069 | | |
| **Total Production Labor** | **222,240** | **0.204** | **280,415** | **0.184** | | |
| | | | | | | |
| **Other Production Costs** | | | | | | |
| Utilities | 19,625 | 0.018 | 19,625 | 0.013 | | |
| Garbage Removal | 2,300 | 0.002 | 2,300 | 0.002 | | |
| Repairs & Maintenance | 11,300 | 0.010 | 14,000 | 0.009 | | |
| Building Rent | 8,266 | 0.008 | 8,266 | 0.005 | | |
| Equipment Lease Costs | 2,075 | $0.002 | 2,075 | $0.001 | | |
| Real Estate Taxes | 4,680 | 0.004 | 4,680 | 0.003 | | |
| Quality Control-Related Expenses | 4,500 | 0.004 | 5,625 | 0.004 | | |
| Sanitation & Production Supplies | 9,000 | 0.008 | 11,500 | 0.008 | | |
| Plant Cleaning Costs | 28,000 | 0.026 | 35,000 | 0.023 | | |
| Insurance | 8,500 | 0.008 | 8,500 | 0.006 | | |
| Other Production Costs | 1,600 | 0.001 | 1,600 | 0.001 | | |
| Depreciation | 15,900 | 0.015 | 15,900 | 0.010 | | |
| **Total Production Costs** | **337,986** | **0.311** | **409,486** | **0.268** | | |
| **Net Margin** | **196,687** | **0.170** | **263,966** | **0.173** | | |
| | | | | | | |
| **Operating Expenses** | | | | | | |
| Salaries & Benefits-Administrative | 52,000 | 0.048 | 65,000 | 0.043 | | |
| Salaries & Benefits-Sales | 50,000 | 0.046 | 60,000 | 0.039 | | |
| Travel & Entertainment | 8,000 | 0.007 | 10,000 | 0.007 | | |
| Marketing Expenses | 3,000 | 0.003 | 3,000 | 0.002 | | |
| Show Expenses | 1,000 | 0.001 | 5,000 | 0.003 | | |
| Samples | 4,600 | 0.004 | 5,500 | 0.004 | | |
| Sales Commissions | 18,000 | 0.017 | 22,000 | 0.014 | | |
| Repairs & Maintenance - IT | 4,800 | 0.004 | 4,800 | 0.003 | | |
| Building Rent | 4,451 | 0.004 | 4,451 | 0.003 | | |
| Real Estate Taxes | 2,520 | 0.002 | 2,520 | 0.002 | | |
| Professional Services | 5,000 | 0.005 | 7,500 | 0.005 | | |
| Depreciation | 3,700 | 0.003 | 3,700 | 0.002 | | |
| Other | 16,000 | 0.015 | 18,000 | 0.012 | | |
| **Total S, G & A Expenses** | **173,071** | **0.159** | **211,471** | **0.138** | | |
| | | | | | | |
| **Operating Income** | **23,616** | **$0.022** | **52,495** | **$0.034** | | |
| | | | | | | |
| **Interest Expense** | | | | | | |
| Ratcliff Note | 0 | | 0 | | | |
| SSJR Note | 8,050 | | 10,100 | | | |
| Other | 10,000 | | 12,500 | | | |
| **Total Interest Expense** | **18,050** | | **22,600** | | | |
| | | | | | | |
| **Net Income** | **$5,566** | | **$29,895** | | | |

Exhibit I

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| In Re: | Case No.: 19-32928-MER |
| Rancher's Legacy Meat Co., | Chapter 11 |
| Debtor. | |

## ORDER AUTHORIZING INTERIM USE OF CASH COLLATERAL
## AND GRANTING ADEQUATE PROTECTION

This case came on for hearing on the Expedited Hearing and for Interim and Final Orders Authorizing Use of Cash Collateral and Granting Adequate Protection filed by Rancher's Legacy Meat Co. ("Debtor"). Based on the motion and the file and having determined that the Debtor's offer of adequate protection constitutes adequate protection of the secured parties' interests under 11 U.S.C. §§ 361 and 363,

**IT IS ORDERED:**

1.      The Debtor's motion is granted.

2.      The Debtor's request for expedited relief is granted.

3.      The Debtor is authorized to use cash collateral in accordance with the terms of the budget filed in support of the Motion through the Interim Period.[1]

4.      The Debtor is authorized and directed to grant adequate protection to the Ratcliff and ULF on the terms as set forth in the motion. The replacement liens granted by the Debtor to

---

[1] Capitalized terms utilized herein and not otherwise defined shall have the meaning ascribed to them in the Motion.

22

Ratcliff and ULF shall have the same dignity, priority and effect as their respective prepetition interests, if any.

     5.       Except to the extent specifically set forth herein, all objections to the entry of this Order are hereby overruled.

     6.       The final hearing authorizing use of cash collateral will be held on **October 23, 2019 at 9:00 a.m.** before Judge Michael E. Ridgway,  Courtroom 7W, U.S. Courthouse, 300 South Fourth Street, Minneapolis, Minnesota 55415.

Dated: September __, 2019

_____
Honorable Michael E. Ridgway
UNITED STATES BANKRUPTCY JUDGE

23