List of Exhibits*:

Exhibit A: December 3, 2010 Promissory Note between Ratcliff and UMC, in the principal amount of $11,885,000.

Exhibit B:  December 3, 2010 Promissory Note between Ratcliff and UMC, in the principal amount of $2,250,000.

Exhibit C: December 3, 2010 UMC Security Agreement in favor of James Ratcliff.

Exhibit D:  December 29, 2010 Financing statement with the State of Minnesota Secretary of State as a purchase money security interest in all of the equipment purchased by the Debtor with the use of the funds provided by Ratcliff in the December 3 Startup Notes (Minnesota Secretary of State Document Number 201022606390).

Exhibit E: January 24, 2011 amendment to original Ratcliff UCC Filing Statement perfecting his rights in all other assets of UMC, Minnesota Secretary of State Document Number 20112290995.

Exhibit F: June 22, 2012, Stock Purchase Agreement.

Exhibit G: January 22, 2014, Second Amended Stock Purchase Agreement.

Exhibit H:  May 6, 2014 Rancher's Legacy Meat Co. name change filed with the State of Minnesota Secretary of State - Filing No. 75959890002.

Exhibit I: November 12, 2015, Ratcliff continuation statement with the debtor's name listed as "Unger Meat Company".  (Secretary of State Document No. 854026600022).

Exhibit J: January 10, 2019, Ratcliff amended financing with the debtor listed as "Ranchers Legacy Meat Co." (Minnesota Secretary of State Document Number 106188100028).

Exhibit K: November 4, 2019 UCC Report for Rancher's Legacy Meat Co. from the Minnesota Secretary of State.

Exhibit L: Letter dated September 24, 2019 demanding adequate protection payments.

Exhibit M: Report of Robert Strachota/Shenehon Group January14, 2020.

* Per Local Rule 9013-2(e), this summary of the voluminous exhibits that accompany this motion is being provided to all parties The full exhibits and the summary were attached to the original motion filed with the clerk. Movant will upon request furnish a copy of the full exhibits to any entity.

# EXHIBIT A

## PROMISSORY NOTE

$2,250,000                                                            4301 White Bear Parkway
5.5% (Indexed)                                                Vadnais Heights, MN 55110
                                                                            December 3, 2010

FOR VALUE RECEIVED, Unger Meat Company, a Minnesota corporation ("Maker"), promises to pay to the order of James L. Ratcliff ("Holder"), at the address of 24631 South Hwy. 2, Vinita, Oklahoma, 74301, or at such other place as the Holder may designate and notify the undersigned, in lawful money of the United States, and in immediately available funds, the principal sum of $2,250,000, together with interest at the initial rate of five percent (5.5%) per annum.

1.     Principal payments on this Promissory Note shall be deferred for eighteen (18) months from the date hereof. During said eighteen-month period, interest shall be payable in eighteen (18) monthly installments. The first monthly installments shall be $10,310.83 commencing on January 3, 2011. The final installment of interest only will be due on June 3, 2012.

2.     Principal and interest payments on this Promissory Note shall become due and payable commencing nineteen (19) months after the date hereof, the first such payment of principal and interest in the sum of $18,388.83 (subject to adjustment or set forth below) will be due and owing on July 3, 2012, with successive installments in said amount being due on the first day of each month thereafter until June 3, 2017, at which time the entire unpaid balance of principal and interest shall be due and payable in full.

3.     Interest on all sums owing under the terms of this Promissory Note shall be subject to adjustment in the amounts and on the effective dates that the interest rate on the sums owing under the terms of that certain Promissory Note given by James L. Ratcliff as maker to American Bank of

EXHIBIT
A

Oklahoma dated November 24, 2010, and attached hereto and made a part hereof by reference shall

occur.  Interest after default and late payments under the terms of this Note shall be charged in the

same manner as specified by the aforesaid Exhibit "A" Promissory Note from James L. Ratcliff to

American Bank of Oklahoma.

4.    In the event:

a.    Maker fails to pay and installment payment that is due and payable on or
before the date such payment is due;

b.    Maker neglects to comply with any of the terms or provisions of this
Promissory Note;

c.    Maker defaults or neglects to comply with any of the terms of any other
promissory note or other agreement between Maker and Holder;

d.    Maker fails to comply with any of the terms or provisions of the Security
Agreement or Guaranty referenced above.

e.    Maker executes or makes an assignment for the benefit of his creditors and/or
a receiver or trustee is appointed for his creditors or the Maker is unable
generally to pay his debts as they become due;

f.    Any proceedings are commenced relating to the Maker under any bankruptcy,
insolvency, readjustment of debt, dissolution or liquidation statutes or any
jurisdiction now or hereafter in effect; or

g.    There is a seizure and sale, or post-judgment attachment or post-judgment
judicial process upon all or a substantial part of the property of the Maker,

then Holder, upon the occurrence of any such event may, at his sole option, declare any or all of the

indebtedness evidenced by this Promissory Note to be immediately due and payable, and Holder be

entitled to exercise any and all rights and remedies that the he has against Maker.

5.    Maker hereby waives presentment for payment, demand, notice of nonpayment,

protest, and notice of protest, and agrees that the time of payment hereby may be extended from time

to time, one or more times without notice of such extension or extensions and without previous

consent. No delay on the part of Holder in exercising any rights hereunder shall operate as a waiver

of such rights, nor shall any single or partial exercise of any power or right hereunder preclude other

or further exercise of any power or right hereunder.

6.   If this Promissory Note is placed in the hands of any attorney for collection, the

Maker agrees to pay to Holder, in addition to the unpaid principal and interest due hereon, all costs

of collection, including, but not limited to, reasonable attorney's fees and all court costs incurred.

7.   This Promissory Note has been executed and delivered in, and its terms and

conditions are to be governed and construed by, the laws of the State of Minnesota.

8.   This Promissory Note shall be binding upon the successors and assigns of Maker.

9.   This Promissory Note may be assigned without the consent of the Maker.

Dated and signed this 3rd day of December, 2010.

"MAKER"
Unger Meat Company

By: _____
Joe Unger, President

# EXHIBIT B

Loan# 24-155200

## PROMISSORY NOTE – Fixed or Variable Rate – Real Estate – General

| | DATE OF NOTE |
|---|---|
| | 11/24/2010 |

| DEBTOR'S NAME(S) | LENDER'S NAME AND ADDRESS |
|---|---|
| James L. Ratcliff | AMERICAN BANK OF OKLAHOMA<br>Collinsville<br>P.O. Box 68<br>Collinsville, OK 74021-0066 |

**DEBTOR'S ADDRESS**

P.O. Box 402
Vinita, OK 74301

| NOTE NUMBER | MATURITY DATE | PRINCIPAL AMOUNT | CUSTOMER NUMBER | OFFICER | SOCIAL SECURITY/TIN NUMBER | ☒ ACTUAL/360 ☐ 30/360 |
|---|---|---|---|---|---|---|
| | 11/24/2011 | $2,000,000.00 | | JAL | | ☐ ACTUAL/365 |

| ☐ FIXED INTEREST RATE PER ANNUM | ☒ VARIABLE INTEREST RATE INDEX | | VARIABLE RATE INDEX | |
|---|---|---|---|---|
| | PRESENT INDEX RATE 3.250 % | | Wall Street Journal Prime | |
| | MARGIN OVER/UNDER INDEX 2.000 % | | | MAXIMUM PER ANNUM INTEREST RATE CHANGE once a day |
| | INITIAL PER ANNUM RATE 5.500 % | | | MINIMUM INTEREST RATE 5.500 |
| | | | | MAXIMUM INTEREST RATE 21.000 |

| ☐ NEW LOAN | | PURPOSE OF LOAN |
|---|---|---|
| ☐ RENEWAL OF LOAN NUMBER(S) | | Cattle operation expense until Spring & operating |
| ☐ FULLY ADVANCED  ☐ MULTIPLE ADVANCES  ☒ REVOLVING CREDIT | | expense for Minnesota meat packing plants Originally Cattle Operating Expense |

**COLLATERAL DESCRIPTION**

1st RE Mtg on at 35998 Oak Tree Drive Ketchum OK, Delaware County

**PAYMENT TERMS**

Demand or in absence of demand; This note is payable in payments of all accrued interest due quarterly beginning February 24, 2011, a final payment of outstanding principal plus all accrued interest shall be due and payable on November 24, 2011.

**PROMISE TO PAY.** For value received, the undersigned Debtor, whether one or more, and jointly and severally if more than one, agree to the terms of this Note and promises to pay to the order of the Lender named above at its place of business as indicated in this Note or such other place as may be designated in writing by Lender, the Principal Amount of this Note and any accrued and unpaid Finance Charges, together with interest on the unpaid Principal Amount until Maturity at the per annum interest rate(s) stated above and according to the payment terms stated above. Depending on the box checked above, interest on this Note is calculated either on the assumption that every year has 360 days and every month has 30 days (30/360) or on the actual number of days elapsed on a basis of a 360 day year (Actual/360) or a 365 day year (Actual/365). For purposes of computing interest and determining the date principal and interest payments are received, all payments will be deemed made only when received in collected funds. Payments are applied first to accrued and unpaid interest and other charges, and then to payment of the unpaid principal balance. In this Note, "Debtor" includes any party liable under this Note, including endorsers, co-makers, guarantors and otherwise, and "Lender" includes all subsequent holders.

**VARIABLE RATE.** If this is a Variable Rate transaction as indicated above, the interest rate shall vary from time to time with changes (whether increases or decreases) in the Index Rate shown above. The interest rate on this Note will be the Index Rate plus a Margin, if any, as indicated above. Each change will become effective on the same date the Index Rate changes unless a different effective date is indicated above. If the Variable Rate is Lender's base or prime rate, it is determined by Lender in its sole discretion, primarily on a basis of its cost of funds, it is not necessarily the lowest rate Lender is charging its customers, and is not necessarily a published rate.

**LATE PAYMENTS.** When permitted by law, any principal and/or interest amount not paid within 10 calendar days after the due date will be assessed the greater of $4.00 or 5.000 % of the amount past due, as a late charge for, with a minimum Fee of $21.00 . At any time after the maturity date, Lender may at its sole discretion raise the interest rate on any unpaid principal and/or interest to the applicable rate stated in this Note plus N/A per annum ("Default Rate"), to no event shall the interest rate and related charges either before or after maturity be greater than permitted by law.

**ALL PARTIES PRINCIPALS.** All Debtors shall each be regarded as a principal and each Debtor agrees that any party to this Note, with Lender's approval and without notice to any other party, may from time to time renew this Note or consent to one or more extensions or deferrals of the Maturity Date for any term(s) or to any other modification(s), and all Debtors shall be liable in same manner as on the original terms.

**ADVANCES AND PAYMENTS.** If the Fully Advanced box is checked, the Debtor acknowledges that the entire Principal Amount has been advanced to the Debtor or for Debtor's account or benefit. For Multiple Advances or Revolving Credit, unless otherwise agreed in writing, Lender has not made a commitment to make any advances and has sole discretion to make, or not

make, each advance under this Note. If the Multiple Advances box is checked, the Debtor understands that the Lender will disburse the proceeds of this Note in increments, up to the Principal Amount, but that even if the Debtor prepays, the Debtor has no right to reborrow any amount disbursed. The balance that the Debtor owes under this Note is the aggregate of all such disbursement, less any payments of principal made on this Note. Interest will accrue only on the actual amount of principal disbursed and outstanding from time to time. If the Revolving Credit box is checked, then the Debtor understands that the Lender will disburse the proceeds of this Note in increments up to the Principal Amount and that the remaining terms of this paragraph shall apply to this Note. The balance that the Debtor owes under this Note is the aggregate of all such disbursements, less any payments of principal made on this Note. The Debtor understands that the maximum amount of all such advances outstanding at any one time cannot exceed the Principal Amount, but that the Debtor may repay and reborrow up to the Principal Amount during the term of this Note. If the aggregate outstanding amount advanced under this Note ever exceeds the Principal Amount, then the Debtor will repay the excess upon demand, plus interest on the excess. There may be times when no principal is outstanding on this Note, but this Note and any collateral securing this Note remain valid and effective as to future advances under this Note. Any loans or advances the Lender makes to the Debtor or for the Debtor's account or benefit are presumed to be made under the terms of this Note. The Lender may make advances under this Note at the oral or written request of any person designated or authorized by the Debtor until the Debtor revokes, such designation or authorization in writing received by the Lender, provided that the Lender has the right, but is not obligated, to require written authorization from the Debtor prior to honoring any oral request. Interest will accrue only on the actual amount of principal disbursed and outstanding from time to time.

**PREPAYMENT.** Debtor shall have the right to prepay all or any part of the principal due under this Note at any time, subject to the following conditions: (a) all interest must be paid through the date of any prepayment; (b) if this Note provides for monthly or other periodic payments, there will be no changes in the due dates or amounts following any partial prepayments unless Lender agrees to such changes in writing; and (c) upon prepayment, in whole or in part, Lender may charge and Debtor agrees to pay a fee or premium calculated as follows (this fee/premium provision will not apply if prohibited by applicable law):

**COLLATERAL.** This Note is secured by real property and the debt evidenced by this Note and all other obligations of Debtor to Lender, including renewals and extensions, are secured by all collateral securing this Note, and by all other security interests and mortgages previously or later granted to Lender as more specifically described in security agreements, mortgages and other securing documentation, and by all money, deposits and other property owned by any Debtor and in Lender's possession or control.

**DEBTOR'S SIGNATURE(S)**

X _James L. Ratcliff_ (signature)

James L. Ratcliff

| Form RE 0446.3 | © Copyright 07/06 American Bankers |
|---|---|

**EXHIBIT**

A

**DEBTOR EXPRESSLY AGREES:**

## ADDITIONAL PROVISIONS

**ACCELERATION.** At option of Lender, the unpaid balance of this Note and all other obligations of Debtor to Lender, whether direct or indirect, absolute or contingent, now existing or later arising, shall become immediately due and payable without notice or demand, upon or after the occurrence or existence of any of the following events or conditions: (a) any payment required by this Note or by any other note or obligation of Debtor to Lender or to others is not made when due, or any event or condition occurs or exists which results in acceleration of the maturity of any Debtor's obligation to Lender or to others under any promissory note, agreement or undertaking; (b) Debtor defaults in performing any covenant, obligation, warranty or provision contained in any loan agreement or in any instrument or document securing or relating to this Note or any other note or obligation of Debtor to Lender or to others; (c) any warranty, representation, financial information or statement made or furnished to Lender by or on behalf of Debtor proves to have been false in any material respect when made or furnished; (d) any levy, seizure, garnishment or attachment is made against any asset of any Debtor; (e) Lender determines, at any time and in Lender's sole discretion, that the prospect of payment of this Note is impaired; (f) whenever, in Lender's sole judgment, the collateral for the debt evidenced by this Note becomes unsatisfactory or insufficient either in character or value and, upon request, Debtor fails to provide additional collateral as required by Lender; (g) all or any part of the collateral for the debt evidenced by this Note is lost, stolen, substantially damaged or destroyed; (h) any Debtor dies or becomes incompetent, insolvent, dissolves, changes ownership or senior management, or terminates their existence; or (i) a receiver is appointed over all or part of any Debtor's property, or any Debtor makes an assignment for the benefit of creditors, files for relief under any bankruptcy or insolvency laws, or becomes subject to an involuntary proceeding under such laws. Upon the occurrence of any event described above, Lender may, at its option and with or without accelerating this Note, increase the Interest Rate on this Note to the Default Rate provided herein.

**RIGHT OF OFFSET.** Except as otherwise restricted by law, any indebtedness due from Lender to Debtor, including, without limitation, any deposits or credit balances due from Lender, is pledged to secure payment of this Note and any other obligation to Lender of Debtor, and may at any time while the whole or any part of such obligation(s) remain(s) unpaid, either before or after maturity of this Note, be set off, appropriated, held or applied toward the payment of this Note or any other obligation to Lender by any Debtor.

**ADDITIONAL PROVISIONS.** (1) Debtor agrees, if requested, to furnish to Lender copies of income tax returns as well as balance sheets and income statements for each fiscal year following Date of Note and at more frequent intervals as Lender may require. (2) No waiver by Lender of any payment or other right under this Note or any related agreement or documentation shall operate as a waiver of any other payment or right. All Debtors waive presentment, notice of acceleration, notice of dishonor and protest and consent to substitutions, releases and failure to perfect as to collateral and to additions or release of any Debtor. (3) This Note and the obligations evidenced by it are to be construed and governed by the laws of the state indicated in Lender's address shown in this Note. (4) All Debtors agree to pay costs of collection, including, as allowed by law, an attorney's fee equal to a minimum of 15% of all sums due upon default or such other maximum fee as allowed by law. (5) All parties signing below acknowledge receiving a completed copy of this Note and related documents, which contain the complete and entire agreement between Lender and any party liable for payment under this Note. No variation, condition, modification, change or amendment to this Note or related documents shall be binding unless in writing and signed by all parties. No legal relationship is created by the execution of this Note and related documents except that of debtor and creditor or as stated in writing.

Form 61 5685 3

© Copyright 075 American Bank Systems, Inc.

# PROMISSORY NOTE

$11,885,000                                          4301 White Bear Parkway
5% (Indexed)                                        Vadnais Heights, MN 55110
                                                    December 3, 2010

FOR VALUE RECEIVED, Unger Meat Company, a Minnesota corporation ("Maker"),

promises to pay to the order of James L. Ratcliff ("Holder"), at the address of 24631 South Hwy. 2,

Vinita, Oklahoma, 74301, or at such other place as the Holder may designate and notify the

undersigned, in lawful money of the United States, and in immediately available funds, the principal

sum of $11,885,000, together with interest at the initial rate of five percent (5%) per annum.

1.      Principal payments on this Promissory Note shall be deferred for eighteen (18)

months from the date hereof. During said eighteen-month period, interest shall be payable in

eighteen (18) monthly installments. The first monthly installment shall be $49,512.85 commencing

on January 3, 2011. The final installment of interest only will be due on June 3, 2012. Interest rates

and payment amounts shall be subject to adjustment as provided below.

2.      Monthly principal and interest payments on this Promissory Note shall commence

becoming due and payable commencing nineteen (19) months after the date hereof, the first such

payment of principal and interest in the sum of $94,006.83 (subject to index adjustment as set forth

below) will be due and owing on July 3, 2012, with successive installments in said amount being due

on the first day of each month thereafter until July 3, 2017, at which time the entire unpaid balance

of principal and interest shall be due and payable in full.

3.      The interest rate on all sums owing under the terms of this Promissory Note shall be

adjusted in the same manner and upon the same effective dates as provided by the Loan Application

EXHIBIT

B

and Debt Modification Agreement by and between James L. Ratcliff and James N. Ratcliff as

borrowers and Arvest Bank as lender attached hereto as Exhibit "A" and made a part hereof by

reference. Interest after default and late penalties under the terms of this Promissory Note shall occur

at the same rate and manner as specified by the said Exhibit "A" Loan Application and Debt

Modification Agreement.

4.     Maker acknowledges that this Promissory Note is secured pursuant to the terms of

the Security Agreement executed by Maker, in which Maker grants a security interest in and to all

of its assets including, but not limited to, its equipment, tools, inventory, accounts receivable and

other intangibles. Maker further acknowledges that this Promissory Note is secured by the Personal

Guaranty of Joe Unger.

5.     In the event:

a.     Maker fails to pay and installment payment that is due and payable on or
before the date such payment is due;

b.     Maker neglects to comply with any of the terms or provisions of this
Promissory Note;

c.     Maker defaults or neglects to comply with any of the terms of any other
promissory note or other agreement between Maker and Holder;

d.     Maker fails to comply with any of the terms or provisions of the Security
Agreement or Guaranty referenced above.

e.     Maker executes or makes an assignment for the benefit of his creditors and/or
a receiver or trustee is appointed for his creditors or the Maker is unable
generally to pay his debts as they become due;

f.     Any proceedings are commenced relating to the Maker under any bankruptcy,
insolvency, readjustment of debt, dissolution or liquidation statutes or any
jurisdiction now or hereafter in effect; or

Page 2

g.    There is a seizure and sale, or post-judgment attachment or post-judgment judicial process upon all or a substantial part of the property of the Maker,

then Holder, upon the occurrence of any such event may, at his sole option, declare any or all of the

indebtedness evidenced by this Promissory Note to be immediately due and payable, and Holder be

entitled to exercise any and all rights and remedies that the he has against Maker.

6.    Maker hereby waives presentment for payment, demand, notice of nonpayment,

protest, and notice of protest, and agrees that the time of payment hereby may be extended from time

to time, one or more times without notice of such extension or extensions and without previous

consent. No delay on the part of Holder in exercising any rights hereunder shall operate as a waiver

of such rights, nor shall any single or partial exercise of any power or right hereunder preclude other

or further exercise of any power or right hereunder.

7.    If this Promissory Note is placed in the hands of any attorney for collection, the

Maker agrees to pay to Holder, in addition to the unpaid principal and interest due hereon, all costs

of collection, including, but not limited to, reasonable attorney's fees and all court costs incurred.

8.    This Promissory Note has been executed and delivered in, and its terms and

conditions are to be governed and construed by, the laws of the State of Minnesota.

9.    This Promissory Note shall be binding upon the successors and assigns of Maker.

10.    This Promissory Note may be assigned without the consent of the Maker.

Dated and signed this 3rd day of December, 2010.

"MAKER"
Unger Meat Company

By: _____
     Joe Unger, President

Page 3

# ARVEST
## BANK
Member FDIC

**LOCATIONS**
- BARTLESVILLE, OK • P.O. BOX 968, 74005 (918) 337-3282
- DEWEY, OK • P.O. BOX 969 • BARTLESVILLE, OK 74006
- NOWATA, OK • P.O. BOX 312, 74048 • (918) 273-6400
- VINITA, OK • P.O. BOX 989 • 125 W. CANADIAN, 74301 (918) 256-6906
- CANEY, KS • P.O. BOX 86, 67333 • (620) 879-5411

**LOAN APPLICATION** WSB—1264-C

| | | |
|---|---|---|
| NAME James L Ratcliff and James N Ratcliff | | PHONE |
| PRESENT ADDRESS P.O. Box 402 | | |
| CITY Vinita | STATE OK | ZIP 74301 | SOCIAL SECURITY NUMBER OR TIN |
| ☐ Corporation   ☐ Partnership   ☒ Individual/Proprietorship | | BUSINESS PHONE |
| AMOUNT OF LOAN REQUESTED $12,000,000.00 | PURPOSE OF LOAN Increase Loan | |
| COLLATERAL OFFERED AND HOW OWNED | | |
| REQUESTED PAYMENT TERMS | TYPE OF BUSINESS / OCCUPATION | |

## DISCLOSURE OF APPLICANT RIGHTS

If your application for business credit is denied, you have the right to a written statement of the specific reasons for the denial. To obtain the statement, please contact: _____ Commercial Loan Officer, at address and telephone number indicated above, within 60 days from the date you are notified of our decision. We will send you a written statement of reasons for the denial within 30 days of receiving your request for the statement, if your application is for consumer credit, you will receive a written statement of reason for denial without your having to request it. Said statement will be sent within 30 days of date of application.

## EQUAL CREDIT OPPORTUNITY ACT NOTICE

NOTICE: The federal Equal Credit Opportunity Act prohibits creditors from discriminating against credit applicants on the basis of race, color, religion, national origin, sex, marital status, age (provided the applicant has the capacity to enter into a binding contract); because all or part of the applicant's income derives from any public assistance program; or because the applicant has in good faith exercised any right under the Consumer Credit Protection Act. The federal agency that administers compliance with this law concerning this creditor is [name and address as specified by the appropriate agency listed in appendix A].

FEDERAL RESERVE BANK OF ST. LOUIS
411 LOCUST ST.
ST. LOUIS, MO 63102

A complete, current and signed Financial Statement of Applicant must be attached. (Additional data and income information may also be required.)

Everything stated in this Application and the Financial Statement of the Applicant attached hereto is correct to the best of undersigned Applicant's knowledge. It is understood that you will retain this Application whether or not it is approved. You are authorized to check credit and business experience and to answer questions about your credit experience with Applicant.

| SIGNATURE | TITLE | DATE 12-2-10 |
|---|---|---|

**FOR BANK USE ONLY**

| SIC CODE | COLL CODE | INTEREST RATE - PER ANNUM | INTEREST FREQUENCY | ☐ Revolving  ☐ Nonrevolving | 1 2 3 4 5 6 7 8 |
|---|---|---|---|---|---|
| DISBURSE TO Account No: | | | CASHIER'S CHECK Payable To: | | |

**EXHIBIT**
A

|  | LOAN NUMBER | ACCT. NUMBER | NOTE DATE | CREDIT LIMIT | MATURITY DATE |
|---|---|---|---|---|---|
| **PRIOR OBLIGATION INFORMATION** |  |  | 09/30/10 | $11,000,000.00 | 09/30/11 |

|  | LOAN NUMBER | ACCT. NUMBER | MODIFICATION DATE | CREDIT LIMIT |
|---|---|---|---|---|
| **AMENDED OBLIGATION INFORMATION** |  |  | 12/01/10 | $12,000,000.00 |
|  | MATURITY DATE | INDEX (w/margin) | INTEREST RATE | INITIALS |
|  | 09/30/11 | Wall Street Journal Prime minus 0.5% | 5.0% | DLK |

Creditor Use Only

## DEBT MODIFICATION AGREEMENT

**DATE AND PARTIES.** The date of this Debt Modification Agreement (Modification) is December 1, 2010. The parties and their addresses are:

**LENDER:**
ARVEST BANK
P. O. BOX 999
Bartlesville, OK 74005-0999
Telephone: (918) 337-3000

**BORROWER:**
JAMES L. RATCLIFF
PO BOX 402
VINITA, OK 74301-0402

JAMES N. RATCLIFF
PO BOX 407 .
VINITA, OK 74301-0407

1. **DEFINITIONS.** In this Modification, these terms have the following meanings:
   A. **Pronouns.** The pronouns "I," "me," and "my" refer to each Borrower signing this Modification, individually and together with their heirs, executors, administrators, successors, and assigns. "You" and "your" refer to the Lender, with its participants or syndicators, successors and assigns, or any person or entity that acquires an interest in the Modification or the Prior Obligation.
   B. **Amended Obligation.** Amended Obligation is the resulting agreement that is created when the Modification amends the Prior Obligation. It is described above in the AMENDED OBLIGATION INFORMATION section.
   C. **Credit Limit.** Credit Limit means the maximum amount of principal you will permit me to owe you under this Line of Credit, at any one time. My Credit Limit is stated at the top of this Modification.
   D. **Loan.** Loan refers to this transaction generally. It includes the obligations and duties arising from the terms of all documents prepared or submitted in association with the Prior Obligation and this modification, such as applications, security agreements, disclosures, notes, agreements, and this Modification.
   E. **Modification.** Modification refers to this Debt Modification Agreement.
   F. **Prior Obligation.** Prior Obligation refers to my existing agreement described above in the PRIOR OBLIGATION INFORMATION section, and any previous extensions, renewals, modifications or substitutions of it.

2. **BACKGROUND.** You and I have previously entered into a Prior Obligation. As of the date of this Modification, the outstanding, unpaid balance of the Prior Obligation is $10,379,187.29. Conditions have changed since the execution of the Prior Obligation instruments. In response, and for value received, you and I agree to modify the terms of the Prior Obligation, as provided for in this Modification.

3. **TERMS.** The Prior Obligation is modified as follows:
   A. **Promise to Pay.** My promise to pay is modified to read:
      (1) PROMISE TO PAY. For value received, I promise to pay you or your order, at your address, or at such other location as you may designate, amounts advanced from time to time under the terms of the Loan up to the maximum outstanding principal balance of $12,000,000.00 (Principal), plus interest from the date of disbursement, on the unpaid outstanding Principal balance until the Loan is paid in full and you have no further obligations to make advances to me under the Loan.
   My Credit Limit has been increased by $1,000,000.00.
   B. **Interest.** Our agreement for the payment of interest after default is modified to read:
      (1) Interest After Default. If you declare a default under the terms of the Loan, including for failure to pay in full at maturity, you may increase the Interest Rate payable on the outstanding Principal balance of the Loan. In such event, interest will accrue on the outstanding Principal balance at the variable Interest Rate in effect from time to time, plus an additional 6.000 percent, until paid in full.
   C. **Payments.** The payment provision is modified to read:
      (1) PAYMENT. I agree to pay all accrued interest on the balance outstanding from time to time in regular payments beginning December 30, 2010, then on the same day in each 3rd month thereafter. Any payment scheduled for a date falling beyond the last day of the month, will be due on the last day. A final payment of the entire unpaid outstanding balance of Principal and interest will be due September 30, 2011.

JAMES L. RATCLIFF
Debt Modification Agreement
OK/4MCFREEMA00187900007143003120110N

Wolters Kluwer Financial Services ©1996, 2010 Bankers Systems™



Payments will be rounded to the nearest $.01. With the final payment I also agree to pay any additional fees or charges owing and the amount of any advances you have made to others on my behalf. Payments scheduled to be paid on the 29th, 30th or 31st day of a month that contains no such day will, instead, be made on the last day of such month.

D. **Fees and Charges.** As additional consideration for your consent to enter into this Modification, I agree to pay, or have paid these additional fees and charges:

(1) Late Charge. If a payment is more than 10 days late, I will be charged 5.000 percent of the Unpaid Portion of Payment or $5.00, whichever is greater. However, this charge will not be greater than $50.00. I will pay this late charge promptly but only once for each late payment.

**4. CONTINUATION OF TERMS.** Except as specifically amended by this Modification, all of the terms of the Prior Obligation shall remain in full force and effect.

**5. WAIVER.** I waive all claims, defenses, setoffs, or counterclaims relating to the Prior Obligation, or any document securing the Prior Obligation, that I may have. Any party to the Prior Obligation that does not sign this Modification, shall remain liable under the terms of the Prior Obligation unless released in writing by you.

**6. REASON(S) FOR MODIFICATION.** CHANGE CREDIT LIMIT ON REVOLVING LOC.

**7. SIGNATURES.** By signing, I agree to the terms contained in this Modification. I also acknowledge receipt of a copy of this Modification.

BORROWER:

JAMES L. RATCLIFF
Individually

JAMES N. RATCLIFF
Individually

## DISBURSEMENT AUTHORIZATION

DATE AND PARTIES. The date of this Disbursement Authorization is December 1, 2010. The parties and their addresses are:

LENDER:
ARVEST BANK
P. O. BOX 999
Bartlesville, OK 74005-0999
Telephone: (918) 337-3000

BORROWER:
JAMES L. RATCLIFF
PO BOX 402
VINITA, OK 74301-0402

JAMES N. RATCLIFF
PO BOX 407
VINITA, OK 74301-0407

1. DEFINITIONS. As used in this Disbursement Authorization, the terms have the following meanings:

A. Pronouns. The pronouns "I", "me" and "my" refer to all Borrowers signing this Disbursement Authorization, individually and together. "You" and "Your" refer to the Lender.

B. Loan. "Loan" refers to this transaction generally, including obligations and duties arising from the terms of all documents prepared or submitted for the transaction such as applications, security agreements, disclosures or notes, and this Disbursement Authorization.

2. DISBURSEMENT SUMMARY. The following summarizes the disbursements from the Loan.

| | | |
|---|---|---|
| Initial Advance | | $10,379,167.25 |
| Cash Paid In | $0.00 | |
| Amount Contributed by Borrower | $0.00 | |
| Total Cash Received | | $0.00 |
| Disbursed to Borrowers | $0.00 | |
| Disbursed to Lender | $10,379,167.25 | |
| Disbursed to Other Payees | $0.00 | |
| Total Amounts Disbursed | | $10,379,167.25 |
| Amount Remaining To Be Disbursed | | $0.00 |
| Undisbursed Fees/Charges | | $0.00 |

3. DISBURSEMENT AUTHORIZATION. I authorize you to disburse the following amounts from my Loan.

| DISBURSED TO: | DATE: | AMOUNT DISBURSED: |
|---|---|---|
| Disbursements to Borrower: | | $0.00 |
| Disbursements to Lender: | | $10,379,167.25 |
| MODIFY LOAN # | 12/01/2010 | $10,379,167.25 |
| Disbursements to third parties: | | $0.00 |
| TOTAL DISBURSED: | | $10,379,167.25 |

Remaining Credit Line: $1,620,832.75

I acknowledge receipt of a copy of this Disbursement Authorization on December 1, 2010.

BORROWER:

JAMES L. RATCLIFF
Individually

JAMES N. RATCLIFF
Individually

JAMES L. RATCLIFF
Disbursement Authorization
OK44ACFREEMA00187800007143003120110N                    Wolters Kluwer Financial Services ©1996, 2010 Bankers Systems™          Initials _____
Page 1

# EXHIBIT C

## SECURITY AGREEMENT

THIS SECURITY AGREEMENT is executed and delivered as of this 3rd day of December, 2010, by UNGER MEAT COMPANY, a Minnesota corporation (the "Debtor"), to JAMES L. RATCLIFF (the "Secured Party"), with reference to the following facts:

A.    Debtor and Secured Party have entered into a transaction whereby Secured Party financed the purchase price and acquisition of all of Debtor's business assets;

B.    Debtor and Secured Party have entered into a second transaction whereby Secured Party has provided additional working capital for Debtor's benefit;

C.    Debtor has executed two promissory notes dated December 3, 2010 in favor of Secured Party which evidence the financing arrangement described in paragraph A. above; and

D.    Debtor and Secured Party desire to enter into this Security Agreement to secure payment of the debt evidenced by the two promissory notes as owed to Secured Party arising from the purchase of such business assets, together with any and all other debts owing from Debtor to Secured Party.

NOW, THEREFORE, in consideration of the foregoing, the mutual covenants herein contained, and other fair and valuable considerations, the receipt and adequacy of which are hereby acknowledged, Debtor and Secured Party agree as follows:

1.    <u>Secured Interest</u>. Debtor does hereby grant, bargain, sell, and convey unto Secured Party a purchase money security interest in and to all of Debtor's equipment, including but not limited to the equipment described on Exhibit "1" hereto, inventory, lease agreement, accounts receivable, furniture and fixtures, whether now owned or hereafter acquired, together with all proceeds and products thereof and replacements therefor (hereafter the "Collateral").

2.    <u>Obligations Secured</u>. The security interest created hereby is given to secure the due, punctual and complete performance by Debtor of all Debtor's obligations now or hereafter owed to Secured Party.

3.    <u>Representations and Warranties</u>. Debtor does hereby represent and warrant to Secured Party as follows:

a.    <u>Ownership of Collateral</u>. Debtor is the owner of the Collateral and is not prohibited by contract or otherwise from subjecting the same to the security interest created hereby. Immediately prior to the execution of this Security

EXHIBIT

C

Agreement the Collateral is free and clear of all security interests and encumbrances of every nature.

b.   Financing Statements. Debtor will execute and deliver to Secured Party such certificates and other documents or instruments as may be necessary to enable Secured Party to perfect the security interest created hereby including, without limitation, such financing statements, certificates and other documents as may be necessary to perfect the security interest created hereby in any collateral hereafter acquired by Debtor or in any replacement or proceeds of the Collateral.

4.   Affirmative Covenants. Until this Agreement is terminated, Debtor covenants that it shall:

a.   Notify Secured Party in writing, promptly upon Debtor's learning thereof, of any litigation or the institution of any suit or administrative proceeding which may materially and adversely affect Debtor's financial condition or Secured Party's security interest in the Collateral, whether or not the claim is considered by Debtor to be covered by insurance;

b.   Maintain the Collateral, as the same is constituted from time to time, free and clear of all liens, claims, security interests and encumbrances;

c.   Notify Secured Party, in writing, promptly upon Debtor's learning of any violation of any law, statute, regulation or ordinance of any governmental entity, or of any agency thereof, applicable to Debtor which violation in any respect may materially and adversely affect the Collateral or Debtor' property, assets, operations or condition, financial or otherwise; and

d.   Notify Secured Party in writing, within thirty (30) days after the occurrence thereof, of Debtor's default under any note, indenture, loan agreement, mortgage, lease, deed or other similar agreement to which Debtor are a party or by which Debtor are bound.

5.   Negative Covenants. Without Secured Party's prior written consent, until this Agreement is terminated, Debtor covenants that it shall not:

a.   Enter into any transaction which materially and adversely affects the Collateral or Debtor's ability to repay all obligations owed to Secured Party;

b.   Encumber, pledge, mortgage, grant a security interest in, assign, sell, lease or otherwise dispose of or transfer, whether by sale, merger, consolidation,

liquidation, dissolution, or otherwise, outside the ordinary course of business, any of the Collateral without Secured Party's consent in writing.

c.    Declare or pay any dividend or bonus with respect to the stock of the Debtor.

d.    Pay any salary, bonus, consulting fee or other payment of any description to the officers and directors of Debtor apart from the salaries and benefits detailed at Exhibit "2" hereto.

6.    Term. This Agreement shall terminate upon Debtor's full performance, payment and satisfaction of the obligations owed to Secured Party.

7.    Insurance. Debtor shall insure the Collateral in Secured Party's name against loss or damage by accident, fire, theft, burglary, pilferage, loss in transit and such other hazards as Secured Party shall specify in amounts and under policies by insurers acceptable to Secured Party, and all premiums thereon shall be paid by Debtor and the policies or a certificate thereof signed by the insurer shall be delivered to Secured Party. Each such policy shall name Secured Party as an additional named insured, and shall provide that such policy may not be amended or canceled without thirty (30) days prior written notice to Secured Party. If Debtor fails to do so, Secured Party may (but shall not be required to) procure such insurance and charge the cost to Debtor's account as part of the obligations secured by the Collateral. Copy of page 1 showing terms of insurance and showing Secured Party as additional insureds shall be provided to Secured Party upon each renewal.

8.    Default. Debtor shall be in default hereunder in the event Debtor fails to punctually and completely satisfy all of Debtor's obligations to Secured Party embodied in any promissory note or otherwise or in the event of a failure by Debtor to comply with any term, covenant or condition of this agreement. Debtor will be provided a ten-day (10) grace period for all installment payments on the promissory note, and payment within such grace period will not be considered an Event of Default. Otherwise, the occurrence of any such events shall herein be referred to as an "Event of Default".

9.    Remedies. If an Event of Default occurs, Secured Party shall have all remedies available under law. Without limitation of the foregoing, at the request of Secured Party, Debtor will assemble the Collateral and make it available to Secured Party at a place designated by Secured Party. Debtor agrees that a period of five days from the time the notice is sent shall be a reasonable period for notification of any sale or other disposition of Collateral by the Secured Party. Debtor agrees to pay, on demand, the amount of all expenses for storing and selling the Collateral, and Debtor further agrees that if this Security Agreement, or any obligation secured by it, is referred to an attorney for protecting or defending the priority of Secured Party's interest or for enforcing any of the provisions thereof, Debtor shall pay a reasonable attorneys' fee, all court costs, and all costs incurred by Secured Party in the taking possession of, preservation, maintenance, and sale of the Collateral, which amounts shall be deemed a portion of the indebtedness secured hereby, and any

and all such items shall bear interest from the date incurred by Secured Party until repaid by Debtor at the rate of eighteen percent (18%) per annum.

     10.    <u>Governing Law</u>.  This Security Agreement shall be governed by and construed in accordance with the laws of the State of Minnesota applicable to contracts made and performed entirely therein.

     11.    <u>Notices</u>.  All notices, requests, demands, instructions, and other communications called for hereunder or contemplated hereby shall be given in the manner set forth herein and to the Debtor and Secured Party at their respective addresses as set forth below:

<u>Secured Party:</u>

    Ratcliff Ranch and Investment Co.
    Attention:  James L. Ratcliff
    24631 South Hwy. 2
    Vinita, OK  74301

<u>With Copy To:</u>

    Thomas J. McGeady, Esquire
    Logan & Lowry, LLP
    101 South Wilson
    P. O. Box 558
    Vinita, OK  74301

<u>Debtor:</u>

    Unger Meat Company
    Attention:  Joe Unger
    4301 White Bear Parkway
    Vadnais Heights, MN  55110

<u>With Copy To:</u>

_____

_____

     12.    <u>Whole Agreement – No Oral Modification</u>.  This Agreement embodies all representations, warranties, and agreements of the parties hereto and may not be altered or modified except by an agreement in writing signed by the parties.

13.    _Remedies Cumulative_.  The various rights, powers, elections, and remedies of the parties hereto shall be considered as cumulative and no one of them is exclusive of the others or exclusive of any right or remedy allowed by law and no right shall be exhausted by being exercised on one or more occasions.

14.    _Benefit of Agreement_.  This Agreement shall be binding upon and the benefits shall inure to the parties and their respective successors and assigns.

15.    _Section Headings_.  The section headings contained in this Agreement are for convenient reference only and shall not in any way affect the meaning or interpretation of this Agreement.

EXECUTED AND DELIVERED the day and year first above written.

"DEBTOR":

UNGER MEAT COMPANY

By:  _____
       Joe Unger

"SECURED PARTY"

_____
James L. Ratcliff

P1 OF 2

**Unger Meat Company**
**Equipment Schedule**
**11/30/2010**

EXHIBIT

1

_Production Equipment Schedule_

| Equipment Location | Product Description | Vendor | Cost |
|---|---|---|---|
| **GRINDING LINE** | | | |
| | OMNI V / WITH SPARE PARTS. | Provisor | 187,882.30 |
| | DOMINATOR 14 | Provisor | 388,700.83 |
| | DOMINATOR 14/spare parts | Provisor | 6,988.90 |
| | DOMINATOR 14/Co2 | Provisor | 39,423.00 |
| | STSOR PAPER ASSEMBLY (VACHOP) | Provisor | 7,254.80 |
| | DOMINATOR 14/CO2 - fitted for future | Provisor | 2,537.50 |
| | AUGER WITH PIVOT | Provisor | 41,839.05 |
| | PLATFORM | Provisor | 14,729.00 |
| | PIRANHA | Provisor | 59,338 |
| | LOAD CELL (LATE ADD ON) | Provisor | 10,000.00 |
| | COMBO DUMPERS | A-One | 25,155.00 |
| | TABLES SS | A-One | 4,572.00 |
| | ANYL RAY | M&M | 18,500 |
| | GONDOLAS | M&M | 13,269.00 |
| | ALL SCALES | Kennedy | 11,680 |
| | 2 MEAT BELTS ACETLE | Unisource | 70,005 |
| | CO2 GAS INSTALL EQUIPMENT | TC Oxygen | 10,000.00 |
| | **Total Grinding Line** | | **867,146.28** |
| **FRESH PATTIE LINE** | | | |
| | FORMAX | Provisor | 489,262 |
| | FORMAX/Spare parts | Provisor | 8,384 |
| | Paper Hopper | Provisor | 6,750 |
| | Mold Plates (we get 11 plates) | Provisor | 58,006 |
| | MOLD PLATES 10 | Tomahawk | 24,000 |
| | MULTIVAC | Unisource | 282,818 |
| | METAL DETECTOR | Unisource | 45,090 |
| | HITACHI DATER | Unisource | 33,900 |
| | BOX LABELER | Unisource | 52,050 |
| | GRAVITY CONVEYOR | Unisource | 3,450 |
| | LABEL CONVEYOR | Unisource | 28,150 |
| | COLUMN DUMPER | A-One | 22,468 |
| | **Total Fresh Patty Line** | | **985,341** |
| **FRESH BULK/ RETAIL LINE** | | | |
| | VEMAG(RUSSER) | Unisource | 128,016 |
| | INLINE GRINDER & CUT OFF | Unisource | 25,010 |
| | SMART CONVEYOR | Unisource | 81,120 |
| | TAPE MACHINE | Unisource | 16,867 |
| | VACUUM | Unisource | 282,316 |
| | PACK OFF TABLE/BELT | Unisource | 30,000 |
| | METAL DETECTOR | Unisource | 25,461 |
| | SPIRAL FREEZER | JST | 630,000 |
| | COLUMN DUMPER | A-One | 12,324 |
| | Cuber Perforated | Frivisor | 64,252 |
| | **Total Fresh Bulk/Retail Line** | | **1,239,119** |
| **RETAIL FROZEN** | | | |
| | ADCO BOX MACHINE | Unisource | 76,500 |
| | TIPPER TIE | Unisource | 147,685 |
| | CHUB METAL DETECTOR | Unisource | 19,650 |
| | BAND SEALER | Unisource | 14,855 |
| | EMBOSSING CODER | | 5,497 |
| | **Total Retail Frozen Line** | | **264,187** |
| **DOCK** | | | |
| | FORKLIFT | Quality Forklift | 19,109 |
| | Forklift Parts | Quality Forklift | 538 |
| | Forklift Parts | Quality Forklift | 652 |
| | RIDERS | Quality Forklift | 15,016 |
| | STRETCHWRAPPER | Unisource | 13,252 |
| | AIR SYSTEM | Air Power Equipment | 19,897 |
| | **Total Dock** | | **68,274** |
| **REFRIGERATION EQUIPMENT** | | | |
| | Mechanical Equipment | Solid Refrigeration | 547,624 |
| | **Total Mechanical Equipment** | | **547,624** |
| **KITCHEN** | | | |
| | Racking (Cooler, Freezer etc.) | Quality | 64,185 |
| | Nel-tec Production software | Nel-Tek | 100,000 |
| | Stainless Steel | SS | 10,000 |
| | Kitchen Equipment | Don Stevens | 15,446 |
| | **Total Kitchen Equipment** | | **189,631** |
| **GRAND EQUIPMENT TOTAL** | | | 4,161,321 |

## Unger Meat Company
## Building Improvements
## 11/30/2010

Building Improvements

| Items | Cost |
|---|---|
| Dock equipment | $22,538.00 |
| Misc Metals | $65,475.00 |
| HVAC | $65,040.00 |
| Plumbing | $146,445.00 |
| Electrical | $209,000.00 |
| Millwork | $9,170.00 |
| Roofing | $15,000.00 |
| Drywall | $98,675.00 |
| Flooring | $214,884.00 |
| Fire Protection | $59,360.00 |
| Doors & Hardware | $20,725.00 |
| Signage | $5,120.58 |
| Solid Refrigeration Coolers/Freezers | $332,847.00 |
| Solid Refrigeration Doors | $143,016.00 |
| Solid Refrigeration Installation and Taxes | $424,974.97 |
| Conference Room Appliances | $12,000.00 |
| Electrical | $6,450.00 |
| Plumbing | $1,700.00 |
| Increases for panel installation | $5,000.00 |
| Furnishings | $6,000.00 |
| Transfer Switch | $90,365.00 |
| Extra Bollards | $4,000.00 |
| Guard Rails | $8,000.00 |
| Add Sink in Lab | $7,700.00 |
| Sign out Front | $8,000.00 |
| Water Treatment | $5,000.00 |
| Cabinets & countertops in lab | $5,000.00 |
| Demolition | $101,327.00 |
| Concrete | $196,925.00 |
| Bituminous Paving | $27,650.00 |
| Excavation | $13,125.00 |
| Landscape | $32,650.00 |
| Glazing | $5,150.00 |
| Acoustical | $5,220.00 |
| Site Utilities | $300.00 |
| General Conditions | $51,550.00 |
| General Contractor | $65,000.00 |
| Painting & Repair building | $26,800.00 |
| Architect & Engineering | $23,249.00 |
| Architect & Engineering | $5,000.00 |
| Carpet - Lobby & Offices | $6,520.00 |
| Exterior Block Repair | $4,000.00 |
| Additional roof supports | $10,000.00 |
| Total of Hard Costs | $2,477,838.55 |

**Tom McGeady**

| | |
|---|---|
| **From:** | Zan Christjohn [zanchristjohn@yahoo.com] |
| **Sent:** | Monday, December 13, 2010 4:25 PM |
| **To:** | Tom McGeady |
| **Cc:** | Randy Shie |
| **Subject:** | Re: Salary figures |

Tom,

EXECUTIVE
SALARY SCHEDULE

Joe Unger - 275,000
Heidi Green - 150,000
Randy Shie - 110,000

Thanks,
Zan

Zan Christjohn, MBA, Financial Coordinator
The Ratcliff Group
256-453-0623

**E-mail Confidentiality:** The information contained in this message along with any files attached may be privileged and confidential, which is intended only for the use of the individual or entity to whom the e-mail was sent. If the recipient of this transmittal is not the intended recipient, or an employee or agent responsible to deliver it to the intended recipient, any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please notify the sender and delete all copies. **Thank you.**

---- On Mon, 12/13/10, Tom McGeady <*tjmcgeady@loganlowry.com*> wrote:

From: Tom McGeady <tjmcgeady@loganlowry.com>
Subject: Salary figures
To: "Zan Christjohn (zanchristjohn@yahoo.com)" <zanchristjohn@yahoo.com>
Cc: "James L. Ratcliff (jratcliff@ratcliffranch.com)" <jratcliff@ratcliffranch.com>,
"Neal Rustin (nrbnstr@aol.com)" <nrbnstr@aol.com>
Date: Monday, December 13, 2010, 3:39 PM

Zan,
   We're working this afternoon assembling the Transaction Binders and the Unger Meat Company Minute Book. I still need salary figures for Joe, Randy and Heidi to attach as schedule 2 to the security Agreement.
Thanks,
Tom



EXHIBIT

2

12/13/2010

# EXHIBIT D

Filing NO: 201022606390
Filing Date: 2010/12/29
Filing Time: 12:23 PM
State of Minnesota
Processing Office: Secretary of State
Filed by: boono01

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER (optional)

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

Henningson & Snoxell, Ltd. (SMG)
6900 Wedgwood Road, Suite 200
Maple Grove, MN 55311

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Unger Meat Company | | | | |

OR

| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
|---|---|---|---|---|

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 4301 White Bear Parkway | Vadnais Heights | MN | 55110 | USA |

| 1d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | Corporation | Minnesota | ☐ NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|

OR

| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
|---|---|---|---|---|

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

| 2d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | | | ☐ NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|

OR

| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
|---|---|---|---|---|
| Ratcliff | James | L. | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 24631 South Highway 2 | Vinita | OK | 74301 | USA |

4. This FINANCING STATEMENT covers the following collateral:

See attached Exhibit A

This is a purchase-money security interest.

| 5. ALTERNATIVE DESIGNATION (if applicable): | ☐ LESSEE/LESSOR | ☐ CONSIGNEE/CONSIGNOR | ☐ BAILEE/BAILOR | ☐ SELLER/BUYER | ☐ AG. LIEN | ☐ NON-UCC FILING |
|---|---|---|---|---|---|---|

6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.
Attach Addendum (if applicable)

7. See Instruction Debtor(s)

8. OPTIONAL FILER REFERENCE DATA

401 FILING OFFICE COPY — NATIONAL UCC FINANCING STATEMENT (FORM UCC1) (REV. 9/05)

**EXHIBIT**

D

Filing NO: 201022606390

Exhibit A

Unger Meat Company
Equipment Schedule
11/30/2010

Production Equipment Schedule

| Equipment Location | Product Description | Vendor | Cost |
|---|---|---|---|
| GRINDING LINE | | | |
| | GRAM Y/WITH SPARE PARTS | Provisur | 187,842.10 |
| | DONSAUDIE 14 | Provisur | 973,760.18 |
| | DOMBRATOR 14/spare parts | Provisur | 9,796.30 |
| | DOMBRATOR 14/CMS | Provisur | 99,455.00 |
| | X'TRA PAPER ASSEMBLY (MACHINE) | Provisur | 7,354.80 |
| | DOMBRATOR 14/CMS - Stand for Mixer | Provisur | 1,187.80 |
| | ALPHA WITH PIVOT | Provisur | 41,966.58 |
| | PLATFORM | Provisur | 14,723.48 |
| | PRANDIA | Provisur | 28,158 |
| | LOAD END (SAFE ADD ON) | Provisur | 36,800.28 |
| | CONING SURFACES | A-Con | 16,116.00 |
| | TABLES 20 | A-Con | 4,527.00 |
| | AMPLSAT | Weiss | 14,300 |
| | SCHEDULES | Weiss | 14,399.00 |
| | ALL SCALES | Saturnly | 11,880 |
| | 2 MEAT BELTS ACETLE | Unknown | 70,075 |
| | CO2 BAG REFILL EQUIPMENT | TC Compact | 30,800.00 |
| | **Total Grinding Line** | | **867,146.29** |
| FRESH PATTIE LINE | | | |
| | FORMAX | Provisur | 498,252 |
| | FORMAX/Spare parts | Provisur | 8,304 |
| | Paper Hopper | Provisur | 6,730 |
| | Mold Plates (as per 11 plates) | Provisur | 98,006 |
| | MOLD PLATES 10 | Tempbrook | 34,800 |
| | MATERIAL | Unknown | 102,318 |
| | METAL DETECTOR | Unknown | 45,000 |
| | ARTECH SADDR | Unknown | 13,900 |
| | WIRE LINE ELM. | Unknown | 62,000 |
| | GRAVITY CONVEYOR | Unknown | 3,499 |
| | LABEL CONVEYOR | Unknown | 28,130 |
| | COLEMAN WRAPPER | A-Con | 35,960 |
| | **Total Fresh Pattie Line** | | **865,341** |
| FRESH BULK/ RETAIL LINE | | | |
| | VEMAGBURGER | Unknown | 129,860 |
| | INLINE SCANNER & CUT OFF | Unknown | 25,654 |
| | SMART SERVEYOR | Unknown | 82,130 |
| | TIPPI MACHINE | Unknown | 28,367 |
| | VACCUUM | Unknown | 152,214 |
| | PACK OFF TABLE/BELT | Unknown | 92,000 |
| | METAL DETECTOR | Unknown | 34,482 |
| | APPLE PRECINE | JBT | 600,400 |
| | COLEMAN OLANICA | A-Con | 13,234 |
| | Other Preferred | Printer | 14,382 |
| | **Total Fresh Bulk/Retail Line** | | **1,298,119** |
| RETAIL FROZEN | | | |
| | ACCO BOX MACHINE | Unknown | 70,900 |
| | TIPPER TIE | Unknown | 142,895 |
| | CMM METAL DETECTOR | Unknown | 34,450 |
| | SAND SEALER | Unknown | 14,896 |
| | IBMCORREA CODES | | 2,467 |
| | **Total Retail Frozen Line** | | **264,187** |
| DOCK | | | |
| | FORKLIFT | Crolby Forklift | 19,208 |
| | Forklift Parts | Crolby Forklift | 894 |
| | Forklift Tires | Crolby Forklift | 882 |
| | SHRINK | Crolby Forklift | 12,566 |
| | STRETCH WRAPPER | Unknown | 18,362 |
| | AIR SYSTEM | Air Power Equipment | 21,357 |
| | **Total Dock** | | **63,274** |
| REFRIGERATION EQUIPMENT | | | |
| | Mechanical Equipment | Joial Intelligent Sam | 547,624 |
| | **Total Mechanical Equipment** | | **547,624** |
| KITCHEN | | | |
| | Berline (Kettle, Freezer etc.) | DUMPY | 64,183 |
| | Hot-line Production software | Hot-Tek | 300,000 |
| | Industry Bowl | ID | 29,000 |
| | Cookie Equipment | Gas Barnett | 15,448 |
| | **Total Kitchen Equipment** | | **188,631** |
| GRAND EQUIPMENT TOTAL | | | 4,141,521 |

# EXHIBIT E

**Filing NO: 20112290995**
**Filing Date: 2011/01/24**
**Filing Time: 5:00 PM**
**State of Minnesota**
**Processing Office: Secretary of State**
**Filed by: schdo01**

## UCC FINANCING STATEMENT AMENDMENT
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

Henningson & Snoxell, Ltd. (SMG)
6900 Wedgwood Road, Suite 200
Maple Grove, MN 55311

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1a. INITIAL FINANCING STATEMENT FILE#
**201022606390**

1b. This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.

2. ☐ TERMINATION: Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

3. ☐ CONTINUATION: Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

4. ☐ ASSIGNMENT (full or partial): Give name of assignee in item 7a or 7b and address of assignee in item 7c; and also give name of assignor in item 9.

5. AMENDMENT (PARTY INFORMATION): This Amendment effects ☐ Debtor or ☐ Secured Party of record. Check only one of these two boxes.
Also check one of the following three boxes and provide appropriate information in items 6 and/or 7.

☐ CHANGE name and/or address: Please refer to the detailed instructions in regards to changing the name/address of a party.   ☐ DELETE name: Give record name to be deleted in item 6a or 6b.   ☐ ADD name: Complete item 7a or 7b, and also item 7c; also complete items 7e-7g (if applicable)

6. CURRENT RECORD INFORMATION:

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR | **Unger Meat Company** | | |
| 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

7. CHANGED (NEW) or ADDED INFORMATION:

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR | | | |
| 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 7d. SEE INSTRUCTIONS | ADD'L INFO RE. ORGANIZATION DEBTOR | 7e. TYPE OF ORGANIZATION | 7f. JURISDICTION OF ORGANIZATION | 7g. ORGANIZATION ID#, if any | ☐ NONE |
|---|---|---|---|---|---|
| | | | | | |

8. AMENDMENT (COLLAERAL CHANGE): check only one box.
Describe collateral ☐ deleted or ☐ added, or give entire ☒ restated collateral description, or describe collateral ☐ assigned.

See attached Exhibits "A," "B," and "C."

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT (name of assignor, if this is an Assignment). If this is an Amendment authorized by a Debtor which adds collateral or adds the authorizing Debtor, or if this is a Termination authorized by a Debtor, check here ☐ and enter name of DEBTOR authorizing this Amendment.

| 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR | | | |
| 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| **Ratcliff** | **James** | **L.** | |

10. OPTIONAL FILER REFERENCE DATA
**26225-002**

## EXHIBIT "A"

This financing statement covers the following types (or items) of property:

(a) INVENTORY:

All inventory of Debtor, whether now owned or hereafter acquired and wherever located; together with

(b) EQUIPMENT:

The following equipment of Debtor:

All furniture, fixtures, and equipment of Debtor, whether now owned or hereafter acquired and wherever located, including without limitation, the furniture, fixtures, and equipment listed in the attached Exhibit "B;" together with:

(c) ACCOUNTS AND OTHER RIGHTS TO PAYMENT:

Each and every right of Debtor to the payment of money, whether such right to payment now exists or hereafter arises, whether such right to payment arises out of a sale, lease or other disposition of goods or other property by Debtor, out of a rendering of services by Debtor, out of a loan by Debtor, out of the overpayment of taxes or other liabilities of Debtor, or otherwise arises under any contract or agreement, whether such right to payment is or is not already earned by performance, and howsoever such right to payment may be evidenced, together with all other rights and interests (including all liens and security interests) which Debtor may at any time have by law or agreement against any account debtor or other obligor obligated to make any such payment or against any of the property of such account debtor or other obligor; all including, but not limited to, all present and future debt instruments, chattel papers, accounts, investment property, letters-of-credit rights, letters of credit, documents, deposit accounts, payment intangibles, loans and obligations receivable, tax refunds and all supporting obligations relating to the foregoing; and together with

(d) LEASES

All rents, issues, income, revenue, receipts, fees, and profits now due or which may hereafter become due under or by virtue of and together with all right, title and interest of the Debtor in and to any lease, license, sublease, contract or other kind of occupancy agreement, whether written or verbal, for the use or occupancy of the real property legally described in the attached Exhibit "C" or any part thereof, together with all security therefor and all monies payable thereunder, including, without limitation, tenant security deposits, and all books and records which contain information pertaining to payments made thereunder and security therefor.

(e) GENERAL INTANGIBLES:

All general intangibles of Debtor, whether now owned or hereafter acquired, including, but not limited to, applications for patents, patents, applications for copyrights, copyrights, application for trademarks, trademarks, trade secrets, good will, trade names, other names, customer lists, permits and franchises, software, payment intangibles and the right to use Debtor's name; together with

all substitutions and replacements for and products of any of the foregoing property and together with proceeds of any and all of the foregoing property, including without limitation all investment property, letter-of-credit rights, letters of credit, other rights to payment, deposit accounts, money insurance proceeds and general intangibles related to the foregoing property, and all refunds of insurance premiums due or to become due under all insurance policies covering the foregoing property, and, in the case of all tangible collateral, together with all accessions, together with (a) all accessories, attachments, fittings, increases, parts, equipment, returns and repairs now or hereafter attached or affixed to or used in connection with any such goods, and (b) all warehouse receipts, bills of lading and other documents of title now or hereafter covering such goods. All books and records relating to any of the foregoing Collateral and all computers and other equipment (and computer software used in connection therewith) used in connection with the record keeping for the collateral.

**Unger Meat Company**
**Equipment Schedule**
**11/30/2010**

# Exhibit "B"

*Production Equipment Schedule*

| Equipment Location | Product Description | Vendor | Cost |
|---|---|---|---|
| **GRINDING LINE** | | | |
| | OMNI V / WITH SPARE PARTS | Provisor | 157,862.30 |
| | DOMINATOR 14 | Provisor | 393,700.33 |
| | DOMINATOR 14/spare parts | Provisor | 6,896.80 |
| | DOMINATOR 14/Co2 | Provisor | 89,429.00 |
| | 5' SQ3 PAPER ASSEMBLY (VAC-HOP) | Provisor | 7,254.80 |
| | DOMINATOR 14/CO2 - fitted for future | Provisor | 2,137.50 |
| | AUGER WITH PIVOT | Provisor | 41,880.25 |
| | PLATFORM | Provisor | 14,775.00 |
| | PIRANHA | Provisor | 30,185 |
| | LOAD CELL (LATE ADD ON) | Provisor | 10,000.00 |
| | COMBO DUMPERS | A-One | 26,156.00 |
| | TABLES SS | A-One | 4,972.00 |
| | ANTI RAY | M&M | 18,500 |
| | GONDOLAS | M&M | 13,369.00 |
| | ALL SCALES | Kennedy | 11,680 |
| | 2 MEAT BELTS ACETLE | Unisource | 70,000 |
| | CO2 GAS INSTALL EQUIPMENT | TC Oxygen | 10,000.00 |
| | **Total Grinding Line** | | **867,146.28** |
| **FRESH PATTIE LINE** | | | |
| | FORMAX | Provisor | 430,262 |
| | FORMAX/Spare parts | Provisor | 9,394 |
| | Paper Hopper | Provisor | 6,750 |
| | Mold Plates (we get 11 plates) | Provisor | 38,006 |
| | MOLD PLATES 10 | Tomahawk | 14,000 |
| | MULTIVAC | Unisource | 252,316 |
| | METAL DETECTOR | Unisource | 45,000 |
| | HITACHI DATER | Unisource | 53,900 |
| | BOX LABELER | Unisource | 52,060 |
| | GRAVITY CONVEYOR | Unisource | 3,450 |
| | LABEL CONVEYOR | Unisource | 28,150 |
| | COLUMN DUMPER | A-One | 23,063 |
| | **Total Fresh Patty Line** | | **985,341** |
| **FRESH BULK/ RETAIL LINE** | | | |
| | VEMAG(REISER) | Unisource | 128,010 |
| | INLINE GRINDER & CUT OFF | Unisource | 23,010 |
| | SMART CONVEYOR | Unisource | 83,230 |
| | TAPE MACHINE | Unisource | 30,587 |
| | VACCUM | Unisource | 252,516 |
| | PACK OFF TABLE/BELT | Unisource | 30,000 |
| | METAL DETECTOR | Unisource | 25,491 |
| | SPIRAL FREEZER | JBT | 630,000 |
| | COLUMN DUMPER | A-One | 12,224 |
| | Cuber Perforated | Provisor | 64,262 |
| | **Total Fresh Bulk/Retail Line** | | **1,239,119** |
| **RETAIL FROZEN** | | | |
| | ADCO BOX MACHINE | Unisource | 78,500 |
| | TIPPER TIE | Unisource | 147,685 |
| | CHUB METAL DETECTOR | Unisource | 19,650 |
| | SAND SEALER | Unisource | 14,855 |
| | EMBOSSING CODER | | 3,497 |
| | **Total Retail Frozen Line** | | **264,187** |
| **DOCK** | | | |
| | FORKLIFT | Quality Forklift | 19,209 |
| | Forklift Parts | Quality Forklift | 536 |
| | Forklift Parts | Quality Forklift | 632 |
| | RIDERS | Quality Forklift | 15,016 |
| | STRETCH-WRAPPER | Unisource | 13,292 |
| | AIR SYSTEM | Air Power Equipment | 28,887 |
| | **Total Dock** | | **68,274** |
| **REFRIGERATION EQUIPMENT** | | | |
| | Mechanical Equipment | Solid Refrigeration | 547,624 |
| | **Total Mechanical Equipment** | | **547,624** |
| **KITCHEN** | | | |
| | Racking (Cooler, Freezer etc.) | Quality | 64,585 |
| | Nel-tec Production software | Nel-Tek | 100,000 |
| | Stainless Steel | SS | 10,000 |
| | Kitchen Equipment | Don Steeves | 15,446 |
| | **Total Kitchen Equipment** | | **189,631** |
| **GRAND EQUIPMENT TOTAL** | | | 4,161,321 |

## EXHIBIT "C"

THAT PART OF THE SOUTH THREE HUNDRED FORTY-TWO (342) FEET OF THE NORTH SIX HUNDRED FORTY-TWO (642) FEET OF THE NORTHWEST QUARTER OF THE SOUTHEAST QUARTER (NW ¼ SE ¼) OF SECTION TWENTY-ONE (21), TOWNSHIP THIRTY (30) NORTH, RANGE TWENTY-TWO (22) WEST, LYING EAST OF THE EASTERLY RIGHT-OF-WAY LINE OF INTERSTATE HIGHWAY NO. 35E, RAMSEY COUNTY, MINNESOTA.

# EXHIBIT F

*Original Copy in Safe Deposit Box*

# UNGER MEAT COMPANY

## STOCK PURCHASE AGREEMENT

## JUNE 22, 2012
## WITH
## EXHIBITS:

**A.** **Non-Recourse, Non-Negotiable Demand Promissory Note**

**B.** **Security Agreement Stock Pledge (with attached Stock Certificates No. 12, 13 and 14)**

**C.** **Amended and Restated Ground Lease**

**D.** **FNB Consent Letter**

## STOCK PURCHASE AGREEMENT

This agreement ("Agreement") made and entered into this 22nd day of June, 2012 (the "Closing Date"), by and between NEIL RUSTIN ("Rustin"), JAMES L. RATCLIFF ("Ratcliff" together with Rustin, the "Sellers" and each, a "Seller"), SSJR, LLC, a Minnesota limited liability company ("Bradshaw Entity"), Alyieo Holdings of Minnesota, L.L.C. ("Lomen Entity") and F.B. LLC, a Minnesota limited liability company ("Fredin Entity"), (collectively, "Purchasers" and each, a "Purchaser"), JAMES N. RATCLIFF ("Landlord"), and Unger Meat Company, a Minnesota corporation ("Unger" or "Unger Meat Company");

<u>W I T N E S S E T H</u> :

WHEREAS, Rustin is the record and beneficial owner of the stock certificates representing eighty (80) shares of common stock of Unger (the "Shares"), the same being one-hundred percent (100%) of the outstanding capital stock of Unger,

WHEREAS, Rustin has full authority to convey the Shares, and

WHEREAS, Purchasers desire to acquire the aforesaid Shares.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is acknowledged and confirmed by the parties, the parties agree as follows:

1.     *Stock Purchase.*  In consideration for the number of Shares to be purchased by each Purchaser as set forth below in Section 2, on the Closing Date each Purchaser shall execute and deliver to Rustin (a) the Non-Recourse Promissory Note attached hereto as Exhibit "A" (the "Note") in the principal amount of $500,000.00 and (b) the accompanying Security Agreement — Stock Pledge attached hereto as Exhibit "B" (the "Security Agreement"), the same representing the entire initial purchase price for the Shares.  On the Closing Date, Rustin shall execute and deliver to the Purchasers the Security Agreement.

2.     *Sale of Stock.*  On the Closing Date, Rustin hereby sells, transfers, and assigns all right, title and interest in and to the Shares to Purchasers, free and clear of any liens, claims or encumbrances of any kind ("Liens").  On the Closing Date Rustin shall tender to the Secretary of Unger the stock certificates representing the Shares with direction to re-issue the entirety of the Shares of Unger as follows:

| Shareholder | Shares Purchased | Percentage Ownership in Company | New Stock Certificate Numbers |
|---|---|---|---|
| F.B., LLC | 36 | 45% | 12 |
| SSJR, LLC | 36 | 45% | 13 |
| Alyieo Holdings of Minnesota, LLC | 8 | 10% | 14 |

Unger shall thereafter deliver the certificates described above to Rustin to perfect his rights as Lender under the Security Agreement.

3.   *Extension of Credit to Unger Meat Company*.   Either Ratcliff (individually) shall provide, or Ratcliff shall arrange for a third party banking entity to provide, Unger with revolving lines of credit in the aggregate principal amount of $3.4 million as of the Closing Date and continuing through July 15, 2012.   Thereafter, Ratcliff shall provide or cause to be provided to Unger aggregate revolving lines of credit in the aggregate principal amount of $4.5 million at an interest rate equal to the Prime Rate, plus one percent (1%) adjusted annually (except for the Vinita Loan I, which shall be at a fixed interest rate not to exceed 6% per annum until its maturity on March 7, 2013), with such lines of credit existing through at least December 31, 2014, as such date may be extended by the Parties in writing. Unger agrees that it will pay interest to the applicable lender monthly (or such other interval as the loan documents require) from Closing Date on the total borrowings outstanding under the aforesaid lines of credit.  The forgoing extensions of credit shall not require any Purchaser or its affiliates to guarantee any obligation of Unger or post any additional security or collateral to support such extensions of credit. If the initial financing described in the first sentence of this paragraph partially consists of a loan evidenced by a Promissory Note dated March 7, 2011 made by Unger to the order of The First National Bank & Trust of Vinita in the principal amount of $2,000,540 (the "Vinita Loan I"), then prior to the Closing Date (as a condition of Purchasers' obligation to close), the lender of such loan shall have provided written approval to the change in control in the borrower in connection with the closing (as required in Section (h) of the "Acceleration" provisions of such note) and acknowledge in writing that no default shall occur due to the collateral securing the Vinita Loan I also securing the James L Ratcliff Loans.

4.   *Outstanding Indebtedness Owing from Unger Meat Company to James L. Ratcliff*.  The parties agree that no interest will accrue nor will any interest or principal amounts be payable on the notes presently outstanding from Unger Meat Company to James L. Ratcliff (the "James L. Ratcliff Loans") totaling $14,135,000.00 as of the Closing Date (pursuant to a Promissory Note dated December 3, 2010 in the original principal amount of $11,885,000, and a Promissory Note dated December 3, 2010 in the original principal amount of $2,250,000) for a twenty-four (24) month period subsequent to the Closing Date.  Commencing on the first day following the end of such initial twenty-four (24) month period (the "Amortization Date"), the James L. Ratcliff Loans will accrue interest at the Prime Rate, plus one percent (1%), adjusted annually, with the principal to be amortized in monthly payments computed for a twenty (20) year term, with a maturity date to be mutually agreed by Unger and Ratcliff, but in any event no earlier than the date which is ten (10) years following the Amortization Date (*i.e.* twelve (12) years from the Closing Date). The terms set forth in this Section 4 shall be deemed to be, and are, amendments to the James L. Ratcliff Loans effective as of the date hereof.

5.   *Amendment and Restatement of Ground Lease*:   On the Closing Date Ratcliff, Landlord and Unger Meat Company shall execute and deliver the Amended and Restated Lease Agreement in the form attached hereto as Exhibit C (the "Amended Lease").  The Amended Lease amends and restates the Ground Lease, dated June 2010 among James L. Ratcliff, as Trustee of the James L. Ratcliff 2001 Revocable Trust Agreement dated January 11, 2001, Landlord and the Unger Meat Company.

6.   *Representations and Warranties of Seller*.  Sellers represent and warrant to Purchasers as follows, all of which representations and warranties will survive until the date that is 18 months after the Closing Date, provided that the representations and warranties set forth in

paragraphs 6(a), 6(b), 6(c) and 6(e) shall survive until the date that is 120 days following the date of the applicable statute of limitations:

(a)    Authorization of Agreement and Enforceability; No Conflict.  Sellers, Landlord and Unger each have the requisite power and authority, and, with respect to Ratcliff and Landlord, legal capacity to perform each of their respective obligations hereunder and to consummate the transactions contemplated by this Agreement, the Notes and the Security Agreements.  This Agreement has been duly and validly executed and delivered by Sellers, Landlord and Unger and constitutes the valid and legally binding obligations of Sellers, Landlord and Unger enforceable against them in accordance with its terms (except as such enforcement may be limited by bankruptcy, insolvency, moratorium or similar laws affecting creditors' rights generally from time to time in effect and by equitable principles of general application).  To the best of Sellers' knowledge there are no consents, notices, registrations or filings of any kind that must be made or obtained in order to complete the transactions contemplated by the Agreement. Neither the execution and delivery of this Agreement nor the consummation or performance of any of the contemplated transactions will directly or indirectly (with or without notice or lapse of time) (a) contravene, conflict with or result in a violation of any provision of the organizational documents of Unger, (b) contravene, conflict with, or result in a violation or breach of any provision of, or give any person the right to declare a default or exercise any remedy under, or to accelerate the maturity or performance of, or to cancel, terminate or modify, any contract, agreement, subcontract, lease, license, permit  (including without limitation any USDA or FDA permits or licenses), purchase order, commitment or arrangement to which Unger is a party or a beneficiary, or (c) create any Lien, security interest, charge, restrictions, claims, or encumbrance on the Shares or any assets of Unger.

(b)    Ownership of the Shares.  Rustin owns the Shares of record and beneficially, free and clear of any Liens.  Rustin has the absolute right, power and capacity to sell, assign and deliver the Shares to Purchasers, free and clear of any Liens and Purchasers will acquire good and marketable title to the Shares.  There are no actions, suits or proceedings pending, or to the knowledge of Sellers, threatened against Sellers, affecting the title of Rustin to the Shares or the right of Sellers to execute, deliver and perform this Agreement.  No third party, including any former owner of the Shares has the basis for any claims against the Shares, Unger, Sellers, or the Purchasers with respect to the transactions contemplated by this Agreement.

(c)    Capitalization.  The Shares represent all of the issued and outstanding shares of capital stock of Unger, have been duly and validly authorized and issued, are fully paid and non-assessable, and are subject to no options, calls, warrants or pre-emptive rights.  There are no outstanding options, warrants, rights of first referral, rights of first offer or other agreements of any kind to purchase or otherwise receive from Unger, or for Unger to issue or distribute, any shares of the capital stock or any other security of Unger and there is no security of any kind convertible into such capital stock or other security. The Stock Transfer Restrictions and Buy Out Agreement (Unger Meat Company) dated December 2010 has been validly terminated prior to the Closing Date and is of no force or effect.

(d)    Organization.  Good Standing.  Unger is a corporation duly organized, validly existing and in good standing under the laws of the State of Minnesota, and has the

requisite power and authority, licenses, permits and franchises to own, lease and operate its properties and to carry on its business as it is now being conducted.

(e)    Tax Returns and Audits.  All required federal, state and local tax returns (including without limitation, income, franchise, real property, personal property, excise, sales, use, employment and occupational) or appropriate extension requests of Unger have been filed, and all federal, state and local taxes required to be paid with respect to such returns have been paid or due provision for the payment thereof has been made.  Each such return is true and correct.  Unger has made adequate provision for the payment of all accrued and unpaid federal, state, county, municipal and local tax liabilities (including any interest and penalties) of Unger. Unger has not waived any statute of limitations governing federal or state income tax claims.  All taxes, charges, levies and assessments, which Unger is required by law to withhold or collect have been duly withheld or collected, and to the extent required, have been paid over to the proper governmental authorities or are held in a separate account for such purposes.  At no time during its existence has Unger has been an "S" corporation within the meaning of Section 1361 of the Code for federal income tax purposes and any corresponding provision of applicable state or local income tax law for applicable state and local tax purposes.

(f)    Title to Properties and Encumbrances.  Unger has good and marketable title to all of its properties and assets, including without limitation, the properties and assets used in the conduct of its business, and such properties and assets are not subject to any Liens other than the Liens contemplated by the James L. Ratcliff Loans and the Vinita Loan I.  Except for the equipment listed on Schedule 6(f), all equipment (including, without limitation, all coolers and freezers, regardless of whether the same are physically attached to the building), trade fixtures and personal property located at the building with the address 4301 White Bear Parkway, Vadnais Heights, MN 55110 is owned (and not leased) by Unger.  Unger leases the equipment listed on Schedule 6(f) and Seller has provided Purchasers with true, accurate and complete copies of the operative lease agreements for such leased equipment.

(g)    Litigation: Governmental Proceedings.  There are no legal actions, suits, arbitrations or other legal, administrative or governmental proceedings or investigations pending or, to the knowledge of Sellers, threatened against Unger, or its properties or business, and Sellers are not aware of any facts which are likely to result in or form the basis for any such action, suit, investigation or other proceeding.  Unger is not in default with respect to any judgment, order or decree of any court or any governmental agency or instrumentality.  Unger has not been threatened with any action or proceeding under any business or zoning ordinance, law or regulation.

(h)    Compliance With Applicable Laws and Other Instruments.  The business and operations of Unger have been and are being conducted in all material respects in accordance with all applicable laws, rules and regulations of all governmental authorities. Neither the execution nor delivery of, nor the performance of or compliance with, this Agreement nor the consummation of the transactions contemplated hereby will, with or without the giving of notice or passage of time, result in any breach, acceleration or termination of, or constitute a default under, or result in the imposition of any Liens upon any asset or property of Unger pursuant to any contract, commitment, agreement or arrangement, or other instrument to which Unger is a party or by which it or any of its properties, assets or rights is bound or

affected, nor cause a violation of, or a default under, any Liens, contracts, commitments, agreements or arrangements, or other instruments.

(i)    Intellectual Property.    Except with respect to the IMI Agreements (as defined below), Unger (i) owns or has the exclusive right to use, free and clear of all Liens, all intellectual property and intangible assets used in the conduct of its business as now conducted without infringing upon or otherwise acting adversely to the right or claimed right of any person under or with respect to any of the foregoing, and (ii) is not obligated or under any liability whatsoever to make any payments of a material nature by way of royalties, fees or otherwise to any owner of, licensor of, or other claimant to, any intellectual property or intangible assets, with respect to the use thereof or in connection with the conduct of its business or otherwise.

(j)    Insurance Coverage.    Unger has at all times had in place policies of insurance issued by insurers of recognized responsibility insuring Unger and its properties and business against such losses and risks, and in such coverage and amounts, as are reasonable and customary for business of the type and size conducted by Unger. All such policies are in full force and effect, are occurrence (as opposed to claims made) and there has been no lapse in the coverage under such policies. No claims have been made under any insurance policy covering Unger, its properties or business.

(k)    Licenses.    Unger possesses from the appropriate agency, commission, board and government body and authority, whether state, local or federal, all licenses, permits, authorizations, approvals, franchises and rights which (i) are necessary for it to engage in the business currently conducted by it, and (ii) if not possessed by Unger would have an adverse impact on Unger's business.    The transactions contemplated by this Agreement will not terminate or violate the terms of such licenses, permits, authorizations, approvals, franchises and rights. Unger has filed any and all required annual reports with the applicable federal and state agencies or commissioners, as required by and pursuant to the federal Packers and Stockyards Act and the Minnesota Packers and Stockyards Act, and their associated rules and regulations.

(l)    Employees.    Unger has complied with all laws, rules and regulations relating to the employment of labor, including provisions relating to wages, hours, equal opportunity, collective bargaining and payment of social security and other taxes, and Unger has not encountered any material labor difficulties and Unger has no union employees. Unger does not have any worker's compensation liabilities exceeding $50,000 in the aggregate. No Unger employee has any contract, commitment, agreement or arrangement (written or verbal) regarding his or her employment. Unger is not party to any consulting agreements.

(m)    ERISA.    No benefit plan of Unger's is a "multi-employer plan," as defined in Section 4001(a)(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), or a plan subject to Title IV of ERISA, and Unger has not made any contributions to or participated in any "multi-employer plan" or plan subject to Title IV of ERISA. Each benefit plan which is intended to qualify under Section 401 (a) of the Code is so qualified. No Lien has been imposed under Section 412(n) of the Code with respect to the funding of any benefit plan which is subject to the minimum requirements of Section 412 of the Internal Revenue Code of 1986 (the "Code"). There is no pending, or to the knowledge of Sellers, threatened claim which alleges any violation of ERISA or any other law (i) by or on behalf of any benefit plan or benefit

arrangement, or (ii) by any employee of Unger or any plan participant, beneficiary, administrator, contract employee, independent sales representative or other independent contractor with respect to any such benefit plan or benefit arrangement. Each benefit plan has been administered and maintained in compliance in all material respects with all laws, rules, regulations or governmental orders. No prohibited transactions (within the meaning of Section 4975 of the Code) have occurred with respect to any benefit plan. Unger has no liability to pay excise taxes with respect to any benefit plan under the applicable provisions of the Code or ERISA.

(n)     Financial Statements  Set forth on Schedule 6(n) hereto is the balance sheet and income statement of Unger for the period ending March 31, 2012 (collectively, the "Financial Statements"). To Sellers' knowledge the Financial Statements fairly present the financial condition of Unger at such date and the results of its operations for the fiscal period then ended.

(o)     No Undisclosed Liabilities. Except as disclosed in the Financial Statements and except for normal liabilities incurred in the ordinary course of business of Unger subsequent to the Balance Sheet Date, Unger does not have any undisclosed indebtedness or liabilities, whether accrued, fixed, contingent or otherwise.

7.      *Unrestricted Operation of Unger by Purchasers.*  Neither Rustin, Ratcliff, Landlord nor their respective representatives will impose any restrictions upon Unger, other than those agreed upon in writing by Purchasers, in the conduct of the Unger's business. The foregoing notwithstanding, the Purchasers will provide reasonable communications to Ratcliff pertaining to the operations and profitability of Unger for eighteen (18) months subsequent to Closing Date. Thereafter, communications and reporting of information to Ratcliff will be confined to that customary in normal debtor/creditor relationships.

8.      *Contingent Payment Obligation.*  In the event Purchasers do not exercise the Put Right set forth in Section 16 on or before the expiration of the Put Term, Purchasers shall become obligated to Ratcliff and his son, James N. Ratcliff (collectively, the "Ratcliffs") or another entity designated in writing by the Ratcliffs, in a maximum amount of $2,500,000 (the "Contingent Obligation"). The Purchasers and the Ratcliffs agree, prior to the end of the fiscal year ending on or around April 30, 2017, to diligently negotiate the criteria and conditions for paying the Contingent Obligation. The parties anticipate that such payments, if any, shall be payable over a term of 10 years commencing on May 1, 2017, that the payments will be payable on an annual basis, that the annual payments will not exceed $250,000, and will be limited in an amount of no more than a negotiated percentage of Unger's income before income taxes. It is anticipated that the annual amounts to become payable during this 10-year period will be based upon such things as the then-prevailing economic climate, the profitability of Unger, the cash requirements of Unger, and other criteria that indicates the overall financial success of Unger. No interest will accrue on the Contingent Obligation.

In the event that the parties are unable to reach agreement concerning the aforesaid terms, Ratcliff and Purchasers shall each appoint, at their own costs, on or prior to May 31, 2017, a qualified appraiser (the "Qualified Appraiser") who is qualified by experience, education and other criteria to allow the Qualified Appraiser the ability to evaluate the financial

condition of Unger to generate sufficient free cash flow to finance or pay the annual payments requested by Ratcliff.

        If both Qualified Appraisers agree on a payment schedule, their opinion, which shall be submitted in writing, shall be conclusive and binding on the Purchasers and on Ratcliffs (and each of their respective successors, assigns, heirs or devisees as the case may be). If only one of the parties appoints a Qualified Appraiser, that appraiser's written opinion shall be conclusive and binding on all parties. If the two (2) Qualified Appraisers disagree on the aforesaid matters, they shall appoint a third Qualified Appraiser mutually acceptable to them and the written opinion of the third Qualified Appraiser, whose fees and expenses shall be divided equally between Ratcliff and the Purchasers shall be conclusive and binding as to the amortization and interest rate aforesaid. The Concluding Payment Obligation may then be enforced in the same manner as an arbitration award.

        9.    **Grant of License.**  Unger and IMI Global, Inc. ("IMI Global") have entered into a Labeling, Trademark Use, Marketing Program and License Agreement dated as of January 6, 2011 (including Exhibits A, B, C and D attached thereto) (collectively, the "IMI Agreements") whereby IMI Global has granted Unger a non-exclusive, limited license to use the trademarks and other proprietary source-verification labeling and other marketing programs. A copy of the IMI Agreements is set forth as Exhibit D. Prior to closing, Unger will obtain an extension of the license through at least May, 2013.

        10.    **Alternative Dispute Resolution.**  Ratcliff and Purchasers agree to diligently attempt to satisfactorily resolve any disagreements of any significance that may arise or become known to the parties prior or subsequent to the date of the closing. Any matter, apart from the Concluding Payment Obligation, which cannot be resolved through good faith negotiation shall be submitted to arbitration pursuant to the Commercial Rules of the American Arbitration Association, the physical situs of such arbitration to be Minneapolis, Minnesota.

        11.    **Indemnification.**  Ratcliff, his heirs, successors and assigns hereby agrees to indemnify, defend and hold each Purchaser (and Purchasers collectively) harmless from and against any and all liabilities, losses, claims, damages, costs and expenses, including but not limited to each Purchaser's reasonable attorneys' fees, fines, penalties, charges, assessments, judgments, settlements, causes of action and other liabilities and obligations of any nature whatsoever (individually, a "Loss" and collectively, "Losses") suffered by any Purchaser (or Purchasers collectively) resulting from: (a) any misrepresentation or breach of any representation, warranty, covenant or agreement on the part of any Seller or Unger made pursuant to this Agreement or any document or agreement delivered in connection herewith; (b) the assertion against any Purchaser of any liability of any Seller; and (c) the operation of Unger and its business prior to closing, including without limitation liabilities (i) arising out of Unger's employment of its employees or the termination of such employment; (ii) arising out of circumstances pertaining to Unger's violations, actual or threatened, if any, of laws regarding the environment or worker health or safety; (iii) arising from the failure of Unger to pay any taxes or any obligations associated with Unger's employee benefit plans established by Unger for its employees; or (iv) arising out of transactions, sales, activities or business operations of Unger occurring prior to the closing.

12.   ***Governing Law***.   The obligations of the parties under this Stock Purchase Agreement shall be construed in accordance with the laws of the State of Minnesota without application of any law that would apply the law of any other jurisdiction.

13.   ***Closing***.   The transactions contemplated by this Stock Purchase Agreement shall be closed on the Closing Date.

14.   ***Counterparts***.   This Agreement may be executed in multiple counterparts with the same effect as if all signatures were affixed to the same document. Signatures transmitted by fax or electronic file transmission (e.g., PDF files) shall have the same effect as original, hard copy signatures.

15.   ***Entire Agreement***.   This Agreement together with the Note and the Security Agreement represents the entire agreement between the parties and may not be changed or varied except by a written modification signed by all of the parties hereto.

16.   ***Termination by Purchasers***.   During the eighteen (18) months following closing (the "Put Term"), Purchasers shall have the right, at any time and for any reason or no reason, in each case as determined in Purchasers' sole discretion, to (a) transfer all, but not less than all of, the Shares to Rustin (or Rustin's successors, assigns, heirs or devisees as the case may be), and (b) terminate all obligations arising under this Agreement, the Note and the Security Agreement, by delivering to Rustin (or Rustin's successors, assigns, heirs or devisees as the case may be), Ratcliff (or Ratcliff's successors, assigns, heirs or devisees as the case may be) and Unger the put notice in the form attached hereto as Exhibit E ("Put Right"). No further action on the part of any party is required to effect the Put Right. Upon the exercise of the Put Right by Purchasers, and without further action by the Purchasers, Rustin or Ratcliff, (a) the Purchasers shall have no further obligations under the Note issued by the Purchasers to Rustin or Ratcliff, (b) this Agreement and the Security Agreement shall automatically terminate and be of no force or effect, (c) not more than five business days following the effective date of the Put Right, Rustin and Ratcliff shall (i) deliver to the Purchasers the original Note marked "CANCELLED", and (ii) deliver to Unger the original certificates representing the Shares (the "Certificates") to the Secretary of Unger, and (d) Unger shall (i) transfer such Shares on the books and records of Unger to Rustin or a proxy of Rustin as the owner of such Shares, and (ii) not more than ten business days following the effective date of the Put Right, deliver to the Purchasers copies of the Certificates marked "CANCELLED." Rustin and Ratcliff each acknowledge and agree that any one or more of the Purchasers may sell or convey its interest in the Shares at any time to any one or more of the other Purchasers pursuant to a separate shareholder agreement (or similar document) that may be entered into among the Purchasers, and that Rustin and Ratcliff shall accept exercise of the Put Right from any one or more of the Purchasers that collectively hold all of the Shares at the time of such exercise. Sellers agree that in the event Purchasers exercise the Put Right, the business risk of the operations of Unger from and after the Closing Date and through the transfer of the Shares pursuant to the Put Right shall be borne by Sellers. As such, Sellers and Landlord each individually and on behalf of each of their estates, heirs, successors, assigns, and affiliates, hereby covenants and agrees that Sellers and Landlord shall accept any exercise of the Put Right during the Put Term and agrees and covenants not to commence, join in, prosecute or participate in any suit or other proceeding against or adverse to Purchasers or any officers, directors, members, managers, employees, agents and representatives (collectively,

"Representative"), or any Representative of Unger on account of any action and actions, cause and causes of action, suits, debts, dues, sums of money, accounts, reckoning, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, extents, executions, claims and demands whatsoever in law or in equity against any one or more of the Purchasers (or their respective successors, heirs or assigns), or any Representative of any Purchaser or Unger, which Sellers or Landlord ever had, now has or will have on the effective date of the Put Right or which its heirs, executors and administrators, successors or assigns hereafter can, shall or may have for, upon or by reasons of the operations or management of Unger following Closing Date.  Upon and following the exercise of the Put Right, Purchasers shall have no further obligations to Sellers, Unger or James N. Ratcliff under the terms of this Agreement (provided that such release shall apply to any Purchaser(s) transferring its or their shares to another one or more Purchaser(s) as described above, from and after the time of such transfer).

17.    *Notices.*  Any notice contemplated by this Agreement shall be deemed to be properly given when made by hand delivery, first class US mail or recognized overnight courier to the parties at the following addresses:

If to Rustin:

> Neil Rustin
> PO Box 502
> Vinita, OK 74301

With Copy to:

> Thomas J. McGeady, Esquire
> LOGAN & LOWRY, LLP
> 101 South Wilson Street
> P.O. Box 558
> Vinita, OK 74301
> (tjmcgeady@loganlowry.com)
> (918) 256-7511

If to Ratcliff:

> James L. Ratcliff
> 102 East Illinois
> Vinita, OK 74301

With Copy to:

> Thomas J. McGeady, Esquire
> LOGAN & LOWRY, LLP
> 101 South Wilson Street
> P.O. Box 558
> Vinita, OK 74301

Page 9

(timcgeady@loganlowry.com)
(918) 256-7511

If to James N. Ratcliff:

    James N. Ratcliff
    102 East Illinois Street
    Vinita, OK 74301

With Copy to:

    Thomas J. McGeady, Esquire
    LOGAN & LOWRY, LLP
    101 South Wilson Street
    P.O. Box 558
    Vinita, OK 74301
    (timcgeady@loganlowry.com)
    (918) 256-7511

If to SSJR, LLC: (Bradshaw Entity)

    SSJR, LLC
    Attn: Susan R. Ryan
    1306 West Taylor
    Cloquet, MN 55720

With Copy to:

    Robert H. Magie, III
    501 Lake Ave. South
    Suite 400
    Duluth, MN 55802

If to Alyieo Holdings of Minnesota, LLC: (Lomen Entity)

    4301 White Bear Parkway
    Vadnais Heights, MN 55110
    Attn: Arlyn Lomen

With Copy to:

    Briggs and Morgan, P.A.
    Attn: Julie Drewes
    2200 IDS Center
    80 South Eighth Street
    Minneapolis, MN 55402

<u>If to F.B. LLC:</u> (Fredin Entity)

    F.B. LLC
    38468 US Hwy 14
    P.O. Box 37
    Springfield, MN 56087
    Attn: Curt Fredin

<u>With Copy to:</u>

    Snell & Wilmer L.L.P.
    Attn: John O'Brien
    Tabor Center
    1200 Seventeenth Street, Suite 1900
    Denver, Colorado 80202

[signature pages follow]

IN WITNESS WHEREOF, the parties have given their signatures on the date first hereinabove written.

"SELLERS"

_____

James L. Ratcliff

_____

Neil Rustin

[signature pages continue]

SIGNATURE PAGE TO STOCK PURCHASE AGREEMENT

IN WITNESS WHEREOF, the parties have given their signatures on the date first hereinabove written.

"PURCHASERS"

Fredin Entity:

F.B. LLC

By: _____
Curt Fredin, Chief Manager

[signature pages continue]

SIGNATURE PAGE TO STOCK PURCHASE AGREEMENT

IN WITNESS WHEREOF, the parties have given their signatures on the date first hereinabove written.

"PURCHASERS"

Bradshaw Entity:

SSJR, LLC

By:   _Susan R Ryan_
      Susan R. Ryan, its President


[signature pages continue]

IN WITNESS WHEREOF, the parties have given their signatures on the date first hereinabove written.

"PURCHASERS"

Lomen Entity:

Alyieo Holdings of Minnesota, LLC, a Minnesota limited liability company

By: _____

Name: Arlyn J. Aonten, Chief Manager

[signature pages continue]

IN WITNESS WHEREOF, the parties have given their signatures on the date first hereinabove written.

"SELLERS"

_____
James L. Ratcliff

_____
Neil Rustin

[signature pages continue]

ACCEPTANCE BY UNGER MEAT COMPANY AND JAMES N. RATCLIFF

Each of Unger Meat Company and James N. Ratcliff hereby consents to and agrees to be bound by the terms of this Agreement.

**"Unger Meat Company"**

By: _____

Name: _____

Title: _____

_____

James N. Ratcliff

## SCHEDULE 6(F)

### Leased Equipment

Sharp Model MX-4101NColor Copier and related accessories (leased from TimePayment Corporation)

## SCHEDULE 6(N)

### Financial Statements

See attached

**Unger Meat Company**
**Balance Sheet**
**For Month Ending:  03/31/2012**

| ASSETS | Total |
|---|---|
| Cash | 9,695 |
| Accounts Receivable | 372,639 |
| Inventory | 739,150 |
| Prepaids | 62,132 |
| Fixed Assets | 6,414,214 |
| **Total Assets** | **7,597,830** |

| LIABILITIES | |
|---|---|
| Accounts Payable | 1,228,991 |
| Line of Credit | 1,973,580 |
| James L Ratcliff Loan | 14,135,000 |
| Sandstone Contract for Deed | 0 |
| Common Stock | 0 |
| Retained Earnings | -4,815,765 |
| Current Year Income (Loss) | -4,923,977 |
| **Total Liabilities & Equity** | **7,597,830** |

**Unger Meat Company**
**Income Statement**
**For Month Ending: 03/31/2012**

| | Current Month | Per # Sold | YTD | Per # Sold |
|---|---|---|---|---|
| Pounds Sold | 231,289 | | 2,723,722 | |
| Net Sales | 504,950 | 2.183 | 6,566,383 | 2.411 |
| Cost of Goods Sold | | | | |
| Meat Costs | 425,157 | 1.838 | 5,821,326 | 2.137 |
| Packaging | 28,754 | 0.124 | 346,922 | 0.127 |
| Freight | 2,598 | 0.011 | 80,010 | 0.029 |
| Total | 456,509 | 1.974 | 6,248,257 | 2.294 |
| Gross Margin | 48,440 | 0.209 | 318,126 | 0.117 |
| Manufacturing Costs | 179,262 | 0.775 | 2,060,533 | 0.757 |
| Net Margin | -130,822 | -0.566 | -1,742,407 | -0.640 |
| Operating Expenses | | | | |
| Payroll - Administration | 81,896 | 0.354 | 1,266,061 | 0.465 |
| Travel & Entertainment | 1,596 | 0.007 | 161,868 | 0.059 |
| Selling Expenses | 7,700 | 0.033 | 112,494 | 0.041 |
| General & Administration | 73,172 | 0.316 | 463,710 | 0.170 |
| Professional Services | 6,092 | 0.026 | 445,110 | 0.163 |
| Interest Expense | 70,194 | 0.303 | 739,849 | 0.272 |
| Interest Income | -3 | 0.000 | -2,597 | -0.001 |
| Taxes | 447 | 0.002 | 4,492 | 0.002 |
| Total SG & A Operating Expense | 241,096 | 1.042 | 3,190,987 | 1.172 |
| Operating Income (Loss) | -371,918 | -1.608 | -4,933,394 | -1.811 |
| Other Income | 0 | 0.000 | 9,417 | 0.003 |
| Net Income (Loss) | -371,918 | -1.608 | -4,923,977 | -1.808 |

### Unger Meat Company
### Gross Margin - Non-HR Ground Beef
### For Month Ending: 03/31/2012

|  | Current Month | Per # Sold |
|---|---|---|
| Pounds Sold | 162,042 | |
| Net Sales | 410,284 | 2.532 |
| Cost of Goods Sold | | |
| Meat Costs | 342,514 | 2.114 |
| Packaging | 17,271 | 0.107 |
| Freight | 0 | 0.000 |
| COGS | 359,785 | 2.220 |
| Gross Margin | 50,498 | 0.312 |

### Unger Meat Company
### Gross Margin - Non-HR Boxed Beef & Cut Steaks
### For Month Ending: 03/31/2012

|  | Current Month | Per # Sold |
|---|---|---|
| Pounds Sold | 1,899 | |
| Net Sales | 9,540 | 5.023 |
| Cost of Goods Sold | | |
| Meat Costs | 7,773 | 4.093 |
| Packaging | 926 | 0.488 |
| Freight | 55 | 0.029 |
| COGS | 8,754 | 4.609 |
| Gross Margin | 786 | 0.414 |

**Unger Meat Company**
**Gross Margin - HR Ground Beef and Steaks**
**For Month Ending:  03/31/2012**

|  | Current Month | Per # Sold |
|---|---|---|
| Pounds Sold | 397 | |
| Net Sales | 4,781 | 12.058 |
| **Cost of Goods Sold** | | |
| Meat Costs | 2,985 | 7.529 |
| Packaging | 996 | 2.512 |
| Freight | 0 | 0.000 |
| COGS | 3,981 | 10.041 |
| Gross Margin | 800 | 2.018 |

EXHIBIT A

Form of Non-Recourse Promissory Note

## Non-Recourse, Non-Negotiable Demand Promissory Note

$ 500,000.00
June 22, 2012
Vinita, Oklahoma

**SSJR, LLC, F.B. LLC, and Alyieo Holdings of Minnesota, LLC,** (hereinafter referred to as "Makers"), jointly and severally promise to pay to the order of **NEIL RUSTIN** (referred to as "Holder"), the sum of $500,000.00, together with interest at the rate of three percent (3%) per annum. The principal balance and all accrued interest on this Note shall be due December 22, 2013, with payment to be made, either in person or by wire transfer to the account of Holder at The First National Bank, Vinita, Oklahoma.

Upon default, the sums herein shall accrue interest at the rate of eighteen percent (18%) per annum. THIS NOTE IS A NON-RECOURSE OBLIGATION WITHOUT PERSONAL LIABILITY OF ANY MAKER, AND THE HOLDER MAY NOT SEEK RECOURSE TO ANY ASSETS OF ANY MAKER OTHER THAN THE STOCK (DEFINED BELOW), AND EACH MAKER DOES NOT AGREE TO SUBJECT ANY OF ITS OR ITS MEMBERS' ASSETS TO THE PAYMENT OF THIS DEBT.

This Note is secured by a certain Stock Pledge Security Agreement of even date herewith ("Pledge Agreement"), pledging, as security for the obligation represented by this Note eighty (80) shares of the Common Stock (the "Stock") of the Unger Meat Company, a Minnesota corporation ("Unger").

If at any time at or prior to the maturity date of this Note, one or more of the Makers sell(s) and convey(s) its or their shares of the Stock to one or more of the other Makers (and such other Maker(s) accept such conveyance), then the transferring Maker shall thereupon be, without any action by Holder, released from all obligations under this Note.

In the event the Makers exercise the "Put Right" as defined in a certain Stock Purchase Agreement by and among Makers, Holder, Unger, James L. Ratcliff and James N. Ratcliff, and relinquish the Stock to Holder, Makers shall thereafter have no further obligations hereunder and such relinquishment shall constitute full payment of this Note.

Holder may assign this Note together with the Pledge Agreement to James L. Ratcliff without the prior written consent of Makers.

**"MAKERS"**

SSJR, LLC

*Susan R Ryan*

By: Susan R. Ryan, President


F.B. LLC

_____

By: Curt Fredin, Chief Manager


Alyieo Holdings of Minnesota, LLC

_____

By: Arlyn J. Lomen, Chief Manager

"MAKERS"

SSJR, LLC

_____

By: Susan R. Ryan, President

F.B. LLC

_____

By: Curt Fredin, Chief Manager

Alyico Holdings of Minnesota, LLC

_____

By: Arlyn J. Lomen, Chief Manager

"MAKERS"

SSJR, LLC

_____

By: Susan R. Ryan, President

F.B, LLC

_____

By:  Curt Fredin, Chief Manager

Alyico Holdings of Minnesota, LLC

_____

By:  Arlyn J. Lomen, Chief Manager

# EXHIBIT B

## Form of Security Agreement—Stock Pledge

## SECURITY AGREEMENT — STOCK PLEDGE

This Agreement (this "Pledge Agreement"), effective as of June 22, 2012, is made and entered into by and between SSJR, LLC, F.B. LLC and Alyieo Holdings of Minnesota, LLC ("Pledgors") and NEIL RUSTIN ("Lender").

### W I T N E S S E T H :

WHEREAS, by the execution of a certain Non-Recourse Non-Negotiable Demand Promissory Note (the "Note") of even date herewith, Pledgors are indebted, on a non-recourse basis, to Lender, in the principal sum of $500,000.00; and

WHEREAS, it is the intention of the parties that the obligations aforesaid be secured by a pledge of all the outstanding stock in Unger Meat Company, consisting of eighty (80) shares comprising one-hundred percent (100%) of the issued and outstanding stock of Unger Meat Company.

NOW THEREFORE, the parties agree as follows:

1.    *Pledge of Stock.* In consideration of the premises and for value received, the undersigned Pledgors hereby pledge to Lender or his successors and assigns the following described stock (the "Shares"):

| Shareholder | Shares Purchased | Percentage Ownership in Company | Stock Certificate Numbers |
|---|---|---|---|
| F.B. LLC | 36 | 45% | 12 |
| SSJR, LLC | 36 | 45% | 13 |
| Alyieo Holdings of Minnesota, LLC | 8 | 10% | 14 |

2.    *Purpose of Pledge.* That certain stock aforesaid and any other securities issued and accepted in lieu thereof shall be held by Lender to secure the prompt and full payment of any sums owing from Pledgors to Lender under the terms of the Note.

3.    *Payment of Dividends on Stock.* The Security Agreement between Unger Meat Company and Lender contains a negative covenant barring declaration or payment of dividends with respect to the stock pledged herein until such time as the Unger Meat Company's separate indebtedness to Lender has been paid in full. Accordingly, no dividends may be declared with respect to the above-described stock until such time as the Note has been paid in full to Lender.

4.    *Substitution of Stock.* It is understood between Pledgors and the Lender that Lender may permit the substitution of the stock described hereinabove for new certificates which Unger Meat Company may issue in the future with consent of Lender. Lender shall also permit any one or more of the Pledgors to transfer and convey the stock in Unger Meat Company owned by it or them to one or more of the other Pledgors who agree(s) to accept such stock, and thereupon the transferring Pledgor(s) shall have no further obligations under, and shall be released as a party to, this Pledge Agreement and as a "Maker" under the Note, provided that the lien created by this Pledge Agreement shall continue with respect to the transferred Shares.

Page 1

5.    *Preservation of Lien on Stock.* It is expressly agreed and understood that in making such substitution Lender shall not relinquish any lien or right granted to Lender by this Pledge Agreement in and to such stock.

6.    *Notice of and Curing of Default.* Lender acknowledges and agrees that Pledgors are purchasing the stock of Unger Meat Company pursuant to the terms of that certain Stock Purchase Agreement dated of even date herewith (the "Stock Purchase Agreement"). Lender further acknowledges and agrees that Pledgors have the right, pursuant to Section 16 of the Stock Purchase Agreement, to terminate the Stock Purchase Agreement and return the stock of the Unger Meat Company to Lender pursuant to a Put Right (as defined in the Stock Purchase Agreement). Upon the exercise of such Put Right, this Pledge Agreement will automatically terminate and be of no further force or effect, without any action being required on the part of any party. Pledgors shall be entitled to notice of demand for payment which shall be deemed to be properly made and completed when transmitted to Pledgors via fax at the following fax numbers:

| | | | |
|---|---|---|---|
| a. | If to F.B. LLC | (Fax No. (507) 723-6444 | ) |
| b. | If to SSJR, LLC | (Fax No. is (218) 879-1406 | ) |
| c. | If to Alyieo Holdings of Minnesota, LLC | (Fax No. (651) 429-9779 | ) |

7.    *Lender's Remedies Upon Default.* Lender, upon default by Pledgors under the terms of the Note, shall be entitled to exercise any remedy allowed to secured creditors by the Uniform Commercial Code as then presently in effect in the State of Minnesota. Without limiting the generality of the foregoing, Lender, upon default, shall be entitled to sell the stock herein pledged at public or private sale and shall further be entitled to register the stock in the name of Lender or a proxy of Lender who shall be empowered to vote all of the Shares represented by any certificate or certificates pledged hereunder in such manner as Lender or his proxy deem fitting.

**Anything to the foregoing notwithstanding, the obligations created by this Security Agreement-Stock Pledge are entirely non-recourse obligations without any personal liability of any Pledgor's members, managers, representatives or affiliates. Lender may not seek recourse to (a) any assets of any Pledgor other than the Shares or (b) any assets of any members, managers, representatives or affiliates of any Pledgor. Pledgors do not agree to subject any assets other than the Shares to the payment of the debt herein secured.**

8.    *Return of Pledged Stock.* Upon the complete payment of the indebtedness represented by the Note, Lender shall return all stock certificates pledged hereunder to the record owners thereof free and clear of any lien or encumbrance created by Lender.

9.    *Assignment of Pledge Agreement.* Lender may assign this Pledge Agreement together with the Note to James L. Ratcliff without the prior written consent of Pledgors.

[signature page follows]

JUN-22-2012  11:33          LAW OFFICE                              218 722 6909      P.02

IN WITNESS WHEREOF, the parties have executed this Pledge Agreement as of the date first set forth above.

SSJR, LLC

By: _____*Susan R Ryan*_____
Susan R. Ryan, its President

Alyieo Holdings of Minnesota, LLC,

By: _____
Arlyn J. Lomen, Chief Manager

F.B. LLC

By: _____
Curt Fredin, Chief Manager

_____
Neil Rustin, Lender

IN WITNESS WHEREOF, the parties have executed this Pledge Agreement as of the date first set forth above.

SSJR, LLC

By: _____
       Susan R. Ryan, its President

Alyleo Holdings of Minnesota, LLC,

By: _____
       Arlyn J. Lomen, Chief Manager

F.B. LLC

By: _____
       Curt Fredin, Chief Manager

_____
Neil Rustin, Lender

IN WITNESS WHEREOF, the parties have executed this Pledge Agreement as of the date first set forth above.

SSJR, LLC

By: _____
     Susan R. Ryan, its President

Alyieo Holdings of Minnesota, LLC,

By: _____
     Arlyn J. Domen, Chief Manager

F.B. LLC

By: _____
     Curt Fredin, Chief Manager


_____
Neil Rustin, Lender

IN WITNESS WHEREOF, the parties have executed this Pledge Agreement as of the date first set forth above.

SSJR, LLC

By: _____

     Susan R. Ryan, its President

Alyieo Holdings of Minnesota, LLC,

By: _____

     Arlyn J. Lomen, Chief Manager

F.B. LLC

By: _____

     Curt Fredin, Chief Manager

_____

Neil Rustin, Lender

*Corporate Endorsement:* Unger Meat Company, acting through its undersigned President, hereby agrees that, throughout the term of this Pledge Agreement, it will not issue any additional shares of stock without the prior written consent of James L. Ratcliff and each of the Pledgors.

**Unger Meat Company**

By: _____

_____, President







INCORPORATED UNDER THE LAWS OF THE STATE OF MINNESOTA

UNGER MEAT COMPANY

**This Certifies that** Alyico Holdings of Minnesota, LLC  *is the owner of*

Eight  *fully paid and*

non-assessable Shares of the above Corporation transferable only on the books of the Corporation by the holder hereof in person or by duly authorized Attorney upon surrender of this Certificate properly endorsed.

In Witness Whereof, the said Corporation has caused this Certificate to be signed by its duly authorized officers and to be sealed with the Seal of the Corporation.

Dated  June 22, 2012

EXHIBIT C

<u>Amended and Restated Lease (as amended)</u>

EXHIBIT C TO STOCK PURCHASE AGREEMENT

## AMENDED AND RESTATED LEASE

### Description

This Amended and Restated Lease (this "Lease") is made this 22nd day of June, 2012, by

and between JAMES L. RATCLIFF, as Trustee of the James L. Ratcliff 2001 Revocable Trust

Agreement dated January 11, 2001, and JAMES N. RATCLIFF, individually (collectively

"Landlord") and UNGER MEAT COMPANY, INC., a Minnesota corporation ("Tenant").

### RECITALS:

A.    Landlord and Tenant are parties to a certain Ground Lease dated June 15, 2010

relating to the Leased Premises (defined below) (the "Existing Lease").

B.    Landlord and Tenant desire to amend and restate the Existing Lease with the

terms and conditions stated herein.

IN WITNESS WHEREOF, for the consideration hereinafter named, and for other good

and valuable consideration, receipt of which is acknowledged hereby, the parties do hereby agree

as follows:

### AGREEMENTS:

### ARTICLE I.

### Lease of Premises; Term

Landlord, in consideration of the rent hereinafter described, leases to Tenant, and Tenant

hereby leases from Landlord the "Leased Premises" described as follows:

> That part of the South 342 feet of the North 642 feet of the
> Northwest Quarter of the Southeast Quarter (NW/4 SE/4) of
> Section Twenty-one (21), Township Thirty (30) North, Range
> Twenty-two (22) West lying East of the Easterly right-of-way line
> of Interstate Highway No. 35E, Ramsey County, Minnesota;

together with and including all improvements and appurtenances thereunto belonging, including

the office and factory building there situated (the "Building").

TO HAVE AND TO HOLD the Leased Premises for an initial term of five (5) years commencing on the 22nd day of June, 2012, and expiring on the 21st day of June, 2017 (the "Initial Term"), with three (3) options to renew the term for consecutive additional periods of five (5) years (each, a "Renewal Term") pursuant to the terms of the following paragraph. The Initial Term, together with the Renewal Term(s) (if exercised) are referred to herein as the "Term."

Tenant shall have the option to extend the term for each Renewal Term, provided that (a) Tenant is in occupancy of the Leased Premises at the time of exercise of such extension option, and (b) Tenant gives Landlord written notice of its election to exercise each extension option no later than three (3) months prior to the expiration date of the then-current Initial Term or Renewal Term, as applicable.

## ARTICLE II.

### Rental

A.    The basic rent under this Lease for the period from May 1, 2012 through July 31, 2012 shall be abated and shall not be due or owing by Tenant to Landlord (the "Abatement Period").

B.    Commencing approximately thirty (30) days prior to the end of the Abatement Period, Landlord and Tenant will negotiate in good faith to determine the base rent amount applicable for the next three (3)-month period immediately following the Abatement Period. Landlord and Tenant shall repeat this process for each subsequent 3-month period through April 30, 2013, negotiating in good faith prior to the start of each successive 3-month period to determine the applicable base rent for such period. Landlord and Tenant shall memorialize the agreed rental rate for each such period in writing. In all cases, the base rent amount for all such

2

3-month periods through April 30, 2013 shall be less than the base rent amount shown in Section II(C) below).

C.     Commencing on May 1, 2013 through the balance of the Initial Term, Tenant agrees to pay to the Landlord the basic monthly rent in the sum of TWELVE THOUSAND ONE HUNDRED TEN AND 94/100 DOLLARS ($12,110.94) payable on the 1st day of each month during such period.   In the event any Tenant exercises one or more of the extension options pursuant to Article I above, the basic monthly rent for each exercised Renewal Term shall increase by five percent (5%) from the basic monthly rent for the prior Initial Term or Renewal Term, as applicable.

D.     A late fee of five percent (5%) of the amount due shall be charged retroactive to the 1st day of the month for rents due but not paid by the 10th day of any calendar month.

E.     Tenant further contracts, covenants and agrees that it shall be responsible for utilities, telephone and the maintenance of the lawn, lawn sprinkler system and landscaping, and shall be responsible to pay the ad valorem taxes assessed with respect to the Leased Premises directly to the taxing authority each year when due.   If Landlord receives any tax bills or notices, Landlord shall promptly send the same to Tenant.   Notwithstanding the foregoing, with respect to the real estate taxes due May 15, 2012, Landlord shall be responsible (without reimbursement from Tenant) for two-thirds, and Tenant shall be responsible for one-third; Landlord shall make such payment to the taxing authority and Tenant shall reimburse Landlord for such one-third amount.

### ARTICLE III.

#### Insurance

Tenant shall maintain, for the mutual benefit of Landlord and Tenant, "all-risk" property insurance and commercial general liability insurance on the Leased Premises located at 4301

3

White Bear Parkway, Vadnais Heights, MN 55110, against all claims for personal injury, death or property damage. The property insurance shall include replacement cost coverage for the Building. The liability insurance shall have a combined single limit of $1,000,000 per occurrence and $1,000,000 aggregate coverage and shall name Landlord and the Fee Owner (as defined in Article VIII below) of the as additional insureds. At such time that the Contract for Deed (as defined in Article VIII below) is fully performed and Landlord owns the fee interest in the Leased Premises, then such insurance shall thereafter name only Landlord as additional insured.

Tenant covenants that it will not do or permit to be done nor keep or permit to be kept upon the Leased Premises anything that will contravene the policy or policies of insurance against loss by fire or other causes.

## ARTICLE IV.

### Landlord's Right to Perform Tenant's Covenants

The Tenant covenants that if the Tenant shall at any time fail to make any payment or perform any other act on its part to be performed here under, the Landlord may, but shall not be obligated to, and without notice and demand and without waiving or releasing the Tenant from any obligation under this Lease, make such payment or perform such other act to the extent Landlord may deem desirable.

## ARTICLE V.

### Repairs and Maintenance of Premises; Surrender of Premises; Waste

The Tenant will, during the term of this Lease, keep the Leased Premises, the Building and appurtenances thereto, in good order and condition subject to reasonable wear and tear. Landlord acknowledges that all personal property and trade fixtures (including all coolers, freezers, and equipment) are the property of Tenant.

4

Tenant further covenants that upon termination of this Lease for any reason whatsoever, the Tenant will surrender to the Landlord the Leased Premises, including the Building, together with all improvements and accessions thereto (but excluding any trade fixtures and personal property owned by Tenant), in good order, condition and repair, except for reasonable wear and tear.

Tenant agrees to use the Leased Premises in a clean, orderly condition for the purpose of the manufacture, preparation and packaging of "end meats" as that term is understood in the meat packing trade and business, or for any other lawful use. The Tenant covenants not to do or suffer any waste or damage or other injury to the Building and Leased Premises, reasonable wear and tear excepted.

## ARTICLE VI.

### Changes and Alterations by Tenant

Tenant shall not make any structural alterations to the Leased Premises without the Landlord's prior written consent. Tenant may make non-structural alterations without Landlord's consent.

## ARTICLE VII.

### Damage or Destruction; Condemnation

A.    The Tenant covenants and agrees that in case of damage or destruction of the Leased Premises by fire or other casualty, the Tenant will promptly give written notice thereof to the Landlord and the Landlord, at Landlord's own expense, will repair and rebuild the same as nearly as possible to the condition of the Leased Premises prior to such damage or destruction. Tenant shall permit the casualty insurance proceeds to be made available to Landlord for such rebuilding.

5

Anything in the foregoing paragraph notwithstanding, if the Building shall be substantially damaged or destroyed by fire or otherwise, to such extent that the damage cannot reasonably be expected to be repaired within 180 days, both the Tenant and the Landlord shall have the option of terminating this Lease as of the date of such damage or destruction by written notice to the other party given within thirty (30) days after such damage or destruction. All rent shall be equitably abated from and after the date of the damage through the date of full restoration of the Leased Premises.

B.      If the whole or any substantial part of the Leased Premises shall be taken or condemned or purchased under threat of condemnation by any governmental authority, then this Lease shall cease and terminate as of the date the condemning authority takes possession of the Leased Premises. Landlord shall be entitled to the condemnation award, provided that Tenant shall be entitled to obtain and any award for loss of business or costs of relocation.

### ARTICLE VIII.

### Landlord's Right to Enter Premises; Contract for Deed Performance

A.      The Tenant agrees to permit the Landlord and any authorized representatives of the Landlord to enter the Leased Premises at all times during usual business hours or at any other time in case of emergency to inspect the same and, at Landlord's option and expense, to make any repairs deemed necessary in Landlord's reasonable discretion.

B.      Landlord covenants and agrees to timely and fully perform all of Landlord's obligations on the Contract for Deed dated June ___, 2010 (the "Contract for Deed") by and between Landlord, as Purchaser, and William J. Nielsen, as Trustee of the Revocable Living Trust of William John Nielsen dated February 8, 2002, as amended (the "Fee Owner"). In the event Landlord receives any notice of default of Landlord (as purchaser) under the Contract for Deed, Landlord shall immediately provide a copy of the same to Tenant.

6

## ARTICLE IX.

### Assignment and Subletting

Tenant shall not have the right to assign this Lease or sublet, transfer or sell any part of the Leased Premises without written consent of the Landlord, which consent shall not be unreasonably withheld.

## ARTICLE X.

### Right of First Refusal.

During the Term, Landlord may sell, convey, or otherwise transfer the Leased Premises ("Sale") to any third party (the "Proposed Purchaser"), provided that Landlord first provide Tenant with such Proposed Purchaser's written bona-fide offer to purchase the Leased Premises or portion thereof (a "Transfer Offer"). Tenant shall then have the exclusive right to purchase the Leased Premises from Landlord under the terms set forth in the Transfer Offer within sixty (60) days of Tenant's receipt of the Transfer Offer, provided, however, in the event the terms of the Transfer Offer contemplate as consideration for the Sale consideration other than cash consideration (the "Non-Cash Consideration"), Tenant shall be entitled to substitute for such Non-Cash Consideration an amount of cash equal to the fair market value of such Non-Cash Consideration (the "Right of First Refusal"). During this 60-day period, Landlord may not sell, convey or otherwise transfer any interest in the Leased Premises, or engage in any efforts intended to result in any such sale, conveyance or transfer. If Tenant does not exercise its Right of First Refusal within the 60-day period, Landlord may sell the Leased Premises to the Proposed Purchaser under the specific terms set forth in the Transfer Offer, provided that prior to the closing of the Sale contemplated by the Transfer Offer, the Proposed Purchaser shall assume, in writing, all of the rights and obligations of Landlord under this Lease and agree to be bound by all of its terms and conditions. In the event that any Sale contemplated by a Transfer Offer that

7

does not close within 180 days of the expiration of Tenant's Right of First Refusal then Tenant's

Right of First Refusal shall be re-instated. In the event that the terms of a Transfer Offer change

materially from those contained in the original Transfer Offer, Landlord shall again deliver such

revised Transfer Offer to Tenant and Tenant shall have a Right of First Refusal with respect to

such revised Transfer Offer on the same terms provided however that Tenant shall have thirty

(30) days in which to exercise its Right of First Refusal with respect to the revised Transfer

Offer. The Right of First Refusal shall not apply to any transfer of the Premises by Landlord to

an affiliate or related party of Landlord ("Permitted Transferee") for bona fide estate planning

purposes, provided, however, the Permitted Transferee shall assume, in writing, all of the rights

and obligations of Landlord under this Lease and agree to be bound by all of its terms and

conditions.

### ARTICLE XI.

#### Notices

All notices, demands and requests which may be or are required to be given by either

party to the other shall be in writing and shall be deemed given when delivered personally to

Landlord or Tenant or sent by United States Certified Mail or overnight courier, postage prepaid,

at the following addresses:

If to Landlord:

James N. Ratcliff
The First National Bank of Vinita
102 West Illinois Street
Vinita, OK 74301

With Copy to:

Thomas J. McGeady, Esquire
Michael T. Torrone, Esquire
LOGAN & LOWRY, LLP

8

101 South Wilson Street
P. O. Box 558
Vinita, OK 74301

If to Tenant:

Unger Meat Company
Attention: President
4301 White Bear Parkway
Vadnais Heights, MN 55110

## ARTICLE XII.

### Entire Agreement

This Lease represents the entire agreement between Landlord and Tenant with respect to the lease of the Leased Premises and may not be changed or varied except by a writing, executed by both Landlord and Tenant. This Lease amends, restates, and supersedes in its entirety the Existing Lease from and after the date hereof.

9

"LANDLORD"

James L. Ratcliff, as Trustee of the James L.
Ratcliff 2001 Revocable Trust Agreement dated
January 11, 2001

James N. Ratcliff, individually

"TENANT"

UNGER MEAT COMPANY, INC.

By: _____

Name: _____

Title: _____

10

# EXHIBIT D

Copy of IMI License Agreement (as amended)

EXHIBIT D TO STOCK PURCHASE AGREEMENT



IMI Global, Inc.
221 Wilcox St., Suite A
Castle Rock, CO 80104
Phone: 303.895.3002
Fax: 720.221.0411
www.imiglobal.com

May 15th, 2012

Arlyn J. Lomen

**Unger Meat Company**

4301 White Bear Parkway

Vadnais Heights, MN 55110

Arlyn:

Per our last conversation, this letter is sent to provide confirmation that IMI Global, Inc. is in agreement to extend the existing Where Food Comes From@ Licensing Agreement with Unger Meat Co until May 31, 2013.

Regards,

John Saunders

CEO, IMI Global, Inc.

INTEGRATED . MANAGEMENT . INFORMATION

## EXHIBIT E

### Form of Put Notice
[DATE]

James L. Ratcliff
102 East Illinois
Vinita, OK 74301

Neil Rustin
PO Box 502
Vinita, OK 74301

Unger Meat Company
4301 White Bear Parkway
Vadnais Heights, MN 55110

Re:  Unger Meat Company - Exercise of Put Right

Gentlemen:

Pursuant to Section 16 of the Stock Purchase Agreement, dated June 20, 2012 (the "Agreement"), among NEIL RUSTIN ("Rustin"), JAMES L. RATCLIFF ("Ratcliff" or together with Rustin, "Sellers" and each a "Seller"), on the one hand, and SSJR, LLC, a Minnesota limited liability company, Alyieo Holdings of Minnesota, LLC, a Minnesota limited liability company, and F.B. LLC, a Minnesota limited liability company, (collectively, "Purchasers"), Purchasers hereby exercise the Put Right effective as of _____ (the "Effective Date").  In accordance with Section 16 of the Agreement, the Agreement, the Note and the Security Agreement are hereby terminated and each Seller and each Purchaser are released from all obligations and liabilities, whether known or unknown, actual or contingent, arising therefrom, in each case, as of the Effective Date, provided, however, Sections 10, 11, 12, 17 and 16 of the Agreement hereby survive such termination and remain in effect according to their terms.  Pursuant to Section 16 Sellers are hereby directed to deliver (a) the original certificates representing the Shares (the "Certificates") to the Secretary of Unger Meat Company and (b) the original Note marked as "CANCELLED" to the Purchasers, in each case, not later than five business days following the Effective Date.

Upon earlier of the receipt of the Certificates or the date that is six business days following the Effective Date, Unger Meat Company is hereby directed to cancel the Certificates and issue the Shares to Rustin or Rustin's designee.  Unger Meat Company shall deliver copies of the Certificates marked as "CANCELLED" to the Purchasers not later than 10 business days following the Effective Date.

PURCHASERS

[_____]

By:       _____
Name:   _____
Title:    _____

Date:    _____

cc:  Thomas J. McGeady, Esquire
LOGAN & LOWRY, LLP
101 South Wilson Street
P. O. Box 558
Vinita, OK 74301

EXHIBIT E TO STOCK PURCHASE AGREEMENT



**The First
National
Bank**

VINITA • GROVE • CLEORA

June 20, 2012

Unger Meat Company
4301 White Bear Parkway
Vadnais Heights, MN 55110

     Re:    $2,000,540 Loan to Unger Meat Company, Loan Number 249039 (the "Loan")

Gentlemen:

    The First National Bank and Trust Company of Vinita (the "Bank") has received the request by Unger Meat Company (the "Borrower") for approval of (i) a change in control in the ownership of the Borrower and (ii) the collateral for the Loan also being used to secure additional financing to the Borrower.

    The Bank hereby approves the following:

    A.    The change in ownership of the stock in the Borrower, in one or more transactions, such that the stock is ultimately owned collectively by the following entities: SSJR, LLC, a Minnesota limited liability company, Alyieo Holdings of Minnesota, LLC, a Minnesota limited liability company, and F.B. LLC, a Minnesota limited liability company (the "New Ownership Group"). The Bank further to consents to any reallocation of shares in the Borrower among the New Ownership Group following their initial acquisition of such shares. Such transactions shall not result in an acceleration event or default under the Promissory Note evidencing the Loan or any other provisions of the Loan documents.

    B.    The collateral for the Loan may also be used as collateral to secure certain loans existing as of the date hereof from one or more other lender(s) to the Borrower in an aggregate amount of up to $14,135,000, notwithstanding anything to the contrary in Section V of the Security Agreement executed by the Borrower in favor of the Bank in connection with the Loan.

                             THE FIRST NATIONAL BANK AND
                             TRUST COMPANY OF VINITA

                             By: _____
                             Name: Timothy S. Williams
                             Title: President

**VINITA LOCATION**
102 W. ILLINOIS • P.O. BOX 407
VINITA, OKLAHOMA 74301-0407
(918) 256-7811 • FAX (918) 256-7855 OR (918) 256-8064
www.fnbvinita.com

**GROVE LOCATION**
600 S. MAIN • P.O. BOX 6660
GROVE, OKLAHOMA 74344-6660
(918) 786-7775 • FAX (918) 786-7770
www.fnbgrove.com

**CLEORA LOCATION**
30776 HWY. 85, SUITE B
AFTON, OKLAHOMA 74331-8425
(918) 782-1020 • FAX (918) 782-1030
www.fnbcleora.com

```
         8/16/18                              Loan trial     09:21:04
SSJR, LLC                                     CIF number......      S055352 0
1306 WEST TAYLOR                              Home phone .....   (000) 000-0000
CLOQUET MN  55720                             Business phone..   (000) 000-0000
                                              Personal cell ph   (000) 000-0000
                                              Tax ID number...     45-3966527
                                              Type.... CO  COMMERCIAL-360
                                              Account number..         261057
PAST DUE!   Non-accrual  Messages   Alternate schedule             1 of 2
Original loan amt    3,508,046.55      Officer/collection off.    HDR HDR
Current balance      2,167,849.11      Original loan date         1/22/14
Accrued interest             .00       Loan term                    81 M
Late charges due       1,400.00        Maturity date              1/05/21
                                       Last payment date          8/01/17
Current payoff       2,238,868.20      Next payment due date      8/05/17
Payoff is good thru     2/21/18        Amt partially paid
Payoff w/ sec acc    2,345,424.00      Amount past due         720,964.69

Interest base         360 actual       Payment amount           56,576.73
Interest rate           5.0000         Payment type    Interest included
Per diem              301.09015        Payment frequency            1 M
                                                                 More...
F2=Image  F3=Exit  F12=Previous  F4,F5=History  F6=Messages  F7=Addresses
F8=Maintenance  F9=Relationships  F10=Pmt sched  F11=Memo post  F24=More keys
```

# EXHIBIT G

## SECOND AMENDMENT TO STOCK PURCHASE AGREEMENT and
## NON-RECOURSE, NON-NEGOTIABLE DEMAND PROMISSORY NOTE

**THIS SECOND AMENDMENT TO STOCK PURCHASE AGREEMENT and NON-RECOURSE, NON-NEGOTIABLE DEMAND PROMISSORY NOTE** (this Second Amendment) is made effective as of January 22, 2014, by and between NEIL RUSTIN ("Rustin") and JAMES L. RATCLIFF ("Ratcliff"), hereinafter "Sellers" and SSJR, LLC ("SSJR"), a Minnesota limited liability company, hereinafter "Purchaser" and acknowledged by Unger Meat Company a Minnesota corporation ("Unger") and James N. Ratcliff ("Landlord").

### RECITALS:

A. Sellers and Purchaser entered into a Stock Purchase Agreement as of June 22, 2012 (the "Stock Purchase Agreement"), with the consent and acknowledgement of Landlord and Unger, pursuant to which, among other things, Rustin conveyed and transferred all of the shares of common stock of Unger to Purchaser and other parties upon certain terms and conditions, specifically including a Security Agreement whereby Rustin retained said shares pending payment of said Non-Recourse, Non-Negotiable Demand Promissory Note ( the "Note").

B. Purchaser has subsequently purchased all of the shares of other parties in Unger and now owns all of the outstanding common stock shares of Unger.

*SSJR owns 100% of unger*

C. As consideration for the sale of the Unger shares from Sellers to Purchaser, Purchaser executed a certain Non-Recourse, Non-negotiable Demand Promissory Note (the "Note") in the original sum of $500,000 made payable to Rustin.

D. Pursuant to Section 16 of the Stock Purchase Agreement and the 5th paragraph of the Note, there was a Put Right during a defined Put Term (as extended) that allowed for Purchaser to elect to void the purchase of said common stock shares of Unger by exercising the Put Right, in which case Purchaser would have no further obligation upon said Note.

E. Purchaser did not exercise said Put Right and the Sellers and Purchaser have agreed upon certain additional changes and modifications to the Stock Purchase Agreement and Note, set forth herein.

In consideration of the Recitals and for other good and valuable consideration, the parties hereby agree as follows:

## AGREEMENTS:

1.  <u>Amendment to Note and Acknowledgement of Payment.</u>

    The Note is hereby amended to change the original principal sum of $500,000 to the amended principal sum of $250,000.  Further, Sellers hereby acknowledge full payment of the Note in the amount of $250,000 cash effective as of January 22, 2014.

2.  <u>Release of Shares under Security Agreement.</u>

    Effective January 22, 2014, Rustin shall release said shares of Unger to SSJR and his security interest in said shares shall terminate.

3.  <u>Credit to Unger Meat Company by First National Bank & Trust of Vinita ("Vinita Bank".</u>

    Sellers agree to make their best efforts to accomplish the following changes in existing debt of Unger to Vinita Bank:

    Consolidate the two existing loans (loan #s 249039 and 268038, which  have a combined outstanding principal balance of $3,499,140.46) into a single term loan ("New Loan") having the following characteristics:

    a.  Borrower shall be SSJR, LLC;
    b.  New Loan shall have a one year term and balloon balance at the end of one year;
    c.  New Loan to be secured by Unger stock and current UCC filings in place;
    d.  No other indebtedness, excluding normal, routine operational trade debt, will encumber Unger collateral without written approval of Vinita Bank;
    e.  Payment  holiday, but not interest holiday, for 90 days from January 22, 2014.
    f.  Commencing April 30, 2014, New Loan will have monthly payments of $15,600, applied first to interest and any remainder to principal reduction;
    g.  Commencing January 22, 2015, assuming acceptable financial viability of Unger, Vinita Bank may extend Unger further credit of the outstanding principal balance of New Loan for 6 to 7 additional years at an interest rate of .75% over published WSJ prime rate.

4. <u>Payment of Outstanding Indebtedness to Ratcliff.</u>

Commencing July 1, 2014, Unger will make monthly payments to Ratcliff in the amount of $50,000, which payments shall be applied toward the Unger obligation to Ratcliff in the present amount of $14,135,000.  The annual interest rate on this obligation shall be fixed at 4% and monthly payments shall be applied first to interest and then toward principal reduction.

5. <u>Changes to Amended and Restated Lease of June 22, 2012 (the "Lease").</u>

Sellers agree to make their best efforts to accomplish the following changes in the Lease:

> Parties to the Lease will negotiate new documents whereby Unger will commence purchase of said real estate by monthly payments in the approximate amount of $12,125.00.

6. <u>All other Terms and Conditions of Stock Purchase Agreement to Remain the Same.</u>

Except as set forth hereinabove, the terms and conditions of the original Stock Purchase Agreement shall remain as originally written and agreed upon.

Dated and agreed upon to be effective as of January 22, 2014.


[Signature Pages to Follow]

IN WITNESS WHEREOF, the parties have given their signatures on the date first hereinabove written.

"SELLERS"

_____

James L. Ratcliff


_____

Neil Rustin

IN WITNESS WHEREOF, the party has given its signature on the date first hereinabove written.

"PURCHASER"

SSJR, LLC

By:_____
Susan R. Ryan, its President

**ACCEPTANCE BY UNDER MEAT COMPANY AND JAMES N. RATCLIFF**

Each of Unger Meat Company and James N. Ratcliff hereby consents to and agrees to be bound by the terms of this Second Amendment to Stock Purchase Agreement and Non-Recourse, Non-Negotiable Demand Promissory Note.

"UNGER MEAT COMPANY"

By: _____
Name: _____
Title:_____


_____
James N. Ratcliff

# EXHIBIT H

DC - Business Name

75959890002

# ARTICLES OF AMENDMENT
## TO
## ARTICLES OF INCORPORATION
### OF
### UNGER MEAT COMPANY

The undersigned, President of Unger Meat Company, a Minnesota corporation (the "Corporation"), with the purpose of amending the Corporation's articles of incorporation (the "Articles") under the provisions of Minnesota Statutes, Section 302A.139, hereby certifies that:

1.      The current name of the Corporation is Unger Meat Company.

2.      Article I of the Articles is amended in its entirety to provide as follows:

### "ARTICLE I
### NAME

The name of the Corporation is Rancher's Legacy Meat Co."

3.      The above amendment was duly adopted pursuant to Minnesota Statutes, Chapter 302A.

**IN WITNESS WHEREOF,** the undersigned, being duly authorized on behalf of the Corporation, has executed this document as of April 16, 2014.

Arlyn J. Lomen, President

STATE OF MINNESOTA
DEPARTMENT OF STATE
FILED

MAY - 6 2014

Mark Ritchie
Secretary of State

6199000v1

EXHIBIT

F

H

# EXHIBIT I

Filing Number: 854026600022
Date: 11/12/2015
Time: 4:00 PM
STATE OF MINNESOTA
Office: Office of the Minnesota
Secretary of State

# UCC3 - Continuation - UCC Financing Statement

**ORIGINAL FILING NUMBER:**  201022606390

**ORIGINAL FILING DATE:** 12/29/2010

**RETURN ACKNOWLEDGEMENT TO:**
Steve Graffunder
6900 WEDGWOOD ROAD
MAPLE GROVE, MINNESOTA (MN)  55311

## AUTHORIZING PARTY

| INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL(S)INITIAL(S) |
|---|---|---|
| Ratcliff | James | L. |

EXHIBIT

_E_

I

# EXHIBIT J

**Filing Number: 1061988100028**
**Date: 01/10/2019**
**Time: 4:28 PM**
**STATE OF MINNESOTA**
**Office: Office of the Minnesota**
**Secretary of State**

# UCC3 - Debtor Change - UCC Financing Statement

**ORIGINAL FILING NUMBER:**  201022606390

**ORIGINAL FILING DATE:** 12/29/2010

**RETURN ACKNOWLEDGEMENT TO:**
Kathy Brandt
6900 Wedgwood Road
Maple Grove, MN  55311

## DEBTOR INFORMATION

**ORGANIZATION'S NAME**
Rancher's Legacy Meat Co.

| **MAILING ADDRESS** | **CITY** | **STATE** | **POSTAL CODE** | **COUNTRY** |
|---|---|---|---|---|
| 4301 White Bear Parkway | Vadnais Heights | MN | 55110 | USA |

## AUTHORIZING PARTY

| **INDIVIDUAL'S SURNAME** | **FIRST PERSONAL NAME** | **ADDITIONAL(S)INITIAL(S)** |
|---|---|---|
| Ratcliff | James | L. |

# EXHIBIT K



# State of Minnesota

Office of the Minnesota Secretary of State

Steve Simon

| MN UNIFORM COMMERCIAL CODE | **Debtor Search Report** | November 04, 2019 |
|---|---|---|

Order Type: **UCC Standard Search - With Copies**

Lien Order  Request Number: **1115693500029**

Requested: Organization  Debtor: **Rancher's Legacy Meat Co.**

Requested City: **Not Specified**

Search From Date: **Not Specified**    Search to Date: **Not Specified**

Includes Lapsed: **YES**

Total Financing Statements: **11**

Total Debtors Found: **12**

---

| Filing Office | | Original Filing # | Filing Type |
|---|---|---|---|
| **88 Secretary of State** | | **201022606390** | **Original Filing** |
| Filing Date | Filing Time | Lapse Date | |
| **12/29/2010** | **12:23 PM** | **12/29/2020** | |

Debtor: Rancher's Legacy Meat Co., 4301 White Bear Parkway, Vadnais Heights MN USA, 55110

Debtor: UNGER MEAT COMPANY, 4301 WHITE BEAR PKWY, VADNAIS HEIGHTS MN USA, 55110

Secured: JAMES L RATCLIFF , 24631 S HIGHWAY 2, VINITA OK USA, 74301

| Filing # | Filing Type | Filing Date | Filing Time |
|---|---|---|---|
| 20112290995 | Generic Amendment | 01/24/2011 | 5:00 PM |
| 854026600022 | Continuation | 11/12/2015 | 4:00 PM |
| 1061988100028 | Debtor Change | 01/10/2019 | 4:28 PM |

---

| Filing Office | | Original Filing # | Filing Type |
|---|---|---|---|
| **88 Secretary of State** | | **834683600053** | **Original Filing** |
| Filing Date | Filing Time | Lapse Date | |
| **07/28/2015** | **1:03 PM** | **07/28/2020** | |

Debtor: RANCHER'S LEGACY MEAT CO., 4301 WHITE BEAR PARKWAY, VADNAIS HEIGHTS MN USA, 55110

Secured: UMC EQUIPMENT, LLC, 5505 37TH AVENUE SOUTH, MINNEAPOLIS MN USA, 55417

| Filing # | Filing Type | Filing Date | Filing Time |
|---|---|---|---|
| 1076697800071 | Termination | 03/25/2019 | 12:51 PM |

| Filing Office | | Original Filing # | Filing Type |
|---|---|---|---|
| **88 Secretary of State** | | **946517500058** | **Original Filing** |

| Filing Date | Filing Time | | Lapse Date |
|---|---|---|---|
| **04/18/2017** | **3:28 PM** | | **04/18/2022** |

Debtor: RANCHER'S LEGACY MEAT CO., 4301 White Bear Parkway, Vadnais Heights MN USA, 55110

Secured: UPPER LAKE FOODS, INC., 801 Industry Avenue, Cloquet MN USA, 55720

| Filing # | Filing Type | Filing Date | Filing Time |
|---|---|---|---|
| 1071087300026 | Termination | 02/26/2019 | 10:40 AM |

| Filing Office | | Original Filing # | Filing Type |
|---|---|---|---|
| **88 Secretary of State** | | **962989700323** | **Original Filing** |

| Filing Date | Filing Time | | Lapse Date |
|---|---|---|---|
| **08/30/2017** | **3:50 PM** | | **08/30/2022** |

Debtor: RANCHERS LEGACY MEAT CO, 4301 WHITE BEAR PARKWAY, VADNAIS HEIGHTS MN USA, 55110

Secured: NISSAN MOTOR ACCEPTANCE CORPORATION, 8900 FREEPORT PARKWAY, IRVING TX USA, 75063

| Filing Office | | Original Filing # | Filing Type |
|---|---|---|---|
| **88 Secretary of State** | | **974464700113** | **Original Filing** |

| Filing Date | Filing Time | | Lapse Date |
|---|---|---|---|
| **10/18/2017** | **5:20 PM** | | **10/18/2022** |

Debtor: RANCHER'S LEGACY MEAT CO., 4301 White Bear Parkway, Vadnais Heights MN USA, 55110

Secured: UPPER LAKE FOODS, INC., 801 Industry Avenue, Cloquet MN USA, 55720

| Filing # | Filing Type | Filing Date | Filing Time |
|---|---|---|---|
| 1071081700028 | Termination | 02/26/2019 | 10:32 AM |

| Filing Office | | Original Filing # | Filing Type |
|---|---|---|---|
| **88 Secretary of State** | | **1020425900075** | **Original Filing** |

| Filing Date | Filing Time | | Lapse Date |
|---|---|---|---|
| **06/12/2018** | **3:51 PM** | | **06/12/2023** |

Debtor: RANCHER'S LEGACY MEAT CO., 4301 White Bear Parkway, Vadnais Heights MN USA, 55110

Secured: UMC EQUIPMENT, LLC, 827 Highlander Trl, Hudson WI USA, 54016

| Filing # | Filing Type | Filing Date | Filing Time |
|---|---|---|---|
| 1076697800084 | Termination | 03/25/2019 | 12:53 PM |

| Filing Office | | Original Filing # | Filing Type |
|---|---|---|---|
| **88 Secretary of State** | | **1032094100165** | **Original Filing** |

| Filing Date | Filing Time | | Lapse Date |
|---|---|---|---|

09/14/2018          4:07 PM                    09/14/2023

Debtor: Rancher's Legacy Meat Co., 4301 White Bear Parkway, Vadnais Heights MN USA, 55110

Secured: Ochsner Partnership, 13350 379th Ave, Aberdeen SD USA, 57401

---

| Filing Office | Original Filing # | Filing Type |
|---|---|---|
| **88 Secretary of State** | **1035403200039** | **Original Filing** |

| Filing Date | Filing Time | Lapse Date |
|---|---|---|
| **10/09/2018** | **11:27 AM** | **10/09/2023** |

Debtor: RANCHER'S LEGACY MEAT CO, 4301 WHITE BEAR PKWY, VADNAIS HEIGHTS MN USA, 55110

Secured: OCHSNER PARTNERSHIP, 13350 379TH AVE, ABERDEEN SD USA, 57401

---

| Filing Office | Original Filing # | Filing Type |
|---|---|---|
| **88 Secretary of State** | **1036292600043** | **Original Filing** |

| Filing Date | Filing Time | Lapse Date |
|---|---|---|
| **10/11/2018** | **9:37 AM** | **10/11/2023** |

Debtor: Rancher's Legacy Meat Co., 4301 White Bear Parkway, Vadnais Heights MN USA, 55110

Secured: UMC Equipment, LLC, 827 Highlander Trl, Hudson WI USA, 54016

| Filing # | Filing Type | Filing Date | Filing Time |
|---|---|---|---|
| 1036538000061 | Collateral Restate | 10/11/2018 | 5:00 PM |
| 1076697800097 | Termination | 03/25/2019 | 12:54 PM |

---

| Filing Office | Original Filing # | Filing Type |
|---|---|---|
| **88 Secretary of State** | **1062964400025** | **Original Filing** |

| Filing Date | Filing Time | Lapse Date |
|---|---|---|
| **01/16/2019** | **8:17 AM** | **01/16/2024** |

Debtor: Rancher's Legacy Meat Co., 4301 White Bear Parkway, Vadnais Heights MN USA, 55110

Secured: UMC Equipment, LLC, 827 Highlander Trl, Hudson WI USA, 54016

| Filing # | Filing Type | Filing Date | Filing Time |
|---|---|---|---|
| 1076697800102 | Termination | 03/25/2019 | 12:56 PM |

---

| Filing Office | Original Filing # | Filing Type |
|---|---|---|
| **88 Secretary of State** | **1100795500025** | **Original Filing** |

| Filing Date | Filing Time | Lapse Date |
|---|---|---|
| **09/11/2019** | **3:51 PM** | **09/11/2024** |

Debtor: RANCHER'S LEGACY MEAT CO., 4301 White Bear Parkway, Vadnais Heights MN USA, 55110

Secured: UPPER LAKE FOODS, INC., 801 Industry Avenue, Cloquet MN USA, 55720

I, Steve Simon, Secretary of State of Minnesota, do hereby report that the records listed above and the records attached to this report, if any, reflect the records currently filed in the central filing system under the Uniform Commercial Code, Article 9, which under the applicable search logic match the name requested in the information request to which this is a response, and which have not lapsed or, if so requested, which have lapsed within the last calendar year, subject to any limitations with respect to the city of the debtor or the date of filing of a financing statement.  An information request limited by city or date filed under Minnesota Rules, part 8280.0460 has no legal force and effect and may not reveal all filings against the debtor searched.  The searcher bears the risk of relying on the limited search.

Secretary Of State

Through date:        10/30/2019 5:00 PM

Filing Officer:        Office of the Minnesota Secretary of State

Visit our web site to discover timesaving and convenient ways for doing business online at:
https:\\mblsportal.sos.state.mn.us/

**Uniform Commercial Code**
MN Retirement Systems Building
60 Empire Drive #100
Saint Paul, MN 55103-2141
Phone:  651-296-2803 or 1-877-551-6767 Minnesota Relay Service: 711
E-mail: ucc.dept@state.mn.us

Page 4 of 4

# EXHIBIT L



SAPIENTIA
LAW GROUP

KEN EDSTROM
kene@sapientialaw.com
(612) 756-7108

September 24, 2019

Cameron A. Lallier                                              ***Via email:***
Foley & Mansfield                                    ***clallier@foleymansfield.com***
250 Marquette Avenue, Suite 1200                          ***and U.S. Mail***
Minneapolis, MN 55401

    **Re:**   ***Rancher's Legacy Meat Co.***
            ***Bankruptcy File No: 19-32928-MER***

Dear Cam:

    As you know, 11 USC § 361 provides:

    When adequate protection is required under section 362, 363, or 364 of title of an interest of an entity in property, such adequate protection may be provided by—

    (1) requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent that the stay under section 362 of this title, use, sale, or lease under section 363 of this title, or any grant of a lien under section 364 of this title results in a decrease in the value of such entity's interest in such property;

    (2) providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property; or

    (3) granting such other relief, other than entitling such entity to compensation allowable under section 503(b)(1) of this title as an administrative expense, as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

    Assuming that Judge Ridgway allows the Chapter 11 case of Rancher's Legacy Meat Co. past Thursday, Mr. Ratcliff will be entitled to adequate protection beyond what you have already offered in connection with your motion to use cash collateral. Beyond the depreciation issues of the use of cash collateral, Mr. Ratcliff demands that his security interest in the assets of the debtor be protected provided by this statute. Can we

120 South 6th Street, Suite 100   ᵀ 612.756.7100   sapientialaw.com
Minneapolis, MN 55402   ᶠ 612.756.7101

NAMWOLF·   National Association of
Minority and Women Owned Law Firms

Cameron Lallier
September 24, 2019
Page 2

begin a dialogue after the dust clears from Thursday's hearing to talk about this issue?
If no agreement can be reached as to adequate protection, I would seek the lifting of the
stay to put the issue back in the Federal District Court.

Sincerely,

Kenneth C. Edstrom

KCE/jep

Cc:     James Ratcliff (jratcliff@fnbvinita.com)
        Craig Dokken (cdokken@hennsnoxlaw.com)
        Neil Rustin (neil@rng-us.com)

# EXHIBIT M