## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

In re:                                                    Case No. 19-32928

Rancher's Legacy Meat Co.,

        Debtor.                                        Chapter 11

Rancher's Legacy Meat Co., as Debtor-in-Possession,      Adv. No. 19-03095
and the Official Committee of Unsecured Creditors of
Rancher's Legacy Meat Co.,

        Plaintiffs.

v.

James L. Ratcliff and Great Western Bank,

        Defendants.

## MEMORANDUM DECISION AND ORDER

At Minneapolis, Minnesota, March 23, 2020.

This chapter 11 case came before the Court on James Ratcliff's "Motion for Adequate

Protection or, in the Alternative, Relief From the Automatic Stay," ECF No. 124, along with

objections thereto by both the debtor, at ECF No. 136, and the Official Committee of Unsecured

Creditors ("the Committee," "Creditors' Committee," or "Unsecured Creditors' Committee")[1], at

ECF No. 137.  A hearing was held on February 5, 2020.  Appearances were as noted on the

record.  At the conclusion of the hearing, the Court allowed Ratcliff until February 12, 2020 to

---

[1] The Committee includes (1) Upper Iowa Beef LLC, (2) J&B Partners, (3) Empirical Foods Inc., (4) Ben E. Keith
Company, and (5) Great Plains Beef LLC.

file a supplemental brief and granted both the debtor and the Unsecured Creditors' Committee until February 19, 2020 to respond to Ratcliff's brief. The parties timely did so, and the Court took the matter under advisement.

In filing his motion, Ratcliff brought before the Court the issue of the status of his asserted lien. This issue was already present in an associated adversary proceeding, in which the plaintiffs – the debtor and the Unsecured Creditors' Committee – filed a Partial Motion for Summary Judgment Regarding Count Four of their Complaint, which addresses this issue and to which the defendant – Ratcliff – responded. The facts underlying each of these motions are not in dispute. Because the core issue of both motions will be resolved by determining the perfected status of Ratcliff's asserted lien, both motions will be addressed in this Memorandum Decision and Order.

These are core proceedings under 28 U.S.C. § 157(b)(2), and this Court has jurisdiction over these matters pursuant to 28 U.S.C. §§ 157(a), and 1334, and in accordance with Fed. R. Bankr. P. 5005 and Local Rule 1070-1. This memorandum decision is based on all the information available to the Court and constitutes the Court's findings of fact and conclusions of law under Fed. R. Bank. P. 7052, made applicable to the contested matter by Fed. R. Bankr. P. 9014(c).

For the reasons stated herein, the Court finds that Ratcliff does not hold a perfected security interest. Therefore, Ratcliff's motion for Adequate Protection or, in the Alternative, Relief from the Automatic Stay, in the chapter 11 case is **DENIED** in its entirety, and the plaintiffs' Partial Motion for Summary Judgment in the adversary proceeding is **GRANTED**.

## BACKGROUND

The facts underlying these motions are uncontested.  The debtor, Rancher's Legacy Meat Company (referred to herein as "the debtor," and "Rancher's Legacy"), and James Ratcliff (referred to herein as "Ratcliff") have a long history.  In 2010, Ratcliff and Joseph Unger started Unger Meat Company ("UMC").  The company was a predecessor in interest to Rancher's Legacy and operated under the same basic business model of processing and packing meat. Ratcliff purchased the building to be used for UMC's processing plant and leased it to UMC. Ratcliff also provided startup funds to the new company, as evidenced by two promissory notes between Ratcliff and UMC dated December 3, 2010:  the first note was for a principal amount of $11,885,000, at a 5% indexed rate of interest, and the second was in a principal amount of $2,250,000, at a 5.5% indexed rate of interest.  That same day, Ratcliff and UMC entered into a security agreement (the "Security Agreement") that granted Ratcliff a security interest in:

> . . . all of the Debtor's equipment, including but not limited to the equipment described on Exhibit "1" hereto, inventory, lease agreement, accounts receivable, furniture and fixtures, whether now owned or hereafter acquired, together with all proceeds and products thereof and replacements therefor.

ECF No. 124, Ex. C.  On December 29, 2010, Ratcliff perfected the interests granted to him in the security agreement by filing a UCC-1 Financing Statement with the Minnesota Secretary of State.  On January 24, 2011, Ratcliff filed a UCC-3 Financing Statement Amendment with the Secretary of State, thereby amending the original filing statement and protecting Ratcliff's interest in UMC's assets.

UMC lost money in its first two years of operation, and in June 2012, Ratcliff and another UMC shareholder entered into an Option Agreement with three holding companies, including SSJR, LLC ("SSJR").  Under this agreement, the holding companies had the option to purchase the company and assume its debt owed to First National Bank of Vinita, a bank

3

controlled by Ratcliff.  They also had the option for 18 months to put the sale back to the sellers under certain conditions.  They did not exercise this option, so the sale was finalized on January 22, 2014.  On that date, the parties to the original agreement executed an amended Purchase Agreement that named SSJR as the sole purchaser of Ratcliff's shares.  On May 6, 2014, and in connection with the finalization of the sale, SSJR changed the company's name from UMC to "Rancher's Legacy Meat Co." by amendment to the company's articles of incorporation. Ratcliff was aware of this name change.

By his own admission, Ratcliff's Financing Statement lapsed four months later, on September 9, 2014, and his security interest became unperfected.  More than 14 months later, on November 12, 2015, Ratcliff filed a UCC-3 Continuation Statement, listing the company's name as "Unger Meat Company."  More than three years after that, on January 10, 2019, Ratcliff filed a UCC-3 Amendment with the debtor listed as "Rancher's Legacy Meat Co."  Ratcliff sought collection on the notes starting in early 2019, and later that year, on September 20, 2019, Rancher's Legacy filed a voluntary petition under Chapter 11 of the Bankruptcy Code.[2]

Now, although Ratcliff admits that the perfection of his security interest lapsed on September 9, 2014 (ECF No. 124, 6), he argues that his filings subsequent to that date "revived" the lapse of perfection and operated to "re-perfect" the Financing Statement.  Ratcliff does not claim an interest in certain specific collateral that was obtained between the time his interest lapsed, on September 9, 2014 and the time he filed the UCC-3 Continuation Statement, on November 12, 2015.

Notably, the debtor is in the business of processing fresh and frozen meat products.  Its inventory turns over rapidly.  The company's packing supplies also have limited value if retained

---

[2] Unless stated otherwise, references to the "Bankruptcy Code" or to specific statutory sections throughout this memorandum decision are to the Bankruptcy Reform Act of 1978, as amended, 11 U.S.C. § 101, *et. seq.*

beyond two to three years because of changes in labeling requirements.  It follows that <u>none</u> of the inventory the debtor held in September 2014 remains in the debtor's possession; it has been replaced and sold many times over in the ordinary course of the debtor's business.  The oldest items in the debtor's inventory were purchased in 2016.  ECF No. 27, 5.  Similarly, the debtor's accounts receivable are generally not more than 45 days old and have been replaced so many times since September 2014 that no accounts receivable currently remain from September 2014.

Still, Ratcliff argues that his filings properly re-perfected his Financing Statement, and because the debtor has been in default for failure to make any payments since October 11, 2016, Ratcliff should be entitled to adequate protection payments of $14,300.00 per month.

In response, the debtor and the Creditors' Committee argue that although Ratcliff did have the ability to re-perfect his security interest at any time after it lapsed, the appropriate procedure for accomplishing this task was to file a new UCC-1 Financing Statement – a task Ratcliff failed to accomplish.  They argue that by filing a series of UCC-3 statements over the course of several years, Ratcliff attempted to continue interests that could not be continued because, quite simply, they no longer existed.  Therefore, they argue, Ratcliff's interests remain unperfected.  It is for this reason that the debtor and the Creditors' Committee move for partial summary judgment on count four of their complaint in the adversary proceeding, in which they argue that the debtor can avoid Ratcliff's claimed lien.  They further argue that Ratcliff's interests in the debtor's assets must be determined at this point of both the bankruptcy case and the associated adversary proceeding in order to preserve appropriate value for all creditors, ensure all other parties in interest are treated appropriately and fairly, and move these cases forward appropriately and expeditiously.

**DISCUSSION**

**I.**      **It is uncontested that Ratcliff's lien became unperfected.**

Given that the issue here is the status of a lien – and is therefore a question of

determining the status of property rights – the Court must first look to state law.  As the Supreme

Court said in Butner v. United States, "Congress has generally left the determination of property

rights in the assets of a bankrupt's estate to state law."  Butner v. United States, 440 U.S. 48, 54

(1979).  The Court further explained:

> Property interests are created and defined by state law. Unless some federal interest
> requires a different result, there is no reason why such interests should be analyzed
> differently simply because an interested party is involved in a bankruptcy
> proceeding. Uniform treatment of property interests by both state and federal courts
> within a State serves to reduce uncertainty, to discourage forum shopping, and to
> prevent a party from receiving a windfall merely by reason of the happenstance of
> bankruptcy.

Id. at 55.

Conveniently, Minnesota has adopted provisions of the Uniform Commercial Code that

are relevant here.  UCC §§ 9-506 and 507, as adopted in Minnesota at Minn. Stat. §§ 336.9-506

and 507, state:

> 336.9-506 EFFECT OF ERRORS OR OMISSIONS.
>
> (a) Minor errors and omissions. A Financing Statement substantially satisfying the
> requirements of this part is effective, even if it has minor errors or omissions, unless
> the errors or omissions make the Financing Statement seriously misleading.
>
> (b) Financing Statement seriously misleading. Except as otherwise provided in
> subsection (c), a Financing Statement that fails sufficiently to provide the name of
> the debtor in accordance with section 336.9-503(a) is seriously misleading.
>
> (c) Financing Statement not seriously misleading. If a search of the records of the
> filing office under the debtor's correct name, using the filing office's standard
> search logic, if any, would disclose a Financing Statement that fails sufficiently to
> provide the name of the debtor in accordance with section 336.9-503(a), the name
> provided does not make the Financing Statement seriously misleading.

(d) Debtor's correct name. For purposes of section 336.9-508(b), the "debtor's correct name" in subsection (c) means the correct name of the new debtor.

336.9-507 EFFECT OF CERTAIN EVENTS ON EFFECTIVENESS OF FINANCING STATEMENT.

(a) Disposition. A filed Financing Statement remains effective with respect to collateral that is sold, exchanged, leased, licensed, or otherwise disposed of and in which a security interest or agricultural lien continues, even if the secured party knows of or consents to the disposition.

(b) Information becoming seriously misleading. Except as otherwise provided in subsection (c) and section 336.9-508, a Financing Statement is not rendered ineffective if, after the Financing Statement is filed, the information provided in the Financing Statement becomes seriously misleading under section 336.9-506.

(c) Change in debtor's name. If the name that a filed Financing Statement provides for a debtor becomes insufficient as the name of the debtor under section 336.9-503 (a) so that the Financing Statement becomes seriously misleading under section 336.9-506:

> (1) the Financing Statement is effective to perfect a security interest in collateral acquired by the debtor before, or within four months after, the filed Financing Statement becomes seriously misleading; and

> (2) the Financing Statement is not effective to perfect a security interest in collateral acquired by the debtor more than four months after the filed Financing Statement becomes seriously misleading, unless an Amendment to the Financing Statement which renders the Financing Statement not seriously misleading is filed within four months after the Financing Statement became seriously misleading.

Minn. Stat. §§ 336.9-506 and 507.

Two things are very clear from the plain language of these Minnesota statutes:  (1) a UCC-1 Financing Statement becomes "seriously misleading" when the company to which it refers goes through a name change; and (2) from the date a Financing Statement becomes "seriously misleading" due to a name change, it is only effective to perfect security interests in collateral acquired by the debtor for four months following the name change – unless an Amendment is filed within those four months.  The next logical inquiry, then, is what happens to

7

the security interest upon its lapse at the end of those four months?  Minnesota Statutes provide

answers for this question as well:

> 336.9-515   DURATION   AND   EFFECTIVENESS   OF   FINANCING
> STATEMENT; EFFECT OF LAPSED FINANCING STATEMENT.
>
> [. . .]
>
> (c) Lapse and continuation of Financing Statement. The effectiveness of a filed
> Financing Statement lapses on the expiration of the period of its effectiveness
> unless before the lapse a Continuation Statement is filed pursuant to subsection (d).
> Upon lapse, a Financing Statement ceases to be effective and any security interest
> or agricultural lien that was perfected by the Financing Statement becomes
> unperfected, unless the security interest is perfected otherwise. If the security
> interest or agricultural lien becomes unperfected upon lapse, it is deemed never to
> have been perfected as against a purchaser of the collateral for value.

Minn. Stat. § 336.9-515.  Clearly, then, under Minnesota law, once a security interest becomes

unperfected, it is deemed to have never been perfected.  Although case law interpreting these

requirements is scant, one case from the Eighth Circuit B.A.P. provides some insight; in In re

EDM Corp., 431 B.R. 459 (B.A.P. 8th Cir. 2010), the B.A.P. stated:

> The requirements of the U.C.C. concerning filing, notice and perfection all are
> intended to provide to those dealing with commercial activities knowledge of the
> status of the commodity with which they are dealing so that they may protect their
> interests and act in a commercially prudent manner. To that end, the Financing
> Statement serves the purpose of putting subsequent creditors on notice that the
> debtor's property is encumbered. Its function is to warn other subsequent creditors
> of the prior interest.

EDM Corp., 431 B.R. at 464 (quoting ProGrowth Bank Inc. v. Wells Fargo Bank, N.A., 558

F.3d 809, 812 (8th Cir. 2009)).  The B.A.P. went on to find that the creditor in that case had not

perfected its lien because along with the debtor's proper organizational name, the creditor

included a "d/b/a" name in its Financing Statement, meaning that the statement would not show

up in a UCC search for the debtor.  Id.  In other words, even having the appropriate name as part

of the Financing Statement was not enough to properly perfect the creditor's interests when a search would not reveal that statement.  Id.

Here, Ratcliff admits that his perfection lapsed.  Unger Meat Company became Rancher's Legacy Meat Co. on May 6, 2014.  When this occurred, the name on Ratcliff's filed Financing Statement became "seriously misleading" under UCC §§ 9-506 and 9-507, as adopted in Minnesota at Minn. Stat. §§ 336.9-506 and 507.  At that point, under Minn. Stat. § 336.9-507, the Financing Statement was effective only to perfect Ratcliff's security interest in collateral acquired either before May 6, 2014 or within the four months from that date.  In other words, on May 6, 2014, the statutory "clock" began to steadily track the four-month time period within which Ratcliff had the opportunity to prevent his original UCC-1 Financing Statement from being rendered ineffective.  Ratcliff failed to file anything in that four-month time period.  As a result, the 2010 UCC-1 Financing Statement he filed in 2010 became ineffective, his interest lapsed, and his lien became unperfected.  After September 6, 2014, any property the debtor acquired – including as part of its rapidly-changing inventory – was unencumbered by Ratcliff's interests.

**II.      Ratcliff had the ability to re-perfect his security interest by filing a new UCC-1 Financing Statement.**

The lapse of a security interest's perfection does not mean the interest itself ceases to exist.  However, without a perfected interest, a secured creditor is in a precarious position, since any new creditors registering interests in the same collateral would gain a priority status over the unperfected secured party.  Conveniently for secured creditors, re-perfecting a security interest is relatively straightforward; as long as the language used in the parties' security agreements provides for it, secured parties may file a second Financing Statement after the lapse of an initial Financing Statement.  See, e.g. In re Aliquippa Mach. Co., Inc., 343 B.R. 145 (Bankr. W.D. Pa.

2006).  In fact, secured parties have been able to file multiple Financing Statements in many

cases.  See, e.g., Miami Valley Production Credit Ass'n v. Kimley, 536 N.E. 2d 1182 (Ohio

1987).

Combining multiple filings can sometimes operate to give proper notice under the UCC,

but this does not apply where that notice has become seriously misleading – including when the

debtor has a name change or other major restructuring.  U.S. v. Lincoln Savings Bank (In re

Commercial Millerwright), 245 B.R. 597, 601 (Bankr. N.D. Iowa 1999) ("While it is true that a

combination of two filings arguably gives a subsequent lender inquiry notice of a security

interest, notice is deemed inadequate if it is seriously misleading . . .While a financing statement

substantially complying with UCC requirements may be effective even though it contains minor

errors which are not seriously misleading, it is held to be ineffective if it is determined to be

seriously misleading.").

Ultimately, the recurring theme of interpreting this issue arises:  "The validity of a

Financing Statement depends primarily on its ability to give notice of the security interest to

other creditors."  Id.  (citing In re Rieber, 740 F.2d 10, 12 (8th Cir. 1984)).  Therefore, it follows

that "[i]f a debtor changes its name, identity or corporate structure, it is no longer effective to

perfect a security interest in after-acquired property unless a new filing[3] is made within four

months after the change."  Id.

Additionally, even where the combining of multiple filings has been permitted to perfect

a security interest, these multiple filings are almost always new versions of actual Financing

Statements.  This follows the requirements of Minn. Stat. § 336.9-310(a), which states, ". . . a

---

[3] The court later clarifies that "new filing" means a "new appropriate financing statement."  Id. at 602.

10

Financing Statement must be filed to perfect all security interests . . ."  Minn. Stat. § 336.9-310(a).

A Financing Statement is defined by Minn. Stat. § 336.9-102(39) as "a record or records composed of an initial financing statement and any filed record relating to the initial financing statement."  A UCC-3 Continuation Statement, on the other hand, is defined by Minn. Stat. § 336.9-102(27) as "an amendment of a financing statement" (that also meets other requirements).  Therefore, by definition, a UCC-3 Continuation Statement is designed to amend a UCC-1 Financing Statement; it is not designed to stand on its own or operate as a UCC-1.

Further, Minn. Stat. § 336.9-510(c) indicates that a Continuation Statement filed after a period that is specifically designated as permissible in the statutes is deemed ineffective:

336.9-510 EFFECTIVENESS OF FILED RECORD.

[. . .]

(c) Continuation Statement not timely filed. A Continuation Statement that is not filed within the six-month period prescribed by section 336.9-515(d) is ineffective.

Minn. Stat. § 336.9-510.

The available case law, while sparse, confirms that once a Financing Statement has lapsed, a Continuation Statement cannot revive it:  ". . . after a financing statement has lapsed for failure to file a continuation statement within five years, nothing remain[s] to be continued and a subsequently filed continuation statement [is], therefore, ineffective."  In re Commercial Millerwright, 245 B.R. at 601 (citing In re Ellingson Motors, Inc., 139 B.R. 919, 924 (Bankr. D. Neb. 1991)).  In finding a Continuation Statement ineffective to revive a lapsed Financing Statement, the court in Ellingson Motors stated, "Since the original Financing Statement lapsed . . . in 1982, the 1985 filing cannot be a continuation.  There is nothing to continue."  Ellingson Motors, 139 B.R. at 924.  The court went on to find that the Continuation Statement could not be

considered an effective filing statement because it did not meet the UCC requirements for doing

so.  Id.  (See also In re Hickory Printing Grp., Inc., 479 B.R. 388 (Bankr. W.D.N.C. 2012)

(finding that once a UCC Financing Statement had been terminated, it could not be legally

revived with a further filing; instead a new Financing Statement was needed to re-perfect the

interest)).

Although the issue in Ellingson Motors dealt with filing location instead of filing

contents, the same underlying principle holds:

> When the original creditor who had improperly filed the financing statement also
> improperly filed a continuation statement, the effectiveness of the financing
> statement lapsed, even as against the creditor who had knowledge of the contents
> of the financing statement . . . "filing a continuation statement in the improper place
> is the equivalent of not filing; it does not prevent lapse."

Ellingson Motors, 139 B.R. at 923 (citing State Sav. Bank of Hornick v. Onawa State Bank, 368

N.W.2d 161, 165 (Iowa 1985)).

Additionally, the argument that a UCC-3 form can substitute for a UCC-1 filing fails,

because the UCC-3 would have to meet the requirements of a UCC-1 Financing Statement.  "[A]

Financing Statement is sufficient only if it:  (1) provides the name of the debtor; (2) provides the

name of the secured party or a representative of the secured party; and (3) indicates the collateral

covered by the financing statement."  Minn. Stat. § 336.9-502(a).

In the present case, no one contests that Ratcliff had the right and ability to re-perfect his

security interest at any time – the parties' security agreement provided for that right, and the

interest that Ratcliff had in the debtor's assets was not itself extinguished simply because the

perfection lapsed.  The correct method for accomplishing a re-perfection of his interest was for

Ratcliff to file a UCC-1 Financing Statement.  This is not, however, what Ratcliff did.  Instead,

he filed two UCC-3 documents long after his interests became unperfected and his Financing

Statement became ineffective – and neither of these documents fulfilled the required role of an

effective Financing Statement to perfect Ratcliff's interest and secured status.  Had Ratcliff

instead filed a UCC-1 Financing Statement on either of these occasions, his interests would have

been re-perfected, and he would have been a properly secured creditor for purposes of this

bankruptcy case.  As it is, however, Ratcliff failed to re-perfect his interests in Rancher's

collateral after the interest lapsed (by his own admission) on September 9, 2014.

### A. Ratcliff's subsequent filings did not "connect the dots" to revive and re-perfect his lapsed Financing Statement.

Ratcliff argues that the steps he took were enough to "connect the dots" to give sufficient

notice to an examiner of the filings of Ratcliff's claim on the assets.  ECF No. 147.  He argues

that "Because Ratcliff in fact eventually connected the dots, the only issue for the Court to

decide [] is if in fact the UCC forbids the correction of a continuation statement filed with the

wrong name."  ECF No. 147, 3.  This argument is inapposite.  Just because Ratcliff  "eventually"

got around to attempting to connect the disjointed and ineffective "dots" he had filed does not

mean that he was able to revive his interests or that either of his UCC-3 filings was effective.

Ratcliff also argues that "many cases recognize that even defective UCC filings may

provide enough notice to give a creditor perfected secured status or that corrected filings cure

any errors in the original filings."  ECF No. 147, 7.  In support of this argument, Ratcliff cites to

several cases, including Miami Valley Production Credit Ass'n v. Kimley, 536 N.E.2d 1182

(Ohio 1987); In re APF Indus., Inc., 112 B.R. 446 (Bankr. M.D. Fla. 1990); In re Heger, 133

B.R. 612 (Bankr. S.D. Ohio 1991); In re Fin. Oversight & Mgmt. Bd., 914 F.3d 694 (1st Cir.

2019); and In re Wak Ltd., 147 B.R. 607 (Bankr. S.D. Fla. 1992).  In each of these cases, courts

found that other filings or documents could be read together with a Financing Statement where

one or all of the filings were inadequate by themselves.  Generally, reading the documents

together was permitted because the courts found that specific references to other filings or outside documents gave sufficient notice of the intent of the parties when those other documents were read in conjunction with the referencing document.  Each of these cases also focused on collateral descriptions, and – importantly – in most of these cases, the secured creditor filed either a second Financing Statement or a document that could be interpreted as one when read in conjunction with the other filings on the record.

Here, however, the subsequent filings referred back to a Financing Statement that had lapsed and was no longer valid.  Additionally, even if the Financing Statement could somehow be considered valid, the subsequent filings did not follow the requirements of the UCC and were ineffective.  Therefore, there are significant distinguishing factors between those cited cases and this one; further, this Court does not find them persuasive to the present issues.

Moreover, Ratcliff's argument that the Court should string together both of his UCC-3 filings to show a re-perfection of his interests goes against both the plain language of Minnesota's adoption of the UCC and the intent of the specific UCC filing requirements; as was stated succinctly in In re Metrobility Optical Sys., 279 B.R. 37 (Bankr. D.N.H. June 5, 2002), "the 'simple notice' system['s] purpose would be 'frustrated if searchers are required to pore through the records in order to piece documents together.'"  Metrobility, 279 B.R. at 42 (quoting In re Quality Seafoods, Inc., 104 B.R. 560, 561 (Bankr. D. Mass. 1989)).  Similarly, "the entire purpose of the UCC system is to provide public notice of secured interests without requiring the parties to look behind or beyond the four corners of the public filing."  Official Comm. Of Unsecured Creditors of Motors Liquidation Co. v. JPMorgan Chase Bank, N.A., 103 A.3d 1010, 1017 n.27 (Del. 2014) (internal citations omitted).

The case law and statutes are clear that combining multiple filings does not operate to properly perfect a security interest when (1) the filings are not Financing Statements and (2) the Financing Statement has become "seriously misleading" due to a name change. Here, neither of Ratcliff's UCC-3 filings met the requirements to operate as a UCC-1 Financing Statement, and his original Financing Statement had become "seriously misleading" due to the debtor's name change – even when read in conjunction with each other, the three filings were not enough to re-perfect Ratcliff's interests.

The first UCC-3 Continuation Statement that Ratcliff filed listed "Unger Meat Company" as the debtor's name, even though the debtor's name had been changed to "Rancher's Legacy Meat Co." more than 14 months prior. Another three years after the first UCC-3 Continuation Statement was filed, Ratcliff filed the second UCC-3 Amendment, wherein the name was changed to "Rancher's Legacy Meat Co.," in an attempt to rectify this issue. The Court simply cannot find that this series of actions was enough to "connect the dots" and to properly perfect a document rendered "seriously misleading" by operation of the plain language of the UCC. If for no other reason, this would be dubious because it would essentially authorize one "seriously misleading" document to be rectified with yet another "seriously misleading" document – as long as the second filing was eventually amended to correct the seriously misleading part, of course.

Additionally, it is clear from the plain language of Minnesota's state statutes that UCC-3 filings are not designed to substitute for UCC-1 Financing Statements. Ratcliff assumes that even if a Continuation Statement could somehow operate to revive a long-lapsed Financing Statement, it could do so while listing the wrong name of the debtor – one that had been changed 14 months before the continuation was filed. Ratcliff argues that "[t]here is no requirement

under UCC § 9-510 that the continuation statement be in the correct name of the Debtor."  ECF

No. 147, 2.  He points to UCC § 9-102(27), which defines a Continuation Statement as a

statement which "(A) identifies, by its file number, the initial Financing Statement to which it

relates; and (B) indicates that it is a Continuation Statement for, or that it is filed to continue the

effectiveness of, the identified Financing Statement."  UCC § 9-102(27).  What Ratcliff fails to

consider in this analysis, however, is that the UCC, through its statutory scheme, has specifically

provided that the UCC-3 cannot stand on the foundation of a UCC-1 that has lapsed.  Minn. Stat.

§ 336.9-510.

Further, Ratcliff's UCC-3 documents did not operate to fulfill the fundamental purpose of

these sections of the UCC:  giving notice to other creditors.  Ratcliff argues that once the UCC-3

Amendment was filed, the UCC search issue was solved; he states that at that point, a UCC

search would have revealed both the Continuation Statement and the Amendment.  However,

this argument again ignores the case law and plain language of the UCC.

After the debtor's name change, it is common sense that Ratcliff's original Financing

Statement would not appear in a UCC search of the debtor's new, proper name.  Ratcliff admits

this, stating, "Someone looking at the record more than four months after the name change

occurred would not discover that the [original] Financing Statement [] had anything to do with

Rancher's Legacy Meat Company."  ECF No. 147, 3-4.  Ratcliff's UCC-3 Continuation

Statement filed in 2015 would not have solved this problem, since it again listed the debtor's

name as "Unger Meat Company."  It was only in his 2019 UCC-3 Amendment that Ratcliff

correctly listed the debtor's name, and by that point, his UCC-1 Financing Statement had been

rendered ineffective for more than four years by the plain language of the UCC.  Simply put, the

UCC-3 Amendment, filed so many years later, was inadequate to re-perfect Ratcliff's security interest.

### B. By operation of the statute, Ratcliff had four months from the date his interest lapsed to correct the issue. The filings he made after that time were irrelevant.

Ratcliff also argued that his 2015 UCC-3 filing was effective to revive his UCC-1 Financing Statement because he filed the 2015 UCC-3 within the six-month period prior to the expiration of the five-year period after the date of his UCC-1 filing, as set forth in Minn. Stat. §§ 336.9-510(c) and 515(a), (d).  As discussed above, however, different rules apply here, because the Minnesota Statutes specifically and separately address situations in which a Financing Statement becomes seriously misleading.

Along the same lines, Ratcliff's second UCC-3 filing also could not stand on its own as a Financing Statement, because:  (1) it did not include a description of the collateral covered by the Financing Statement, and (2) it was filed more than five years after the filing date of the original Financing Statement, making it ineffective even without the operation of Minn. Stat. § 336.9-507 by virtue of Minn. Stat. § 336.9-510(c).  Critically, because the first UCC-3 Continuation Statement was ineffective, it could not be saved by being "strung together" with the second UCC-3 Amendment.  Therefore, neither of the UCC-3 filings Ratcliff submitted was sufficient to re-perfect Ratcliff's interests.

### C. Ratcliff's arguments are not supported by principles of statutory construction.

Ratcliff also argues that neither the contract between the parties nor the UCC prevented re-perfection after his perfection lapsed.  He is correct.  However, the appropriate method for re-perfecting was to file a new UCC-1 Financing Statement – not attempt to go against the plain language of the UCC by stringing along multiple filings relating to the original document that

17

had already lapsed.  Ratcliff relies on the rule of statutory interpretation *expressio unius est exclusio alterius* ("expression of one is the exclusion of another"), but his reliance would have been better placed on the maxim of interpretation *in pari materia* ("in the same matter");

> Statutes are *in pari materia* when they relate to the same subject. Such statutes are taken together and construed as one system, and the object is to carry into effect the intention.  It is to be inferred that a code of statutes relating to one subject was governed by one spirit and policy, and was intended to be consistent and harmonious in its several parts and provisions.

St. Alphonsus Reg'l Med. Ctr. v. Elmore Cnty., 158 Idaho 648, 653 (2015) (quoting Grand Canyon Dories v. Idaho State Tax Comm'n, 124 Idaho 1, 4, 855 P.2d 462, 465 (1993)).

Ratcliff's interpretation of the UCC does not create a harmonious result.  Instead, under his theory, a creditor could re-perfect a lapsed security interest by simply filing a Continuation Statement – and a "seriously misleading" one, at that – at essentially any time, as long as it later filed an Amendment to that statement.  This would fly directly in the face of the clear directive of Minn. Stat. § 336.9-507(c)(2); why include directions about a timeframe within which an Amendment to a "seriously misleading" filing statement must be filed if it could, in fact, be filed at any time?  Further, "[a] statute should be construed so that effect is given to all of its provisions, so that no part will be inoperative or superfluous, void or insignificant."  Marx v. Gen. Rev. Corp., 568 U.S. 371, 392-93 (2013) (internal citations omitted).  Interpreting the UCC in a way that requires following the statute's language is not adopting "additional penalties for the failure to file a Continuation Statement," as Ratcliff argues, but is instead interpreting its plain language in a sonorous, rather than dissonant, way.

Ratcliff also points to a 2010 report on the UCC by the National Conference of Commissioners on Uniform State Laws and the American Law Institute, and a comment it made about UCC § 9-507.  Specifically, Ratcliff relies on the following verbiage, in part:  "If an amendment that provides a sufficient name is filed more than four months after the [name]

change, the financing statement as amended would be effective also with respect to collateral

acquired more than four months after the change, but only from the time of the filing of the

amendment."  ECF No. 147, 5.  Ratcliff relies on this language to argue that a lapsed Financing

Statement can be later amended and revived.  Importantly,

> [I]n interpreting a statute a court should always turn first to one, cardinal canon
> before all others . . . courts must presume that a legislature says in a statute what it
> means and means in a statute what it says there . . . When the words of a statute are
> unambiguous, then, this first canon is also the last:  "judicial inquiry is complete."

Conn. Nat'l Bank v. Germain, 503 U.S. 249, 253-54 (1992).  It is very often improper, therefore,

to consider language outside the specific language included in a statute – particularly where that

statutory language is unambiguous.

Further, even if the Court were to find it appropriate to consider the language of the 2010

UCC report, the actual language in the Commissioners' report would not permit Ratcliff to take

that action under the specific facts of this case.  The language states that an *Amendment* that

*provides a sufficient name* can make a Financing Statement effective.  In this case, the

*Amendment* that Ratcliff filed that had a sufficient name was not filed until the five-year deadline

had expired under Minn. Stat. §§ 336.9-510 and 515, and it referred to a Continuation Statement

that listed the same "seriously misleading" name as the one in the problematic filing statement.

Further, Ratcliff relies on his cited cases to show a pattern of courts looking past

violations of "the letter of the UCC" where the "overall purpose of providing notice to creditors

of the claims in the filings" was met.  ECF No. 147, 10.  In the present case, by the time Ratcliff

purportedly "eventually connected the dots" of his filings, it was too late; his interests had

lapsed; outsiders did not have notice of any interest he held in Rancher's Legacy, and the UCC-3

Continuation Statement he filed would not have changed any of that.  Additionally, while some

courts may have looked beyond the proverbial "letter of the law" to string together UCC filings, others have found exactly the opposite in certain circumstances, as was discussed above.

Here, the facts of the case are clear that not only did Ratcliff fail to follow the letter of the law, but in creating a record that failed for more than three years to give the notice Article 9 was intended to create, he failed to follow the spirit of the law as well. The Court simply cannot find that the clear, unambiguous, and extensive requirements outlined in the UCC can be satisfied by simply submitting a string of noncompliant filings.

From the moment Ratcliff's interests became unperfected, by operation of law he became – and remained when this bankruptcy case was filed – an unsecured creditor. He therefore does not have an enforceable security interest and is an unsecured creditor.

### III.   Because there is no statutory requirement that unsecured creditors receive adequate protection, Ratcliff is not entitled to adequate protection payments.

Adequate protection is provided for in section 361 of the Code, which authorizes a debtor to provide adequate protection by providing replacement liens, making periodic cash payments, or granting such other relief "as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property." 11 U.S.C. § 361. If a secured party requests adequate protection, the debtor is obligated to provide that protection under 11 U.S.C. § 363(e). However, only secured creditors have an actual entitlement to adequate protection of their property interests:

> (e) Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest. This subsection also applies to property that is subject to any unexpired lease of personal property (to the exclusion of such property being subject to an order to grant relief from the stay under section 362).

11 U.S.C. § 363(e).  Under this section of the Code, providing adequate protection to a secured

party "is not permissive or discretionary . . . the court 'shall' grant the relief specified, at any

time, on request of a secured entity."  In re Metromedia Fiber Network, Inc., 290 B.R. 487, 491

(Bankr. S.D.N.Y. 2003).  However, "[t]here is no statutory requirement that unsecured creditors

receive adequate protection, and the lack of adequate protection does not entitle an unsecured

creditor to relief from the stay."  In re R.F. Cunningham & Co., 355 B.R. 408, 413 (Bankr.

E.D.N.Y. 2006).  Accordingly, a court may properly determine various issues in an adequate

protection motion, including whether a creditor has a valid security interest or whether it has

properly perfected its security interest.  See In re S. Ill. Railcar Co., 301 B.R. 305 (Bankr. S.D.

Ill. 2002).

        There is no statutory requirement that unsecured creditors receive adequate protection;

because Ratcliff's interests are unsecured, as discussed above, Ratcliff is not entitled to adequate

protection payments under 11 U.S.C. § 363(e).

### A.  Ratcliff is not entitled to relief from the automatic stay.

        Secured creditors can seek relief from the automatic stay under 11 U.S.C. § 362(d),

which states:

> (d) On request of a party in interest and after notice and a hearing, the court shall
> grant relief from the stay provided under subsection (a) of this section, such as by
> terminating, annulling, modifying, or conditioning such stay—
>> (1) for cause, including the lack of adequate protection of an interest in
>> property of such party in interest;
>> (2) with respect to a stay of an act against property under subsection (a) of
>> this section, if—
>>> (A) the debtor does not have an equity in such property; and
>>> (B) such property is not necessary to an effective reorganization;

11 U.S.C. § 362(d).  Pursuant to 11 U.S.C. § 362(g), the party requesting relief under § 362(d)

has the burden of proof on the issue of the debtor's equity in the property, while the party

opposing the relief has the burden of proof on all other issues.  11 U.S.C. § 362(g).

It is only in very rare situations – often related to pending state court proceedings – that

an unsecured creditor will be entitled to relief under this section of the Code:

> Only in extraordinary circumstances will an unsecured creditor be granted relief
> from the stay . . . The general principle is that "unsecured claims should not be
> granted relief from the stay because to do so would result in a violation of one of
> the fundamental concepts of bankruptcy law; that there should be an equality of
> distribution among creditors.

In re R.F. Cunningham & Co., 355 B.R. at 412-13 (citing In re Leibowitz,147 B.R. 341 (Bankr.

S.D.N.Y. 1992)) (internal citations omitted).  Further, "An unsecured claimant should not be

entitled to obtain a distributive advantage over other unsecured claimants who are similarly

enjoined from seeking distribution by any method other than in accordance with the distributive

scheme under the Bankruptcy Code."  Leibowitz, 147 B.R. at 345.

Here, Ratcliff has not shown any extraordinary circumstances that would entitle him to an

advantage over the other unsecured claimants in this case in the form of relief from the automatic

stay.  Therefore, relief from the automatic stay would not be proper under these circumstances.

## IV.     The debtor-in-possession can avoid Ratcliff's liens; summary judgment is appropriate.

Summary judgment is governed by Federal Rule of Civil Procedure 56, which is made

applicable to this motion by Federal Rule of Bankruptcy Procedure 7056.  Rule 56(a) provides:

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as

to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a).  Here, the parties agree that there is no genuine issue of material fact in relation to the

plaintiff's partial motion for summary judgment.  The only remaining question, then, is whether the plaintiffs are entitled to judgment as a matter of the law.  The Court finds that they are.

In his motion for adequate protection, Ratcliff zealously argues that the Court should consider the validity of his liens independently from perfection of those liens.  ECF No. 124, 10-11.  In other words, he argues that because a security agreement between a debtor and creditor can remain valid despite a lapse in perfection, Ratcliff's position as "first secured creditor in all of the assets of the Debtor" should remain in place.  ECF No. 124, 12.  This argument is misplaced due to the operation of sections 544, 550(a) and 551 of the Bankruptcy Code.

11 U.S.C. § 544(a) allows bankruptcy trustees "to avoid liens and security interests against the debtor's estate which were not properly perfected under state law before the debtor filed in bankruptcy."  In re Pirsig Farms, Inc., 46 B.R. 237, 240 (D. Minn. 1985).  In a chapter 11 case, the debtor becomes a debtor-in-possession upon filing, and – with few exceptions – is subsequently granted all the rights and powers of a trustee.  Id.  (citing to 11 U.S.C. § 1107(a)).  Importantly, because avoiding unperfected liens benefits the entire estate and the debtor-in-possession has a fiduciary duty to the estate, "not only can the debtor seek to avoid unperfected liens regardless of the necessity of the avoidance, the debtor has an obligation to the estate to seek lien avoidance."  Id. at 241.  Additionally, any notice or knowledge the debtor had of the relevant lien does not matter for purposes of its ability to avoid the lien under § 544, because that section of the Bankruptcy Code grants debtors-in-possession the status of a lienholder without notice.  Id. at 242.

The creditor in Pirsig argued that, despite these established powers, the bankruptcy court should have prevented the debtor-in-possession from avoiding its liens because there was no

23

harm to other creditors and equity required that outcome.  Id.  The court answered this argument

as follows:

> [A] debtor in its role as trustee does not have to establish that any creditor was
> harmed by the failure to perfect a lien before the debtor can avoid the unperfected
> lien under section 544(a) . . . Moreover, a bankruptcy court's equitable powers do
> not allow a bankruptcy court to contravene clear statutory provisions . . . In fact,
> neither equity nor estoppel doctrines limit a trustee's avoiding powers under section
> 544(a).

Id. (internal citations omitted).

Therefore, it clearly does not matter whether Ratcliff's security agreement remained valid

as between Ratcliff and the pre-petition debtor.  Instead, what matters is that post-petition, the

debtor became a debtor-in-possession and therefore became statutorily entitled to the status of a

hypothetical lien creditor and/or hypothetical bona fide purchaser without knowledge of

Ratcliff's lien.  Ratcliff's lien was unsecured, so its validity became irrelevant upon the filing of

this bankruptcy case.

As a matter of law, the debtor, as debtor-in-possession, has standing to avoid Ratcliff's

lien, regardless of any knowledge it had of Ratcliff's status.  It may avoid and preserve Ratcliff's

liens, the liens may be set aside, and the liens may be recovered or the value thereof for the

benefit of the debtor's bankruptcy estate.

## CONCLUSION

When Unger Meat Company became Rancher's Legacy Meat Co. in May 2014, Ratcliff

had four months within which to correct his UCC-1 Financing Statement to reflect this change.

When he failed to do so, by operation of the plain language of the UCC, as adopted in

Minnesota, his lien became unperfected in September 2014.  Although Ratcliff could have re-

perfected his interest at any time by filing a new UCC-1 Financing Statement, he failed to do that

as well.  Instead, he filed two UCC-3 statements – a Continuation Statement in November 2015

and an Amendment to that Continuation Statement in January 2019. Basic rules of statutory construction prevent these documents – even when taken together as a whole – from serving as a substitute for the UCC-1 Financing Statement required to re-perfect the interest. Therefore, when this chapter 11 case was filed in September 2019, Ratcliff's interests were unperfected; he had the status of an unsecured creditor. As such, he is not entitled to adequate protection payments or relief from the automatic stay, and his liens can be avoided for the benefit of the broader bankruptcy estate.

Accordingly, **IT IS HEREBY ORDERED** that Ratcliff's motion for Adequate Protection or, in the Alternative, Relief From the Automatic Stay, in the chapter 11 case is **DENIED** in its entirety:

1. The debtor is not required to provide Ratcliff with adequate protection payments. In accordance with the operative language of the Stipulated Order Authorizing Continued Use of Cash Collateral and Granting Adequate Protection at ECF No. 142, Ratcliff is no longer afforded adequate protection; his rights and protections under that agreement shall terminate automatically upon entry of this order.

2. The alternative motion for relief from stay is DENIED.

The plaintiffs' Partial Motion for Summary Judgment Regarding Count Four of the Complaint in the adversary proceeding is **GRANTED**, as follows:

1. On May 6, 2014, the debtor changed its name from Unger Meat Company to Rancher's Legacy Meat Co (the "Name Change").

25

2.  As of that date, Ratcliff's UCC financing statements became "seriously misleading" pursuant to Minn. Stat. § 336.9-506.

3.  Pursuant to Minn. Stat. § 336.9-507, upon the expiration of the four-month period following the Name Change – here, September 6, 2014 – Ratcliff's security interest became unperfected because Ratcliff did not file a UCC-3 reflecting the Name Change, thus rendering the 2010 UCC-1 and the 2011 UCC-3 "seriously misleading."

4.  In order to re-perfect his security interest, Ratcliff was required to file a new UCC-1 pursuant to Minn. Stat. § 336.9-310, but he failed to do so.

5.  Therefore, the lien asserted by defendant James L. Ratcliff is avoided pursuant to 11 U.S.C. § 544(a)(3) and is preserved for the benefit of the bankruptcy estate pursuant to 11 U.S.C. § 551.

6.  The issue of plaintiffs' attorney fees is reserved for later resolution.

There being no just reason for delay, per Fed. R. Civ. P. 54(b), made applicable to this adversary proceeding by Fed. R. Bankr. P. 7054(a), **LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:  *March 23, 2020*

*/e/ Michael E. Ridgway*

Michael E. Ridgway
Chief United States Bankruptcy Judge

NOTICE OF ELECTRONIC ENTRY AND
FILING ORDER OR JUDGMENT
Filed and Docket Entry made on *03/23/2020*
Lori Vosejpka, Clerk, by MJS