# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

In re:                                                    Case No. 19-32928

Rancher's Legacy Meat Co.,

       Debtor.                                        Chapter 11

## MEMORANDUM DECISION AND ORDER

At Minneapolis, Minnesota, June 3, 2021.

This chapter 11 case came before the Court on a motion for payment of administrative expense claim filed by Blue Grace Logistics, LLC ("Blue-Grace") (ECF No. 348), along with an objection by Rancher's Legacy Meat Co. (the "debtor-in-possession" or "Rancher's") (ECF No. 349) and Blue-Grace's reply thereto. (ECF No. 351). A hearing was held on March 17, 2021. Appearances were as noted on the record. At the conclusion of the hearing, the Court took this matter under advisement. It is now ready for resolution.

This is a core proceeding under 28 U.S.C. § 157(b)(2), and this Court has jurisdiction pursuant to 28 U.S.C. §§ 157(a) and 1334. This memorandum decision is based on all the information available to the Court and constitutes the Court's findings of fact and conclusions of law under Fed. R. Bankr. P. 7052, made applicable to this contested matter by Fed. R. Bankr. P. 9014(c).

For the reasons stated herein, Blue-Grace's motion for payment of administrative expense claim is **DENIED**. The funds Blue-Grace seeks for payment in its claim have already been settled in the ordinary course of business, and equity demands denial of the motion in accordance with the fundamental tenets of the Bankruptcy Code.

## BACKGROUND

Rancher's Legacy Meat Co. filed for relief under chapter 11 of the Bankruptcy Code on September 20, 2019. For nearly 17 months, the case was pending without a confirmed plan, with a litany of acrimonious issues, adversary proceedings, and appeals along the way. On February 16, 2021, the Official Committee of Unsecured Creditors, the debtor-in-possession, and the creditor whose claim constitutes approximately 71% of the general unsecured claims pool filed an expedited motion to approve a global settlement agreement (ECF No. 344). The expedited hearing for approval of the settlement agreement was scheduled for February 25, 2021. Three days before the hearing, on February 22, 2021, attorneys for Blue-Grace Logistics, LLC, filed notices of appearance (ECF No. 346 and 347), a motion for administrative expense (ECF No. 348) and a limited objection to the global settlement agreement (ECF No. 349).[1]

Blue-Grace's limited objection was the only objection raised to the global settlement agreement. The objection was based on Blue-Grace's concern that the settlement agreement would leave Rancher's administratively insolvent and unable to pay Blue-Grace's newly filed administrative expense claim, which Blue-Grace concluded would have priority over all unsecured claims. Blue-Grace's administrative expense claim was based on transactions that occurred approximately eight months prior, in June 2020.

Rancher's and Blue-Grace established a business relationship well before Rancher's filed its chapter 11 bankruptcy case. Blue-Grace is a third-party shipping and logistics company that arranges for shipment of its clients' products. Rancher's began working with Blue-Grace in April 2018. The relationship between the two entities continued post-petition, with Blue-Grace continuing to arrange shipping services for Rancher's products. From the petition date, September

---

[1] In November 2019, Blue-Grace timely filed a smaller, general unsecured claim; that claim is wholly unrelated to the issues presently before the Court. Claims Register, Claim No. 11.

2

20, 2019, through July 30, 2020, the entities continued their operations, with Blue-Grace arranging for Rancher's shipping needs and Rancher's consistently and timely paying Blue-Grace's invoices.

In June 2020, one of the shipments went wrong ("the June 2020 shipment"). Blue-Grace arranged for one of its many contract carriers to haul a load of Rancher's product, and the carrier failed to timely deliver the product. The buyer rejected the product, resulting in damages to the estate of $126,800.00. Following this incident, Rancher's unsuccessfully attempted to work with Blue-Grace to resolve the issue. Meanwhile, the parties conducted their business as usual, with Blue-Grace arranging shipping services and billing Rancher's for those services. Blue-Grace invoiced Rancher's for post-petition services provided between July 31, 2020, and September 4, 2020, in the amount of $97,952.00. Rancher's opted to offset those invoiced amount against the $126,800.00 in damages it had sustained as a result of Blue-Grace's contract carrier's late delivery (this extrajudicial self-help remedy will be referred to herein as "Rancher's setoff action").

Blue-Grace attempted to resolve the damages issue with its contract carrier, but, to date, has been unsuccessful. On August 27, 2020, Blue-Grace sent a letter to Rancher's in which it purported to assign to Rancher's its claim and rights against the contract carrier. In response, Rancher's rejected the assignment and sent a letter on October 6, 2020, in which it explained its setoff action. There is nothing on the record to indicate that either party took any further action on the matter until more than four months later, when Blue-Grace filed its notices of appearance, administrative expense claim, and limited objection to the global settlement agreement.

At the February 25, 2021 hearing on the global settlement agreement, the Court granted expedited relief and approved the agreement, but also ordered that other than two specific payments, no distributions would be completed under the agreement until the resolution of the Blue-Grace administrative expense claim.

3

## DISCUSSION

Blue-Grace asserted and defended its priority claim for administrative expense under the standards of 11 U.S.C. § 503(b)(1)(A). As will be discussed herein, however, the unique facts of this case show that this is not an issue under 11 U.S.C. § 503(b)(1)(A). Rather, the facts on the record before the Court suggest this is an issue of whether a debtor-in-possession can assert a common law right to setoff in the ordinary course of business, and whether Rancher's, as debtor-in-possession, did so successfully. Still, because Blue-Grace attempted to assert its claim on the basis of 11 U.S.C. § 503(b)(1)(A), the Court will first address that section of the Code and its accompanying standards.

Administrative expenses under 11 U.S.C. § 503(b)(1)(A) are "actual, necessary" costs and expenses of preserving the estate post-petition. In re TransAmerican Nat. Gas Corp., 978 F.2d 1409 (5th Cir. 1992). In order to encourage creditors to extend credit to debtors in bankruptcy, thereby enabling the debtor to continue to conduct business and generate funds from which prepetition creditors can be paid, administrative claims are entitled to priority status under 11 U.S.C. § 507(a)(2). TransAmerican Natural Gas Corp., 978 F.2d at 1420. However, granting priority status to a post-petition expense – and thereby limiting the already-limited "pool" of resources to be distributed to creditors – is an action courts do not take lightly; the terms "actual" and "necessary" in 11 U.S.C. § 503(b)(1)(A) are interpreted strictly and narrowly in order to ensure preservation of the estate for the benefit of all creditors. In re Tama Beef Packing, Inc., 290 B.R. 90 (B.A.P. 8th Cir. 2003); In re Patch Graphics, 58 B.R. 743, 745 (Bankr. W.D. Wis. 1986); see also In re Baldwin-United Corp., 43 B.R. 443 (S.D. Ohio 1984). Therefore, when a party seeks priority status via an administrative expense claim, it carries the burden to prove by a preponderance of the evidence that it is entitled to such claim. In re Food Barn Stores, Inc., 175

B.R. 723 (Bankr. W.D. Mo. 1994). Similarly, a creditor claiming a post-petition administrative

claim for services rendered is entitled to that claim "only to the extent [the creditor] has benefitted

the debtor-in-possession in operating the business." United States v. Dewey Freight Sys., Inc., 31

F.3d 620 (8th Cir. 1994) (citing NLRB v. Bildisco & Bildisco, 465 U.S. 513 (1984)).

Bankruptcy courts have broad discretion to determine whether a claim is a proper

administrative expense and whether or not to allow the claim. Ford Motor Credit v. Bankr. Estates

of Benn, 462 B.R. 1, 5 (E.D. Mich. 2007); Nat'l Labor Relations Board v. Walsh (In re Palau

Corp.), 139 B.R. 942 (9th Cir. B.A.P. 1992), aff'd, 18 F.3d 746 (9th Cir. 1994). In making that

determination, courts have considered whether a creditor has proven that: (1) it has a claim against

the estate due to a transaction with the bankruptcy estate, and (2) the claim arose as a cost of

administration and conferred an actual and demonstrable benefit on the debtor's estate and

creditors. In re Athens/Alpha Gas Corp., 332 B.R. 578, 580 (8th Cir. B.A.P. 2005) (citing In re

Tama Beef Packing, Inc., 290 B.R. 90, 95 (B.A.P. 8th Cir. 2003)); Sanchez v. Nw. Airlines, Inc.,

659 F.3d 671, 677 (8th Cir. 2011). In other words, "[a] court must consider whether the expense

arose from a transaction with the estate and whether it tangibly benefitted the estate." In re

Athens/Alpha Gas Corp., 332 B.R. at 580 (citing In re Williams, 246 B.R. 591, 594 (B.A.P. 8th

Cir. 1999)); see also In re McK, Ltd., 14 B.R. 518, 520 (Bankr. D. Colo. 1981). Courts have applied

dramatically different standards for determining the appropriate application of each factor.

I.    **Serious questions remain as to Blue-Grace's ability to properly support its administrative expense claim under 11 U.S.C. § 503(b)(1)(A) – however, that is not the proper inquiry before the Court.**

At the outset, the Court notes that – on the record currently before it – there remain serious

issues with Blue-Grace's ability to establish both factors needed for a successful claim under 11

U.S.C. § 503(b)(1)(A). For example, there is nothing to indicate the actual value of the services

Blue-Grace provided to the estate. Blue-Grace itself stated that it finances all shipping costs for its customers by invoicing customers after receiving the shipping carriers' invoices. In other words, Blue-Grace's business model relies on paying its contract carriers directly before billing its own customers to be reimbursed for that payment.

Rancher's has questioned whether an administrative expense claim is proper where Blue-Grace itself did not provide the shipping services, or whether only part of Blue-Grace's claimed amount might be proper. Blue-Grace adamantly disagrees with this approach. However, while Blue-Grace wishes to be the point of contact for payment for all the services provided to the estate – indeed, it created a business model that requires such payment – it simultaneously wishes to be seen as only a third-party liaison between its customers and shippers, and therefore responsible for none of the liability or damages resulting from those services. This seems to the Court to be an attempt by Blue-Grace to both have its proverbial cake and eat it too.

Along the same lines, claims under 11 U.S.C. § 503(b)(1)(A) are judged by "the actual value received by the estate and not the cost incurred by the creditor." In re Patch Graphics, 58 B.R. at 746; see also In re Bellman Farms, Inc., 140 B.R. 986 (Bankr. D.S.D. 1991). Blue-Grace carries the burden of establishing that its services provided a "direct and substantial benefit" to the bankruptcy estate. While there appears to be no question that Blue-Grace's services throughout the pendency of the bankruptcy case generally provided a benefit, it also seems clear that, starting on the date of the June 2020 shipment (when Blue-Grace's contract carrier was late in delivering a shipment of the debtor's product, which caused that product to be rejected), the estate was operating with damages of $126,800.00 on its books. After that date, Blue-Grace's services provided the same benefit to the estate that they always had; the difference, however, is that due

to the damages sustained by the estate as a result of Blue-Grace's contract carrier's late delivery, there was no longer a *net* benefit to the estate from the services Blue-Grace provided.

The Eighth Circuit has not yet conclusively considered the specific issue of how damages fit into the equation when calculating allowable administrative expense claims or when determining whether those administrative expenses provided a "benefit" or tangible value. Some courts in other circuits have weighed in on the issue, but again, not conclusively, to the situation presented here. Many courts agree, however, that a debtor's objection to an administrative expense claim – and the debtor's supporting evidence for the same – are "relevant and must be considered in making [the] determination" of whether a creditor has met its burden to establish a proper administrative expense claim. In re TransAmerican 978 F.2d at 1419 (citing In re Gellert, 55 B.R. 90 (Bankr. D.N.H. 1985)). Nevertheless, the weight given that consideration varies among courts that have considered the issue.

However, despite the interesting legal issues raised by Blue-Grace's argument that its claim is properly brought under 11 U.S.C. § 503(b)(1)(A), the unique facts on the record in this case show that the Court need not reach or engage with these inquiries. Instead, the facts indicate that the proper inquiry is not whether Blue-Grace has an appropriately supported administrative expense claim under 11 U.S.C. § 503(b)(1)(A), but rather whether Rancher's, as debtor-in-possession, properly engaged in a common law setoff.

## II.    Setoffs can occur in a variety of situations, including in the ordinary course of business.

A debtor-in-possession has the responsibility to continue ongoing business operations post-petition, which it has the authority to do under 11 U.S.C. § 363(b)(1). An important aspect of that responsibility is retaining the leeway to continue to conduct transactions that are in the ordinary course of business without seeking court approval; this enables the debtor-in-possession to

7

continue its operations without excessive court intervention while still permitting creditors to object to transactions that may deplete the estate. In re Bridge Info. Sys., Inc., 293 B.R. 479, 486 (Bankr. E.D. Mo. 2003).

Courts have taken different approaches in determining when a transaction is in the ordinary course of business. Generally, courts use two different tests in making this determination, including a "horizontal" test and a "vertical" test. Pillar Capital Holdings, LLC v. Williams (In re Living Hope Sw. Med. Servs., LLC), 509 F.App'x 578, 583 (8th Cir. 2013). The "horizontal" test examines "whether the postpetition transaction is of a type that other similar businesses would engage in as ordinary business." Streetman v. United States (In re Russell), 187 B.R. 287, 292 (W.D. Ark. 1995). The "vertical" test asks whether interested parties would reasonably expect the debtor-in-possession to seek court approval before entering into the questioned transaction. Id.; In re Bridge Info., 293 B.R. at 486 (citing In re Crystal Apparel, Inc., 220 B.R. 816, 832 (S.D.N.Y. 1998)). Many courts consider the "horizontal" and "vertical" tests to be two prongs of one overarching inquiry. In re Russell, 187 B.R. at 292; In re Bridge Info., 293 B.R. at 486. Others have found that a transaction is in the ordinary course of business when it meets the requirements of either the horizontal *or* the vertical test. In re Living Hope, 509 F.App'x 583-84.

Still other courts have questioned the application of the horizontal test outside of very specific circumstances, arguing that on statutory interpretation grounds, the horizontal test is applicable only as to the ordinary course of business defense in the context of preference liability under 11 U.S.C. § 547(c)(2)(C). In re Husting Land & Dev., Inc., 225 B.R. 772 (Bankr. D. Utah 2000), aff'd 274 B.R. 906 (D. Utah 2002) (citing Garofalo's Finer Foods, Inc., 186 B.R. 414, 428-30 (N.D. Ill. 1995)). These courts have also found the horizontal test to be duplicative of the vertical test and difficult to apply; therefore, they turn to the vertical test only, referring to it as the

8

"creditor expectations/vertical dimension test." Id. In doing so, these courts consider the reasonable expectations of the interested parties, including whether a transaction subjects a hypothetical creditor to "economic risks of a different nature from those he accepted when he decided to extend credit." In re Husting, 225 B.R. at 778. If a transaction would be considered "unusual, controversial or questionable" for the debtor to undertake, even if the transaction is expected to be beneficial, creditors have a right to notice and hearing before the transaction occurs. Id. An underlying question in this inquiry is "whether a reasonable creditor would expect the debtor in possession to seek court approval before consummating the transaction based on the size and frequency of that transaction." In re Bridge Info., 293 B.R. at 486.

Setoffs occur in the ordinary course of business. The term "setoff" can be applied to many situations, but its basic premise is to permit mutually indebted entities to avoid "the absurdity of making A pay B when B owes A." Citizens Bank of Maryland v. Strumpf, 516 U.S. 16 (1995) (quoting Studley v. Boylston Nat. Bank, 229 U.S. 523 (1913)). Black's Law Dictionary defines a setoff as a "debtor's right to reduce the amount of a debt by any sum the creditor owes the debtor." Black's Law Dictionary (West 8th Ed. 2004).

The right of setoff is specifically addressed in the Bankruptcy Code in 11 U.S.C. § 553, which gives creditors a right to set off in certain circumstances. Id. Section 558, which grants the bankruptcy estate the benefit of any defense available to the debtor against other entities, has also been routinely and consistently interpreted to grant a debtor the right to assert setoff as an affirmative defense or counterclaim in the context of its bankruptcy case. State Bank v. Miller (In re Miller), 459 B.R. 657 (B.A.P. 6th Cir. 2011). Neither of these Bankruptcy Code sections creates a right of setoff; instead, the sections preserve a right of setoff as it exists under non-bankruptcy law. Id.

A party's ability to set off, therefore, must exist fully independently of the bankruptcy

context – or, for that matter, the judicial context – before it can be considered within those contexts:

> Aside from the definition of setoff as a type of counterclaim or affirmative defense
> applicable in court proceedings, the term also refers to the extrajudicial right of
> entities that owe each other money to apply their mutual debts against each other
> . . . The right of setoff entitles either party unilaterally to reduce the amount owed
> to the other party by the amount owed to the party exercising setoff.

In re Nat'l Hydro-Vac Indus. Servs., 314 B.R. 753, 764 (Bankr. E.D. Ark. 2004) (citing Strumpf,

516 U.S. at 18). In other words, while the concept of setoff sometimes operates within the confines

of the Bankruptcy Code, it simultaneously exists and operates completely outside of it.

A party may have a right of setoff established in common law, through a statutorily created

right of setoff, via a setoff right permitted in equity, or as a result of a valid and enforceable

contract. See Practical Law Commercial Transactions, "Setoff and Commercial Contracts" (2021).

In some instances, a party has a right of setoff where the amounts being set off are: (1) enforceable;

(2) matured, meaning the outstanding amounts are due; and (3) mutual, meaning the obligations

are between the same parties. Id. (citing Jordan v. Nat'l Shoe & Leather Bank, 74 N.Y. 467 (1878);

Jensen v. State Bank, 518 F.2d 1, 5 (8th Cir. 1975); In re Luongo, 259 F.3d 323, 334 (5th Cir.

2001)). Subject to specific state law exceptions, the claims being set off generally do not need to

arise out of the same transaction. Id. Specific state law requirements can also provide further

guidance about the right of setoff. Feltman v. Noor Staffing Group (In re Corporate Resource

Services, Inc.) 564 B.R. 196, 200 (Bankr. S.D.N.Y. 2017).

Minnesota law, for example, recognizes an equitable right of setoff in addition to any

contractual right of setoff. Minnesota Voyageur Houseboats, Inc. v. Las Vegas Marine Supply,

Inc., 708 N.W.2d 521, 525 (Minn. 2006) (citing Nietzel v. Farmers & Merchs. State Bank of

Breckenridge, 307 Minn. 147, 152–53, 238 N.W.2d 437, 440 (1976)).

Section 2-717 of the UCC, which has been adopted by Minnesota as Minn. Stat. § 336.2-717, also provides a statutorily created right of setoff:

> The buyer on notifying the seller of [the buyer's] intention to do so may deduct all or any part of the damages resulting from any breach of the contract from any part of the price still due under the same contract.

UCC § 2-717; Minn. Stat. 336.2-717. Courts can also impose setoff as an equitable remedy where setoff is not otherwise available, but equity is necessary to prevent wrong and injustice. See Practical Law Commercial Transactions, "Setoff and Commercial Contracts" (2021). Contractually granted setoff rights are sometimes included in agreements among parties to expand the limited setoff rights granted under common law and state statute. Id.

Common law setoff is a routine practice in the banking industry and in many business relationships, without the involvement of any court. It is available as a unilateral option a party may take without agreement from the other party. Strumpf, 516 U.S. at 19. When this kind of situation occurs, setoff exists as a self-help action that does not require court approval. Id. In order to successfully complete this kind of setoff, a party must: (1) make the decision to set off, (2) take a binding and overt action to accomplish the setoff, and (3) record the setoff, all with an intent to permanently settle accounts. Strumpf, 516 U.S. at 19; Normand Josef Enterprises, Inc. v. Connecticut National Bank, 230 Conn. 486, 506 (1994).

In the present case, the parties appear to address setoff in the context of its use as an affirmative defense. However, the kind of setoff that occurred in this case was not an affirmative defense, and it did not fall under the setoffs provided for in sections 553 or 558 of the Bankruptcy Code – it was the kind of common law, self-help setoff that exists independently of the bankruptcy context. Rancher's, as the debtor-in-possession, validly completed the setoff at issue in the ordinary course of business many months prior to when Blue-Grace filed its motion for

administrative claim for the amount that had been set off. If Rancher's had not already completed the setoff of the amount in question and had raised the issue of setoff only in the context of Blue-Grace's motion for administrative expense, this would be a very different analysis, requiring a different body of case law and different procedural rules and requirements – including, for example, the application of Rule 7008, incorporating Fed. R. Civ. P. 8, regarding notice requirements for affirmative defenses. See, e.g., In re Chester County Plastics, Inc., 174 B.R. 41 (Bankr. E.D. Pa. 1994).[2]

However, that is not the situation before the Court; the funds that Blue-Grace is attempting to claim as an administrative expense have already been "paid" and accounted for through Rancher's completed setoff action. Indeed, some courts have found that "[t]he use of setoff rights does not operate as a denial of [a creditor's] claim; it reduces or eliminates the amount actually paid on account of the claim . . . [the creditor] will receive the equivalent of a payment because its own debt will be extinguished to that amount." In re PSA, Inc., 277 B.R. 51 (Bankr. D. Del. 2002) (finding it unnecessary to require the debtor to engage in a separate action to pursue its claim).

### a. Setoff occurred in the ordinary course of business.

In the present case, after a long history of positive and productive business relationships between the parties both pre- and post-petition, Rancher's, as debtor-in-possession, sustained damages as a result of the June 2020 shipment when Blue-Grace's contracted shipping carrier was late in delivering a shipment of Rancher's product. Blue-Grace and Rancher's continued their business relationship as usual after this incident. Blue-Grace subsequently invoiced Rancher's for

---

[2] The Court similarly notes that while the parties addressed recoupment in their pleadings, the Court does not reach the question of whether application of that doctrine would be appropriate for the same reason it does not reach the question of whether setoff in the context of 11 U.S.C. §§ 553 or 558 would be appropriate: the business transactions at issue occurred many months before Blue-Grace brought this motion for administrative expense, and they consisted of transactions in the ordinary course of business. Therefore, determining the application of affirmative defenses or counterclaims to Blue-Grace's administrative expense motion is not an issue the Court reaches at this time, because it finds that an administrative claim is an inappropriate remedy under the facts presented.

thirty shipments of the debtor's products. In response, Rancher's opted to unilaterally exercise its right to set off the invoiced amounts against the damages Rancher's incurred as a self-help remedy established in common law and equity.

The parties each acknowledge that the estate sustained a loss of $126,800.00 as a result of the late June 2020 shipment. As will be further explained herein, the parties also each made it clear through their subsequent actions that they believed Rancher's could appropriately seek reimbursement for its damages from Blue-Grace. Rancher's action included engaging in the setoff. As was discussed previously, in order to effectively take that setoff action, Rancher's needed to: (1) make the decision to set off, (2) take a binding and overt action to accomplish the setoff, and (3) record the setoff, with an intent to permanently settle the accounts. Rancher's accomplished these tasks and completed its setoff when it sent its October 6, 2020 letter to Blue-Grace, in which it stated:

> Rancher's sustained damages as a result of the incident in the amount of $126,800, prior to addition of attorneys' fees and other costs of collection. Prior to the drafting of this letter, Rancher's has withheld payment on a number of separate invoices from Blue Grace; in aggregate these invoices total $97,952.00. After offsetting the open invoices, Blue Grace owes Rancher's a balance of $28,848.00 before any additional legal and other costs are assessed.

ECF No. 348, Ex. D. Rancher's subsequently opted against further pursuing the $28,848.00 "for practical reasons, including costs of litigation," ECF No. 356, but made clear in the October 2020 letter that it had decided to set off the amounts it owed to Blue-Grace against the damages it sustained from the June 2020 shipment. It also referenced the specific actions it had already taken to accomplish the setoff, and – through the letter – recorded the setoff and showed an intent to permanently settle the accounts as to the $97,952.00 at issue in the motion presently before the Court.

Blue-Grace claims that the sum Rancher's set off needed to be reduced to judgment before Rancher's could engage in a setoff action. The cases Blue-Grace cited to support this argument, however, involved situations in which setoff was raised as an affirmative defense and in which the definite amount claimed by the debtor had not been established. Here, setoff is not being considered in the context of an affirmative defense, and the amount at issue is definite and has been acknowledged by both parties. The Bankruptcy Code defines a "debt" as a "liability on a claim" under 11 U.S.C. § 101(12). In turn, 11 U.S.C. § 101(5)(A) defines a "claim" as "a right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." Courts have interpreted this to mean that a claim arises when the right to payment accrues, not when payment is due, and that a debt arises for setoff purposes when "all transactions necessary for liability occur." See, e.g., United States v. Gerth, 991 F.2d 1428 (8th Cir. 1993) (discussing setoffs in the context of status upon filing). Therefore, the fact that Rancher's had not reduced its claim to judgment is of no consequence – particularly because the parties have each acknowledged the $126,800.00 dollar amount of the damages resulting from the late shipment.

Blue-Grace's actions likewise showed that it believed Rancher's could appropriately seek reimbursement from Blue-Grace for the damages it sustained. Blue-Grace's business model relies on its ability to create and maintain relationships with shipping carriers. As a result, Blue-Grace's business operations were designed to ensure that its customers and carriers have no relationships with each other. This is perhaps most apparent from the language in Blue-Grace's Terms and Conditions: "Payments to Company [Blue-Grace] must be made pursuant to the invoices generated by [Blue-Grace] and provided to Customer [Rancher's]. If [Rancher's] receives an invoice directly from a Servicing Carrier it shall immediately forward such invoice to [Blue-Grace] and shall not

14

otherwise make payment on the invoice to the Servicing Carrier." ECF No. 348, Ex. D, Section 3(f). When the June 2020 product shipment was rejected by the intended customer, Blue-Grace sought reimbursement for that claim from its contracted shipment carrier. When it was unsuccessful in recovering on that claim, it attempted to assign its rights to that claim to Rancher's in its August 27, 2020 letter, in which it stated that it had "made numerous attempts to resolve this freight claim with the Carrier and/or its cargo insurance provider" but had been unsuccessful. ECF No. 356, Ex. 1.

There is no dispute that Rancher's contracted with Blue-Grace to provide services in the form of arranging shipment of Rancher's products; how Blue-Grace performed those services was left to Blue-Grace's business discretion. In order to perform its duties under its agreement with Rancher's, Blue-Grace contracted with its service carriers. No information has been provided to the Court concerning the specific terms of Blue-Grace's contract with the carrier at issue in this matter, but when Blue-Grace attempted to assign its claim against the carrier to Rancher's, it effectively acknowledged that it (1) had a claim against the carrier (which it had been unsuccessfully pursuing) and (2) believed the assignment was necessary for Rancher's to be able to pursue the claim. Id.

Thus, both parties acted in ways that demonstrated they believed Rancher's option for recovery was to rely on Blue-Grace to pursue Blue-Grace's claim against its contracted shipping carrier. It is perhaps unsurprising, then, that after Blue-Grace attempted to assign its claim to Rancher's, Rancher's rejected the assignment, and Rancher's successfully completed and informed Blue-Grace of its setoff action, the parties took no further action based on the record before the Court.

**b. Blue-Grace failed to raise any objections to Rancher's setoff action.**

To the extent Blue-Grace believed it had any rights concerning this exchange, it appears to have sat on them, doing nothing to challenge or in any way respond to Rancher's setoff action until more than four months later, when Rancher's was on the eve of gaining expedited Court approval of a hard-earned global settlement agreement (ECF No. 344).

The settlement agreement proposed to resolve Rancher's acrimonious case, which had been pending for well over a year without a confirmed plan of reorganization. During its pendency, the case weaved through two adversary proceedings: No. 19-03102, which the relevant parties voluntarily dismissed, and No. 19-03095. In the latter proceeding, Adv. No. 19-03095, this Court entered a judgment concerning the secured status of one of Rancher's main creditors ("Ratcliff") and entered an order denying that creditor's motion for summary judgment. (Adv. ECF Nos. 31 and 32). Simultaneously, in the main chapter 11 case, this Court entered an order denying the creditor's motion for adequate protection. (ECF Nos. 165 and 167). Ratcliff appealed these orders to the U.S. District Court in May 2020. (Dist. Ct Nos. 20-CV-834 and 20-CV-835). Rancher's subsequently proposed a sale of substantially all of its assets under 11 U.S.C. § 363(b). Ratcliff moved for a stay of this Court's orders concerning his liens, arguing that he had a right to credit bid at the Rancher's sale, and if the sale proceeded without his ability to exercise that right, the sale would moot his appeal. ECF No. 222. This Court denied Ratcliff's motion to stay (ECF No. 236) and approved Rancher's preliminary sale and bidding procedures motion (ECF No. 237). Ratcliff appealed these orders as well, 20-CV-1343. The District Court[3] granted Ratcliff's motion for stay pending appeal, contingent upon Ratcliff posting a supersedeas bond in the amount of

---

[3] The Honorable Nancy E. Brasel, United States District Court, District of Minnesota.

$6,000,000.00 within two days of the date of its opinion. ECF No. 260. Ratcliff failed to post the bond, the sale occurred, and the parties agreed to mediation.

Despite the long, tortured, and acrimonious background presented by the history of this case, the parties successfully reached their unquestionably hard-earned global settlement agreement. Throughout the intervening months while these negotiations were occurring, Blue-Grace remained silent. It was only once the agreement was filed – with no other objections by any party – and was on the eve of approval, that Blue-Grace decided to take action. It was against this backdrop that Blue-Grace suddenly decided to attempt to unearth events that had occurred and concluded months before, filing its motion for administrative expense (ECF No. 348) and corresponding limited objection to the compromise (ECF No. 349), as a means to challenge Rancher's setoff action from the previous year.

### c.   Rancher's setoff action was in the ordinary course of business.

In order to determine whether the setoff was in the ordinary course of business, the Court must first consider whether to apply one or both of the "horizontal" and "vertical" tests. As indicated from the fact that a right of setoff is a common law right, and also from the plethora of cases addressing situations in which parties engaged in a setoff action, setoffs are common in the business world and the shipping industry. However, the parties did not present information concerning this inquiry on the record.

Turning to the "creditor's expectations/vertical dimensions" test provides more clarity. As has been discussed extensively herein, setoffs are common in a very wide variety of instances and contexts. In this specific situation, the debtor's ability to implement its common law right of setoff preserved the value of the estate for the benefit of all creditors and addressed a damages problem that would have otherwise likely required the debtor-in-possession to expend extensive litigation

costs to recover – if, indeed, Rancher's would have even had standing to do so, given that it was Blue-Grace that held the claim against the shipper. In this instance, when the *debtor* exercised its right of setoff in the ordinary course of business, that action did not subject a hypothetical creditor to economic risks of a different nature from those it accepted when extending credit, and a reasonable creditor would not have expected the debtor-in-possession to seek court approval before consummating the transaction.

Therefore, Rancher's took effective actions to set off, and its setoff was conducted in the ordinary course of business; the setoff action occurred completely outside the robust body of caselaw addressing setoff in the bankruptcy context as an affirmative defense to a motion for administrative expense claim.[4] Rather, the setoff occurred in the ordinary course of business months before Blue-Grace filed its motion for administrative expense, which it did ostensibly to recover the amount that had already been set off.[5] As a result, Rancher's, as debtor-in-possession, did not need to seek either Court approval or agreement among the parties to engage in the setoff – it could do so unilaterally and extrajudicially.

---

[4] It is for this reason that the Court declines to engage in a discussion of the requirements for setoff in the bankruptcy context, including the "mutuality" requirement that has been discussed extensively, particularly in the context of 11 U.S.C. § 553. Put simply, the setoff Rancher's enacted was not that kind of setoff – instead of being a type of transaction contemplated by and addressed through the Bankruptcy Code, it was the type of transaction that occurs in the ordinary course of business.

[5] Interestingly, because of the unique facts of this case – including that the transactions giving rise to this motion occurred several months before Blue-Grace took issue with them – it is possible that Blue-Grace's motion could be considered a request for *nunc pro tunc* relief. While a period of several months in other circumstances may not raise this issue, in the present case, there is nothing on the record to indicate that Blue-Grace took any steps whatsoever to challenge or oppose Rancher's setoff action after it was completed. It was only many months later, on the eve of approval of Rancher's global settlement agreement, that Blue-Grace brought the motion before the Court. When it did so, it ignored Rancher's setoff action that was completed several months prior, and instead brought a new administrative expense claim. To the extent that this motion can be interpreted as a request for *nunc pro tunc* relief, the Court is bound by the Supreme Court's decision in <u>Roman Catholic Archdiocese of San Juan v. Acevedo Feliciano</u>, 140 S. Ct. 696 (2020): "nunc pro tunc orders are not some Orwellian vehicle for revisionist history— creating facts that never occurred in fact. Put plainly, the court cannot make the record what it is not." <u>Id.</u> at 700-01.

### III.    Blue-Grace's argument that its purported contract with Rancher's prevents setoff is unconvincing.

Blue-Grace argues that it bears no responsibility for the rejection and resulting damages from the June 2020 shipment, since the late delivery occurred "[t]hrough no fault or negligence" of Blue-Grace, Blue-Grace never invoiced the debtor for the shipment, and the debtor never paid any fees to Blue-Grace related to the shipment. Blue-Grace further claims it cannot be responsible for the damage because its purported contract with Rancher's, which was not approved by the Court and which the parties apparently entered into prepetition, states:

> [Blue-Grace] shall have no liability for cargo loss, damage, destruction, or delay ("Cargo Claims") except to the extent such Cargo Claims are solely caused by [Blue-Grace's] negligent acts or omissions. The liability of [Blue-Grace] for such claims shall be limited to the fees paid by [Rancher's] to [Blue-Grace] related to the transaction giving rise to the claim.

ECF No. 348, Ex. B, Terms and Conditions, Section 5(a). However, by its own business model and agreements on the record, and by preventing Rancher's from having meaningful contact or business relationships with any of the carriers, Blue-Grace ensured that Rancher's had very limited options to recover damages against the Blue-Grace carriers. For example, Rancher's had no authority or input as to the carrier Blue-Grace directed to provide services. Blue-Grace included the following in its Terms and Conditions: "Payments to [Blue-Grace] must be made pursuant to the invoices generated by [Blue-Grace] and provided to [Rancher's]. If [Rancher's] receives an invoice directly from a Servicing Carrier it shall immediately forward such invoice to [Blue-Grace] and shall not otherwise make payment on the invoice to the Servicing Carrier." Id. at Section 3(f).

Additionally, Blue-Grace's argument assumes the purported contract is valid and enforceable. The parties appear to agree that they entered into the purported contract pre-petition. However, there is nothing on the record to confirm this is what occurred. The purported contract at issue is presented at ECF No. 348, Ex. B. Notably, it contains no date, reference to specific

parties, or signatures. Both parties acknowledge that this "contract," which is actually just four pages of Terms and Conditions, was incorporated by reference as part of Rancher's Account Application when the entities began their business relationship in April 2018. Rancher's has not contested that this is the contract the parties were operating under when they entered into the transaction that resulted in the June 2020 shipment damages, but the Court has nothing to show that this is a valid and enforceable contract.

Even if the contract is valid and enforceable, it was apparently entered into pre-petition and may be an executory contract under 11 U.S.C. § 365. Executory contracts present an area of law described as a "thicket where . . . lurks hopelessly convoluted and contradictory jurisprudence." In re Drexel Burnham Lambert Group, Inc., 138 B.R. 687, 690 (Bankr. S.D.N.Y. 1992). At the core, executory contracts are contracts under which performance remains due on both sides, to the extent that any party's failure to perform would be a material breach excusing performance of the other party. In re Speck, 798 F.2d 279, 279-80 (8th Cir. 1986). An unassumed executory contract is not enforceable against a chapter 11 debtor-in-possession. United States v. Dewey Freight Sys., Inc., 31 F.3d 620 (8th Cir. 1994).

Absent the appointment of a chapter 11 trustee, 11 U.S.C. § 1107 grants a chapter 11 debtor-in-possession the same rights and powers as a trustee serving in the case. Under 11 U.S.C. § 365(d)(2), therefore, a debtor-in-possession exercising the same rights and powers as a trustee "*may* assume or reject an executory contract . . . of the debtor at any time before the confirmation of a plan" (emphasis added). While a party to an executory contract may request that the Court order the debtor-in-possession to determine the treatment of its specific contract, the Code is otherwise permissive on this issue; a chapter 11 debtor-in-possession is not required to assume or reject such a contract. 11 U.S.C. § 365(d)(2). If a debtor-in-possession breaches an executory

contract, then the contract might be considered rejected. <u>See, e.g.</u>, <u>In re Airlift Intn'l, Inc.</u>, 761 F.2d 1503 (11th Cir. 1985). If rejected, an administrative priority claim is deemed to have "arisen before the date of the filing of the petition" under 11 U.S.C. § 502, meaning the administrative claimant holds only an unsecured claim. <u>Id.</u> Further, a debtor-in-possession cannot assume a contract through actions alone; under 11 U.S.C. § 365, the debtor-in-possession's power to assume or reject is subject to explicit court approval. <u>In re Univ. Medical Ctr.</u>, 973 F.2d 1065 (3d Cir. 1992).

It is unclear from the record before the Court whether the purported contract between Rancher's and Blue-Grace could be considered executory. However, even if the purported contract at issue here is a non-executory, post-petition contract, and even if, for the sake of argument, the Court considers it completely valid despite the problems identified here – including its lack of date, parties, or signatures – the purported contract on the record, by its own terms, could not prevent Rancher's setoff action. The purported contract, as it appears on the record at ECF No. 348, Ex. B, states the following:

3. <u>Rates and Payment</u>.

[ . . . ]

h. Any claim related to invoicing by Company must be filed within one hundred eighty (180) days of the date of Company's invoice. Failure to do so will result in waiver by Customer of any claim related to invoiced amounts, including but not limited to claims for overcharge or duplicate invoices. In no event shall a Customer be entitled to offset or deduct any claim it may have against any amounts payable to Company or the Servicing Carrier without the express written consent of Company.

Arguing that the purported contract prevents Rancher's from having a legal right of setoff, Blue-Grace emphasizes the following portion of subsection (h): "In no event shall a Customer be entitled to offset or deduct any claim it may have against any amounts payable to Company or the

Servicing Carrier without the express written consent of Company." However, there are two issues with Blue-Grace's argument.

First, when taken in the context of its subsection (h), the following subsection (i), and the broader section 3, the sentence does not prohibit the setoff of one debt against another in the kind of context at issue here. Instead, the context shows that the language refers to claims a customer has against Blue-Grace related to *invoicing*. Section 3 is labeled "Rates and Payment," and subsection (h) addresses situations in which a customer wishes to challenge invoicing information provided by Blue-Grace. The contract provides examples for these kinds of situations, including if a customer wishes to claim that Blue-Grace overcharged it or provided it with duplicate invoices. In other words, the kinds of situations covered by this part of the Terms and Conditions include a customer's ability to unilaterally set off its claims *concerning Blue-Grace's accounting or billing errors* against the amounts payable to Blue-Grace.

Second, in order for Blue-Grace's quoted sentence to apply to all setoffs, the sentence would have required a different grammatical construction, including a parenthetical element designated by commas or parentheses. If the contract had been drafted that way, it would read as follows: "In no event shall a Customer be entitled to offset or deduct any claim it may have, against any amounts payable to Company or the Servicing Carrier, without the express consent of Company." If the contract had been drafted that way, the sentence could have been correctly read to say, "In no event shall a Customer be entitled to offset or deduct any claim it may have without express consent of Company." In that instance, the parenthetical element "against any amounts payable to Company or the Servicing Carrier" would be extraneous information that could be removed without changing the essential meaning of the sentence; that Blue-Grace's customers were prevented from setting off *any claim* it may have.

22

Without the commas to indicate that the phrase "against any amounts payable to Company or the Servicing Carrier" is a parenthetical element, that phrase becomes essential to the meaning of the sentence, and changes its meaning entirely. As it is actually written, the sentence reads as follows: "In no event shall a Customer be entitled to offset or deduct *any claim it may have against any **amounts payable** to Company or the Servicing Carrier* without the express written consent of the Company" (emphasis added). Thus, by its own language, subsection (h) addresses claims a customer might have against amounts payable – invoicing, accounting, and billing errors – not *any* claims in general that a customer might have against Blue-Grace.

The context provided from the specific language used in the other parts of subsection (h) bolsters this plain language interpretation; other parts of the subsection reference "Any claim related to invoicing by Company" and "any claim related to invoiced amounts." There is nothing in the section to indicate that it applies beyond claims a customer may have concerning whether Blue-Grace's invoicing or accounting were incorrect. Further, to the extent this sentence is ambiguous, it is a fundamental principle of contract interpretation that ambiguity is to be construed against the drafter. Klapp v. United Insurance Group Agency, Inc., 468 Mich. 459 (2003). In the present case, that means any ambiguity is to be construed against Blue-Grace.

Therefore, the purported contract at issue here could not prevent Rancher's setoff action. The contract was never presented for Court approval, and to the extent it could be interpreted to prevent a valid setoff action, it still fails because: (1) an unassumed pre-petition contract is unenforceable against a chapter 11 debtor, and (2) equity demands denial of Blue-Grace's attempts to enforce the purported contract as a means to settle its invoiced amounts a second time through its administrative expense claim.

**IV.    Equity demands denial of Blue-Grace's administrative expense claim.**

Bankruptcy courts are courts of equity, and have broad equitable powers to prevent abuse of the bankruptcy system. <u>Marrama v. Citizen's Bank of Massachusetts</u>, 549 U.S. 365 (2007). Bankruptcy courts are granted these inherent equitable powers under 11 U.S.C. § 105(a), but they may not contravene express provisions of the Bankruptcy Code in enacting those powers. <u>Law v. Siegel</u>, 571 U.S. 415 (2014). In other words, bankruptcy courts are prohibited from "using their discretionary powers to reach results that are inconsistent with the clear meaning of the Bankruptcy Code." <u>In re Brown</u>, 851 F.3d 619, 625 (6th Cir.), <u>cert. denied</u>, <u>sub nom.</u> Brown v. Ellmann, 138 S.Ct. 328 (2017).

Due to the unique factual circumstances of the issue before the Court, *granting* Blue-Grace's administrative expense claim would contravene express provisions of the Bankruptcy Code. As has been discussed herein, the motion before the Court is not really an administrative expense claim at all; rather, it is an attempt by a creditor to receive payment on an invoice that the debtor-in-possession already settled in the ordinary course of business via a common law right of setoff. Notably, outside of the funds it claims here, Blue-Grace has been timely paid for all the services it has provided to the debtor-in-possession throughout the long pendency of this bankruptcy case. The $97,952.00 it now claims is for funds that Blue-Grace paid to its contract carriers on Rancher's behalf, and which Rancher's opted to set off against the $126,800.00 in damages it sustained as a result of the actions of one of Blue-Grace's contract carriers. Both parties' actions show that they understood Blue-Grace to be the entity with the ability to recover the $126,800.00 from its contract carrier; Blue-Grace pursued the claim unsuccessfully before attempting to assign that claim to Rancher's after specifically preventing Rancher's from having it to begin with. Blue-Grace thereby presented the debtor-in-possession with a quandary.

24

Rancher's could have opted to accept the assignment, which would have required significant additional expense to the estate to pursue. If it had taken this option, Rancher's would have diminished the already-limited pool of funds available to all creditors, and would have engaged in an action that almost certainly would have required Court approval.

The alternative option available to Rancher's, and the one it took, was to reject the assignment, leaving the claim – and the onus to recover under it – with Blue-Grace, and preserving the value of the estate. By rejecting the assignment of the claim, Rancher's preserved the status quo that Blue-Grace had created from the beginning of the entities' business relationship; only Blue-Grace, as the third-party liaison between its customers and its shippers, had the right in their relationship to engage with the contract carriers. That status quo applied not only to Blue-Grace's insistence on preventing any direct payments or business dealings between Rancher's and the carriers that were shipping its products, but also applied – despite Blue-Grace's claims to the contrary – to whichever entity had a claim against Blue-Grace's contract carriers if something went wrong with a shipment; that entity, in both logic and equity, was Blue-Grace.

After preserving the status quo, Rancher's took action in the ordinary course of business to settle its accounts with Blue-Grace by engaging in the routine action of setoff. In doing so, and as is true of all setoffs, Rancher's essentially "paid" the amounts in Blue-Grace's invoice by settling them against the damages Rancher's sustained as a result of the June 2020 shipment. On the record before this Court, Blue-Grace did not object to this routine treatment. By its own creation, Blue-Grace's remedy to recover the amounts Rancher's set off is to pursue the claim it has against its contract carrier. Its remedy is *not* to suddenly unearth ordinary and routine transactions from many months before, on the eve of approval of the debtor-in-possession's global settlement agreement. Nor is its remedy to relabel those transactions in an attempt to get paid from the estate (thereby

reducing recovery for all the unsecured creditors), and attempt to avoid the inconvenience of pursuing the claim it has already admitted to having against its own contract carrier. In fact, because of the way Blue-Grace set up its business operations, it is possible that Blue-Grace could recover twice on this amount if its administrative expense claim is granted; Blue-Grace would likely still have a valid claim against its contract carrier concerning the $126,800.00 in damages, notwithstanding the amounts invoiced to Rancher's.

If the Court permitted Blue-Grace to engage in these actions, it would reach a result that would not only be inconsistent within the clear meaning of the Bankruptcy Code, but would also contravene the Code's express provisions. The Bankruptcy Code incorporates fundamental principles such as equal treatment of similarly situated creditors and the preservation of a reorganizing debtor's assets, and the Code's underlying tenets also provide for a very narrow interpretation of allowable administrative expense claims, as has been discussed herein. Administrative expense claims are subject to strict interpretation as added protection for the estate and all creditors: "By limiting priority to those claims that are actual and necessary, the Code prevents the estate from being consumed by administrative expenses, and preserves the estate for the benefit of the creditors. Chapter 11 is intended to rehabilitate the debtor and avoid forfeiture by creditors." In re Marcal Paper Mills, Inc., 650 F.3d 311, 315 (3d Cir. 2011). It is for this reason that the burden lies on the party asserting the administrative expense claim to show that the expense deserves administrative priority. Id. Additionally, "the focus on allowance of administrative claims which enjoy a priority over other creditors is to prevent unjust enrichment of the estate. It is *not* to compensate the creditor [for its loss]." In re Am. Plumbing & Mechanical, Inc., 323 B.R. 442, 462 (Bankr. W.D.Tex. 2005) (citing In re R.H. Macy & Co., Inc., 170 B.R. 69, 78 (Bankr. S.D.N.Y. 1994).

Here, granting Blue-Grace's administrative expense claim would consume a significant portion of the pool of resources available for unsecured creditors – and from which they would all otherwise benefit. If the claim is denied, there will be no unjust enrichment of the estate – on the contrary, denying the claim will preserve the status quo, and Blue-Grace will continue to be able to seek a remedy for its losses by bringing a claim against its contract carrier. Given the unique facts of this case, the Court finds that Blue-Grace has not met its burden to show that its claim deserves administrative priority – in fact, it has not proved to the Court's satisfaction that its claim qualifies as an administrative expense claim at all, rather than an attempt to recover funds for which it has already accepted settlement and payment via setoff. Denying Blue-Grace's motion aligns with the fundamental, underlying, and express tenets and provisions of the Bankruptcy Code.

## CONCLUSION

Setoffs occur regularly in the ordinary course of business, and debtors-in-possession are permitted to engage in actions that are in the ordinary course of business without court approval. That is precisely what occurred here; Rancher's opted to use its common law right to set off the amounts in Blue-Grace's invoice against the amount of damages Rancher's sustained as a result of Blue-Grace's shipping contractor's late delivery. Rancher's setoff action was conducted in the ordinary course of business and remained the status quo for many months before Blue-Grace suddenly attempted to challenge it on the eve of approval of a global settlement agreement. Contrary to Blue-Grace's arguments, even if the purported contract on the record is valid, enforceable, and non-executory, the document's own terms make it inapplicable to Rancher's setoff action. Further, based on the specific facts of this case, and in conformity with the underlying

principles of the Bankruptcy Code, equity demands denial of Blue-Grace's administrative expense claim.

Accordingly, **IT IS HEREBY ORDERED**:

1. Blue-Grace's motion for payment of administrative expense claim is **DENIED**.

2. The $97,952.00 held in reserve pursuant to the Court's Order Granting Expedited Motion for Order Approving Global Settlement Pursuant to Bankruptcy Rule 9019, at ECF No. 353, shall be distributed in accordance with the remainder of that Order and the Global Settlement Agreement.

Dated:  *June 3, 2021*

*/e/ Michael E. Ridgway*

Michael E. Ridgway
Chief United States Bankruptcy Judge

NOTICE OF ELECTRONIC ENTRY AND
FILING ORDER OR JUDGMENT
Filed and Docket Entry made on *06/03/2021*
Lori Vosejpka, Clerk, by MJS